94278

1

```
 1

 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 3    99CV0772
      ----------------------------------------x
 4    KENNETH WYNDER,
                                   Plaintiff,
 5          - against -
      JAMES McMAHON, DAVID SPAHL, ROBERT JONES,
 6    LOUIS B. BARBARIA, CRAIG MASTERSON, JOSH
      KEATS, Individually, and JOHN DOE
 7    employees One through Ten of the NEW YORK
      STATE POLICE who violated the
 8    Constitutional Rights of Plaintiff while
      operating under Color of law or direction
 9    from named Defendants,
                                   Defendants.
10    ----------------------------------------x
                                   April 12, 2005
11                                 11:30 a.m.

12

13

14          Deposition of KENNETH N. WYNDER,

15    JR., taken by the Defendants, pursuant to

16    Notice, held at the offices of New York

17    State Attorney General, 120 Broadway, New

18    York, New York, before Tammy O'Berg, a

19    Shorthand Reporter and Notary Public of

20    the State of New York.

21

22

23

24

25
```

2

1

94278

2    A P P E A R A N C E S:

3

4        RICHARD J. MERRITT, ESQ.

5        Attorney for Plaintiff

6            2 Birs  Avenue

7            Lindenhurst, New York 11757

8

9

10

11

12        STATE OF NEW YORK

13        Office of Attorney General

14        Eliot Spitzer

15        Attorneys for Defendants

16            120 Broadway

17            24th Floor

18            New York, New York 10271

19        BY:   SUSAN H. ODESSKY, ESQ.

20

21

22

23

24

25

                                                    3

1

2            S T I P U L A T I O N S

3

4            IT IS HEREBY STIPULATED AND

94278

5   AGREED by and between the Attorneys for

6   the respective parties hereto that filing

7   and sealing be and the same are hereby

8   waived.

9          IT IS FURTHER STIPULATED AND

10  AGREED that all objections except as to

11  the form of the question, shall be

12  reserved to the time of the trial.

13         IT IS FURTHER STIPULATED AND

14  AGREED that the within examination may be

15  signed and sworn to before any notary

16  public with the same force and effect as

17  though signed and sworn to before this

18  Court.

19         *       *       *

20         MS. ODESSKY:  Can you mark this,

21  please.

22         (Third amended complaint marked

23  Defendants' Exhibit A for identification.)

24  K E N N E T H  N.  W Y N D E R, JR.

25  Having first been duly sworn by a Notary

4

1

2   Public of the State of New York, was

3   examined and testified as follows:

4   EXAMINATION BY

5   MS. ODESSKY:

6      Q.    Please state your name for the

7   record.

Page 3

94278

8      A.     Kenneth N. Wynder, Jr.

9      Q.     Where do you reside?

10     A.     519 Thomas Street, Stroudsburg,

11     Pennsylvania 18360.

12     Q.     Good morning, Mr. Wynder.  As

13     you know, I'm an Assistant Attorney

14     General in the Office of the New York

15     State Attorney General, and I represent

16     the defendants in this matter.

17            Mr. Wynder, have you been

18     deposed before?

19     A.     No.

20     Q.     I'm just going to go over some

21     of the ground rules with you.  I believe

22     that your attorney, Mr. Merritt, I'm sure

23     has spoken to you already about these, but

24     I'll just review them briefly.

25            The court reporter is here

5

1                  WYNDER

2      obviously recording my questions and your

3      answers.  Please try to answer as clearly

4      as possible and try to speak in words

5      rather than using gestures, such if you

6      want to say yes, use the word "yes" rather

7      than nodding your head, because it's hard

8      for her to take down gestures.

9            Please try to wait for me to

10     finish my question before you answer.  And

94278

11    I'll try to do the same for you; if you

12    are answering, I'll try not to cut you

13    off.

14             Please let me know, if I by

15    mistake interrupt your answer.  Let me

16    know because I want you to give a complete

17    answer.

18             Do you understand?

19        A.    Yes.

20        Q.    Let me know if you need to take

21    a break or if you need time to consult

22    with your attorney, and at an appropriate

23    time we can take a short break for lunch.

24             MS. ODESSKY:  I note for the

25    record now that we're starting and it's

                                                    6

1                 WYNDER

2    slightly after 11:30.

3        Q.    Mr. Wynder, if I ask you

4    something and you don't understand my

5    question, don't answer it.  Just tell me

6    you don't understand it and I'll be happy

7    to try to rephrase it.  Okay?

8        A.    Okay.  Yes.

9        Q.    If you answer my question, then

10   I'll assume that you understood it.

11   Agreed?

12        A.    Yes.

13        Q.    Are you currently taking any

94278

14    medication?

15        A.    Yes.

16        Q.    What medication are you taking?

17        A.    Buford (phonetic) -- it's like a

18    sedative to help me sleep.

19        Q.    How did you spell that?  Can you

20    spell it?

21        A.    I don't remember the spelling of

22    it.  Buford.  I forgot the name of it.  I

23    just fill the prescription.  Well, he

24    gives it to me.

25        Q.    It's a sleeping pill?

                                                    7

1                     WYNDER

2        A.    It's a medication for sleep.

3        Q.    That's to help you sleep?

4        A.    Yeah.

5        Q.    Have you taken it today?

6        A.    No.

7        Q.    When was the last time that you

8    took it?

9        A.    Last week.

10        Q.    Do you take that on a regular

11    basis?

12        A.    When I need it.

13        Q.    Is there anything about that

14    medication that would make it difficult

15    for you to concentrate or understand my

16    questions today?

94278

17       A.    No.

18       Q.    Any other medication that you

19  are currently taking?

20       A.    Not right now.

21       Q.    Are you under the influence of

22  alcohol today?

23       A.    No.

24       Q.    Any nonprescription drugs?

25       A.    No.

8

1                WYNDER

2       Q.    Are you currently receiving

3  psychiatric treatment?

4       A.    Yes.

5       Q.    Who are you being seen by

6  currently?

7       A.    Dr. Hugh Butts.

8       Q.    Has Dr. Butts given a diagnosis?

9       A.    Yes.

10       Q.    What is that diagnosis?

11       A.    Post traumatic stress syndrome,

12  DMV 4.

13       Q.    When did you get that diagnosis,

14  if you can recall?

15       A.    1998.  Around April 1998.

16       Q.    When was the last time that

17  you've seen Dr. Butts?

18       A.    It's been about three months.

19       Q.    Do you see him currently on a

94278

20    regular basis?

21        A.    When needed.  Probably every two

22    months, but if I need to see him, I have

23    an appointment in the next two weeks to

24    see him.

25        Q.    You say you have an appointment

⬚

9

1                    WYNDER

2    to see him?

3        A.    Yes.

4        Q.    When is that scheduled for?

5        A.    I believe it's right after Labor

6    Day.

7        Q.    Is there anything about the

8    condition that you've been diagnosed with

9    or the treatment that would affect your

10    ability to testify here today?

11        A.    No.

12        Q.    Are there any other medical

13    conditions that you currently are

14    experiencing?

15        A.    No.

16        Q.    Are you under treatment for

17    anything else other than what we've just

18    discussed?

19        A.    No.

20        Q.    Mr. Wynder, when did you learn

21    that you were going to be deposed today?

22        A.    When I -- July 29 -- when our

Page 8

94278

23   July 29 schedule was canceled.

24        Q.    Did you do anything to prepare

25   for the deposition today?

10

1                    WYNDER

2        A.    A little bit.  I read.

3        Q.    What did you read?

4        A.    All of my paperwork that I

5   have -- that I have in my possession.

6        Q.    Now, the paperwork that you have

7   in your possession, are these all

8   documents that you have provided your

9   attorney with?

10        A.    Correct.

11        Q.    Can you tell me what that

12   paperwork consists of that you have in

13   your possession?

14        A.    Memos.

15        Q.    Who are the memos from?

16        A.    Memos of interaction within the

17   State Police.

18        Q.    Are these all memos from you or

19   are they from other individuals?

20        A.    Some are from me, some are from

21   other individuals.

22        Q.    They are all from individuals

23   within the State Police?

24        A.    Correct.  And outside, also.

25        Q.    When you say "outside," who --

94278

```
 1                    WYNDER
 2    what other individuals outside the State
 3    Police?
 4          A.    Workers' Compensation Board.
 5          Q.    Anyone else?
 6          A.    EEOC.
 7          Q.    Anyone else?
 8          A.    Department of Justice.
 9          Q.    Anyone else?
10          A.    President of the United States.
11    Hillary Clinton, Senator Hillary Clinton.
12          Q.    Anyone else?
13          A.    State Insurance Fund.
14          Q.    Anything else?
15          A.    Attorney General.
16          Q.    Is that Eliot Spitzer?
17          A.    Eliot Spitzer.
18          Q.    Anyone else?
19          A.    Paperwork that we received from
20    you in discovery.
21          Q.    What paperwork did you review
22    that you had received from me?
23          A.    Information that wasn't revealed
24    during my Workers' Compensation hearings.
25          Q.    What did that include?
```

94278

```
 1              WYNDER
 2      A.    Confidential statements.
 3      Q.    Who were those statements by?
 4      A.    Lieutenant Barbaria, Terrence
 5   O'Mara.
 6      Q.    Anyone else?
 7      A.    Major Young, Captain Klusacek.
 8      Q.    Anyone else?
 9      A.    U.S. Customs.
10      Q.    Anyone else?
11      A.    FBI.
12      Q.    Anyone else?
13      A.    Marine Midland Bank.
14      Q.    Any others?
15      A.    Citibank.
16      Q.    Okay.
17      A.    Central Hudson Gas and Electric.
18      Q.    Okay.
19      A.    United States Bankruptcy Court.
20      Q.    Anyone else?
21      A.    Not that I can recall right now.
22      Q.    Now, of those documents that
23   you've just mentioned, is it your
24   testimony that in each case these are
25   documents that you just saw for the first
```

13

```
 1              WYNDER
 2   time when they were produced to
 3   Mr. Merritt in discovery?
```

94278

```
 4      A.    No, the only ones that was just
 5   produced in discovery was Captain
 6   Klusacek, Major Young, Terrence O'Mara,
 7   Lieutenant Barbaria's confidential
 8   statement.
 9      Q.    Anything else that was just
10   seen?
11      A.    No, not right now -- that I can
12   recall.
13      Q.    So would it be fair to say that
14   the other documents you've been making
15   reference to were documents that you had
16   seen in the course of the Workers'
17   Compensation hearing?
18      A.    Yes.  We requested those
19   previous that you just put, but we were
20   told that they didn't exist.
21      Q.    Is there anything else that you
22   read in preparation for this deposition?
23      A.    No.
24      Q.    Other than Mr. Merritt, did you
25   speak to anyone else regarding the
```

14

```
 1              WYNDER
 2   deposition today?
 3      A.    I don't understand the question.
 4      Q.    Other than your attorney,
 5   Mr. Merritt, did you speak to any other
 6   individual regarding the fact that you
```

Page 12

94278

7    were going to be deposed today?

8        A.    No.

9        Q.    Mr. Wynder, do you have any

10   nicknames or other names besides Kenneth

11   Wynder?

12       A.    No.

13       Q.    What is your date of birth?

14       A.    July 17, 1963.

15       Q.    Can you describe for me your

16   educational background?

17       A.    BA in criminal justice.

18       Q.    Where did you receive that?

19       A.    John Jay College of Criminal

20   Justice.

21       Q.    When did you get that BA?

22       A.    2002.

23       Q.    Prior to that, did you attend

24   high school?

25       A.    Yes.

15

1                WYNDER

2        Q.    Where did you go to high school?

3        A.    Christ the King Regional High

4    School.

5        Q.    Where is that?

6        A.    Maspeth, Queens.

7        Q.    When did you graduate from

8    there?

9        A.    '81.  No.  '85.

94278

```
10       Q.    Now, have you had other
11   schooling --
12       A.    I --
13       Q.    That's okay.
14             Did you have any other
15   schooling?
16       A.    New York State Police Academy.
17       Q.    When did you graduate from the
18   Academy?
19       A.    3/20/1987.
20       Q.    Other than that, any other
21   education or vocational school, trade
22   school?
23       A.    No, not really.
24       Q.    Any kind of on-the-job training
25   other than the --
```

16

```
 1               WYNDER
 2       A.    Drug recognition expert.
 3       Q.    Did that involve the taking of a
 4   course?
 5       A.    Yes, it did.
 6       Q.    When did you take that course?
 7       A.    '92.  Probably '91, '92.  '91.
 8             Also academic instructor.
 9       Q.    Is that another course that you
10   took?
11       A.    Yes.  That was 1992 at the New
12   York State Police Academy.
```

Page 14

94278

13      Q.    Any other special courses

14   besides the regular Academy courses that

15   you had?

16      A.    No.

17      Q.    Any other kind of training for

18   the New York State Police or any other job

19   that you've had?

20      A.    Series 7 when I worked on Wall

21   Street.

22      Q.    I'm sorry?

23      A.    Series 7.

24      Q.    What does that entail?

25      A.    Stockbroker.

                                                          17

1                    WYNDER

2      Q.    Is that one course or a series

3   of courses?

4      A.    Two parts.  I only completed the

5   first part.

6      Q.    For that did you receive some

7   type of a certificate or a diploma?

8      A.    Only for the -- I didn't finish

9   the second part, so, no.  I only finished

10   the first part.

11      Q.    Have you ever been in the

12   military?

13      A.    No.

14      Q.    Are you currently married?

15      A.    Yes.

94278

16    Q.    Your wife's name?

17    A.    Jacqueline.

18    Q.    Can you spell it?

19    A.    J-a-c-q-u-e-l-i-n-e.

20    Q.    Does she use your last name?

21    A.    Logan-Wynder, yes.

22    Q.    Is that hyphenated?

23    A.    Yes, Logan, hyphen, Wynder.

24    Q.    How long have you been married?

25    A.    Five years.

18

1                WYNDER

2     Q.    Does she currently reside with

3     you?

4     A.    Yes.

5     Q.    Do you have any children?

6     A.    One.

7     Q.    Is that a boy or a girl?

8     A.    Girl.

9     Q.    How old is she?

10    A.    Eight.

11    Q.    Does she reside with you?

12    A.    Yes.

13          And I have an older daughter --

14    her name is Alexis.

15    Q.    You have an older daughter?

16    A.    But that's by her first

17    marriage.

18    Q.    By your wife's first marriage?

94278

19    A.    Tempestt is her name,

20    T-e-m-p-e-s-t-t.

21    Q.    Had you been married previously?

22    A.    Yes.

23    Q.    The name of your previous wife?

24    A.    Chandra Wynder, C-h-a-n-d-r-a.

25    Her maiden name is Hanes, H-a-n-e-s.

19

1                   WYNDER

2    Q.    When did you marry Chandra?

3    A.    I can't recall right now.

4    Q.    I'll leave a space in the

5    deposition and when you get it, you can

6    insert it there.

7    (Insert)                        .

8    Q.    How long were you married?

9    A.    I believe about 10 years.

10    Q.    When were you divorced?

11    A.    Officially, I believe it was in

12    1999.

13    Q.    Had you been legally separated

14    prior to that?

15    A.    Yes.

16    Q.    When was that?

17    A.    I believe '97 or '98.  She moved

18    to Atlanta, as I can recall.

19    Q.    Can you tell me where she

20    currently resides?

21    A.    I believe Atlanta.  I don't

94278

22    know.  I haven't spoken to her.

23         Q.     When was the last time that you

24    were in touch with her?

25         A.     Maybe six or seven years.

⬜                                                          20

1                   WYNDER

2     Probably eight.

3          Q.     To your knowledge, does Chandra,

4     is she aware of the incidents contained in

5     your complaint?

6          A.     I don't know.  She was -- she

7     was already -- she wasn't living with me.

8     We were separated by the time 1997

9     started.

10         Q.     Besides this case which is filed

11    in the Eastern District of New York,

12    federal court, have you brought any other

13    lawsuits besides this case?

14              MR. MERRITT:  Against whom?

15              MS. ODESSKY:  Against anyone.

16              MR. MERRITT:  I'll object to

17    that.

18              MS. ODESSKY:  I think under the

19    federal rules, he still must answer that

20    question.  I'm entitled to know whether he

21    has other lawsuits.

22              MR. MERRITT:  Only if it's

23    relevant.

24              MS. ODESSKY:  No, relevance is

94278

25      not an objection.

1                    WYNDER

2           MR. MERRITT:  It has to lead to

3      discoverable evidence.

4           MS. ODESSKY:  I'm entitled to

5      know if he's made a similar claim --

6           MR. MERRITT:  Then limit your

7      question.

8           MS. ODESSKY:  No, I believe I'm

9      entitled -- we can call the judge if

10     necessary.

11          MR. MERRITT:  I don't think you

12     are entitled to any lawsuit he's ever

13     brought in his lifetime.

14          MS. ODESSKY:  Should we call the

15     judge?

16          MR. MERRITT:  We'll hold it for

17     a ruling.  You are entitled to a

18     relevant -- you're not going into a

19     fishing expedition on every small claims

20     ticket he's ever had in his life.

21          You've just asked about any kind

22     of litigation he's been involved with

23     since day one.

24          MS. ODESSKY:  You can make your

25     argument when we call the judge for a

94278

22

1                    WYNDER
2    ruling.
3            MR. MERRITT:  Let's get it over
4    with.
5            MS. ODESSKY:  I think we should
6    hold off, because I have a feeling we may
7    have to call for other things at this
8    point.
9            MR. MERRITT:  If you want to ask
10   questions related to this case, I have no
11   problem with that, but if it's not related
12   to this case, I see no reason why he
13   should have to review lawsuits he's
14   brought in the past.
15           BY MS. ODESSKY:
16       Q.    Have you ever filed a lawsuit
17   making claims related to or similar to any
18   of the claims contained in your complaint?
19       A.    No.
20           MR. MERRITT:  We have to give
21   her that.
22           MS. ODESSKY:  For the record,
23   have you provided Mr. Wynder with a
24   document?
25           MR. MERRITT:  Yes, because he's

23

1                    WYNDER

94278

2  going to change his answer to your last

3  question.

4        MS. ODESSKY:  For the record,

5  I'll note that Mr. Wynder is conferring

6  with his attorney.

7        MR. MERRITT:  This is not the

8  one I'm talking about.  I've got it in

9  here.  Here.

10        We're dealing with a claim

11  you've got in the Court of Claims.

12        Do you know what I'm talking

13  about?

14        THE WITNESS:  Oh, okay.

15        MR. MERRITT:  There is a case in

16  the Court of Claims.

17        MS. ODESSKY:  Can I just ask

18  before we go on --

19     Q.   Mr. Wynder, what document were

20  you just looking at?

21        MR. MERRITT:  I gave him an

22  order.  It was the wrong order.

23     A.   This is the order of a

24  confidential informant.

25        MS. ODESSKY:  For the record,

24

1              WYNDER

2  this is an order by Magistrate Pollack

3  dated June 22, 2005 relating to the

4  in-camera review of information regarding

Page 21

94278

5    a confidential informant in this case.

6              MR. MERRITT:  I think what I'm

7    looking for is in this pile.  It was a

8    case that's on appeal.

9        Q.    Are you familiar with the case

10   in the Court of Claims that Mr. Merritt is

11   referring to?

12       A.    Yes.

13       Q.    What case is that?

14       A.    That's in reference to my back

15   pay.

16       Q.    In what county has that been

17   filed?

18       A.    It would be Albany County.  That

19   was filed by the New York State PBA,

20   Troopers Association, in reference to the

21   fact that I've never received, since my

22   disability was effective in 1999, April of

23   1999, State Police refused to pay two

24   years of back pay, sick leave and other

25   accruals that are due me.



                                                    25



1                      WYNDER

2        Q.    Where does that case stand right

3    now?

4        A.    It's in appeals.  Appeals

5    decision.

6        Q.    Has there been a ruling in that

7    case?

94278

```
 8        A.     As to -- oh, the ruling was that
 9    I didn't exhaust my administrative
10    remedies.
11             MR. MERRITT:  You can mark this
12    for identification if you so desire.
13    That's the decision in the case.  That
14    answers your question.
15             MS. ODESSKY:  Thank you.
16             Mr. Merritt, had this previously
17    been provided to us?
18             MR. MERRITT:  I just got it.
19             MS. ODESSKY:  You just received
20    it?
21             I'll note for the record that
22    Mr. Merritt has provided me with what
23    appears to be a judgment in Albany
24    County.
25             It's dated February 3, 2005 and
```

26

```
 1                 WYNDER
 2    it is stamped Albany County Clerk.  It
 3    says, "Kenneth Wynder, petitioner, for a
 4    judgement pursuant to Article 78 against
 5    Wayne E. Bennett, Superintendent of the
 6    New York State Division of State Police
 7    and the New York State Division of State
 8    Police, respondents."
 9             I just ask that this be marked
10    as an exhibit, Defendants' B.
```

Page 23

94278

11      (Judgment marked Defendants'

12 Exhibit B for identification.)

13          MR. MERRITT:  Just let the

14 record reflect that I'm not involved in

15 that litigation in any way.  The

16 litigation is done by another law firm.

17      Q.   Mr. Wynder, it appears to me

18 from this document that the law firm who

19 is representing you in this case is a --

20 is Gleason, Dunn, Walsh and O'Shea; is

21 that correct?

22      A.    Correct.

23      Q.    And Mr. Clay J. Lodovice,

24 C-l-a-y, J. is the middle initial,

25 L-o-d-o-v-i-c-e.

27

1              WYNDER

2          So Mr. Merritt is accurate when

3 he said that he has not been involved in

4 that litigation?

5      A.    He has not been involved.

6      Q.    So it's your understanding,

7 Mr. Wynder, that your attorney in that

8 matter is taking an appeal from that?

9      A.    Yes.

10      Q.    Do you know if the appeal has

11 been filed?

12      A.    To the point, no, it has not

13 been.  Only a notice of appeal was

Page 24

94278

14    entered.

15        Q.    Thank you.

16            MS. ODESSKY:   Off the record.

17            (Discussion off the record.)

18        Q.    Mr. Wynder, did you provide this

19    document that we've just been looking at,

20    Defendants' Exhibit B, to Mr. Merritt?

21        A.    Yes.

22        Q.    When did you provide that to

23    him?

24        A.    Just recently when I was going

25    over all my paperwork.



28

1                WYNDER

2        Q.    For the record, to be absolutely

3    clear, this judgment in Albany County, and

4    the Index Number is 4967-04, this is the

5    Article 78 proceeding that I referred to

6    earlier and that is marked now as

7    Defendants' Exhibit B.

8            Mr. Wynder, is it your

9    understanding that all the documents that

10   you've provided Mr. Merritt with have been

11   provided to the defendants?

12       A.    Yes.   Whatever I have given him.

13       Q.    Other than the Court of Claims

14   action, are there any other lawsuits that

15   either relate to the allegations in this

16   complaint or are similar to, if not the

94278

17    same allegations in this complaint?

18        A.    Repeat that.  To this one now

19    (indicating)?

20        Q.    I'm saying other than this Court

21    of Claims case, are there any other

22    lawsuits in any other courts?

23        A.    Not that I can recall.

24        Q.    You were involved in a Workers'

25    Compensation proceeding in which

                                                    29

1                    WYNDER

2    Mr. Merritt represented you?

3        A.    Correct.

4        Q.    That involved the same causes of

5    action that are in your federal lawsuit,

6    correct?

7        A.    Correct.

8        Q.    Other than that administrative

9    proceeding, any other administrative

10    proceedings that involved the same claims

11    or causes of action.

12        MR. MERRITT:  I have to object

13    and question -- Workers' Compensation,

14    unfortunately, although it has some

15    similarities to the injuries involved in

16    this case, is not the same legal action or

17    it doesn't have the same relief or it

18    doesn't demand 1983 or any Title 7

19    relief.

94278

20      So, it is kind of a misleading

21   question, so I would like you to rephrase

22   that.

23      MS. ODESSKY:  I'll rephrase

24   that.  You are correct, Mr. Merritt.

25      Q.   I'm just trying to ascertain,

30

1              WYNDER

2   other than the Workers' Compensation,

3   which we'll get to later on, have you

4   filed any actions either in a court or

5   before any type of administrative body

6   regarding any of the claims or allegations

7   or the incidents that you relate in your

8   federal complaint?

9           (Witness conferred with counsel

10   off the record.)

11      MR. MERRITT:  Can we take a

12   break?

13      MS. ODESSKY:  I note for the

14   record that we're taking a small break for

15   Mr. Merritt and Mr. Wynder to confer.

16           (Brief recess taken.)

17      MS. ODESSKY:  Are we back on the

18   record?

19      MR. MERRITT:  Yes.

20      He wasn't sure if he should

21   expound upon the EEOC complaint, because

22   it is related to this legal action.

94278

23          MS. ODESSKY:  Yes.

24          MR. MERRITT:  The EEOC complaint

25     is a matter of record.  It's part of the

                                                    31

1                    WYNDER

2      complaint, as a matter of fact.  You'll be

3      aware that he wasn't sure if it was

4      related to this action.

5          BY MS. ODESSKY:

6          Q.    For the record, you had filed a

7      complaint with the EEOC?

8          A.    Correct.

9          Q.    We'll get to that later on.

10         Q.    Mr. Wynder, have you yourself

11     ever been named as a defendant in a

12     lawsuit?

13         A.    Not that I can recall.

14         Q.    Have you ever been called to

15     testify as a witness in any matter for

16     anyone else other than your own cases?

17         MR. MERRITT:  Let the record

18     reflect that Kenneth Wynder was a New York

19     State trooper for a period of over 12

20     years, and during that period of time, he

21     was called upon numerous times involving

22     traffic citations, arrests that he had

23     made.  I don't know if he can remember

24     them all.

25              But if you are asking for all

                    Page 28

94278

```
1                    WYNDER
2    those --
3            MS. ODESSKY:  No, not
4    necessarily.
5            Mr. Merritt, I would ask that
6    you please limit your objections. Under
7    the federal rules there are no speaking
8    objections, and I'd ask you not to
9    answer.  You can certainly confer with
10   Mr. Wynder, but this is Mr. Wynder's
11   deposition and he should be answering the
12   questions.
13           MR. MERRITT:  Go ahead.
14       Q.    Mr. Wynder, as a New York State
15   trooper, during your employment, did you
16   testify in New York State Police matters?
17       A.    Yes.
18       Q.    Have you ever been named as a
19   witness by any fellow member of the New
20   York State Police regarding a civil
21   lawsuit?
22       A.    Not that I can recall.
23       Q.    Have you ever appeared as a
24   witness on behalf of anyone else in any
25   type of an administrative proceeding such
```

94278

1               WYNDER

2    as a Workers' Compensation hearing?

3        A.     Workers' Compensation hearing?

4    No.

5        Q.     Mr. Wynder, how long were you

6    employed at the New York State Police?

7        A.     3/30/87 until April 3 -- no,

8    July 7, 1999.

9        Q.     Can you just go through the

10   different assignments that you had during

11   your career?

12       A.     Basic instruction, which is the

13   State Police Academy in Albany.

14       Q.     That was six months from the

15   March 30, 1987 date?

16       A.     Correct.

17       Q.     After you left the Academy,

18   where did you go?

19       A.     I was stationed at SP Peekskill.

20       Q.     What did you do there?

21       A.     Road trooper.

22       Q.     What did your duties involve as

23   a road trooper?

24       A.     Law enforcement.

25       Q.     When you say "law enforcement,"

34

1               WYNDER

2    what in particular were you responsible to

3    do?

94278

4      A.    Traffic, complaints.

5      Q.    Anything else?

6      A.    Anything that was asked.

7      Q.    Did you have a partner when you

8  were at SP Peekskill?

9      A.    No, we only paired up at night

10  and it was numerous partners.  No set

11  partners.

12      Q.    Did you have any particular

13  supervisor when you were at SP Peekskill?

14      A.    Station commander and

15  sargeants.  There were quite a few.

16      Q.    Let me back up a for a moment.

17          Can you recall the time frame

18  when you were at SP Peekskill?

19      A.    Yeah, 1987, September of 1987,

20  to, I believe, '93.  During -- or '92.

21  Yeah, '92.

22      Q.    So those five years.  During

23  that time, was there one station

24  commander?

25      A.    Bobby Welsh.  Robert Welsh.

35

1              WYNDER

2      Q.    Welsh?

3      A.    Yes.

4      Q.    Underneath Commander Welsh, did

5  you have any direct supervisor?

6      A.    Thomas Cerrone, C-e-r-r-o-n-e.

94278

7        Q.      Anyone else?

8        A.      Sergeant Antalek, A-n-t-a-l-e-k.

9        Q.      Anyone else?

10       A.      I can't recall right now.  They

11   were basically there for a while.

12       Q.      Were you disciplined for any

13   reason when you were at SP Peekskill?

14       A.      At SP Peekskill?

15       Q.      Yes.

16       A.      Yes.  I believe I recall my car

17   wasn't inspected.

18       Q.      I'm sorry --

19       A.      My car was uninspected.

20       Q.      What happened as a result of

21   that?

22       A.      Letter censure.

23       Q.      Anything else as a result of

24   that?

25       A.      No.

                                              36

1                    WYNDER

2        Q.      Any other discipline?

3        A.      Not that I can recall.

4                MR. MERRITT:  She's asking --

5                THE WITNESS:  She said at

6   Peekskill.

7                MR. MERRITT:  Oh, only limited

8   to Peekskill?

9                MS. ODESSKY:  At this point,

94278

10    yeah.

11            Let the record reflect that

12    Mr. Merritt has shown Mr. Wynder a

13    document.  I assume that's regarding

14    discipline.

15        Q.    Can you tell me what

16    Mr. Merritt's document referred to?

17        A.    That's when I was stationed at

18    another station.  SP Hawthorne.

19        Q.    First of all, what was that

20    document that Mr. Merritt was showing to

21    you?

22        A.    Just a letter from Workers'

23    Compensation.

24            MS. ODESSKY:  Mr. Merritt, is

25    this a document that's been provided to

⬜

37


1                  WYNDER

2     us?

3             MR. MERRITT:  This is a Workers'

4     Compensation document.  Truly isn't

5     relevant to this proceeding.  It deals

6     with Section 27 of the Workers'

7     Compensation law.  I thought there was a

8     reference to discipline in it and that's

9     why I thought it was responsive to your

10    question.

11            MS. ODESSKY:  I'm going to mark

12    this as Defendants' Exhibit C.

94278

13          (Letter dated December 28, 1999

14  marked Defendants' Exhibit C for

15  identification.)

16          MR. MERRITT:  Off the record.

17          (Discussion off the record.)

18          MS. ODESSKY:  On the record, I

19  would not object, Mr. Merritt, to you

20  showing Mr. Wynder something to refresh

21  his recollection to correct the record as

22  to background information, but I will have

23  an objection if we get into substantive

24  matters regarding any of the incidents

25  that are contained in the complaint.  I

38

1              WYNDER

2  will definitely have an objection to you

3  stopping and refreshing his recollection

4  and possibly providing answers that

5  Mr. Wynder doesn't recall.

6          So, I think we're not at that

7  point yet and I think we can proceed right

8  now.

9          BY MS. ODESSKY:

10      Q.    For the record, I'm going to

11  show you, Mr. Wynder, what has been marked

12  as Defendants' Exhibit C.  This is a

13  letter addressed to you from Linda A.

14  Walker of the State of New York, Workers'

15  Compensation Board.  It's dated December

94278

16    28, 1999.

17          I believe Mr. Merritt said that

18    he showed you this document because he

19    felt that it had something to do with my

20    question about disciplinary proceedings

21    against you.

22          I'm going to ask you to take a

23    look at this document and tell me if

24    there's anything in there that refreshes

25    your recollection regarding whether you

39

1                    WYNDER

2     had been disciplined at any -- anyplace in

3     the New York State Police that you were

4     stationed?

5         A.    No.  It said Newburgh.

6         Q.    It just makes a reference to

7     Newburgh?

8         A.    Correct.

9         Q.    Other than making a reference to

10    Newburgh, does it say anything else in

11    there regarding discipline?

12        A.    No.

13        Q.    Mr. Wynder, I would like to ask

14    you, Mr. Merritt has stated that sometimes

15    the medication that you are taking causes

16    you to have some difficulties with your

17    memory.

18          Is that your understanding?

94278

19    A.    Sometimes, or if I'm stressed.

20    Q.    Have you been treated for memory

21  loss?

22    A.    It's not so much memory loss,

23  it's just at that point trying to -- we're

24  talking six, seven years ago.  Actually,

25  back 13 or 14 years.  I couldn't remember

40

1              WYNDER

2  when I graduated from high school.

3    Q.    Have you been told by any

4  health-care professional that you have

5  some impairment to your memory?

6    A.    When I get stressed, it could

7  bother me.

8    Q.    Who has particularly --

9    A.    Dr. Hugh Butts.

10    Q.    Anyone else besides Dr. Butts

11  mention that?

12    A.    That's all the psychiatric

13  treatment I receive.

14          MR. MERRITT:  Let's take a short

15  break for a minute.

16          (Brief recess taken.)

17          MR. MERRITT:  Miss Odessky,

18  Kenneth Wynder has a long history,

19  documented history, from 1998 forward, of

20  being treated for this illness,

21  post-traumatic stress syndrome.

94278

22          He has in the past, and even up

23    to the present time when needed, been

24    prescribed medication for that illness.

25    That medication is known and has been

41

1                WYNDER

2    known in the past to cause some memory

3    loss.

4          So I interrupted, I didn't mean

5    to interrupt you, but there were periods

6    of time when Mr. Wynder has had blanks in

7    his memory due to the post-traumatic

8    stress that he suffered and due to the

9    medication that he was taking which was

10    prescribed by his psychiatrist,

11    Dr. Butts.

12          So, in response to your

13    question, you had asked him if he had any

14    memory losses in the past and there were

15    periods of time in which he had been

16    taking medication, and some of the

17    questions you asked him with regard to

18    discipline, also, were periods of time in

19    which he had been suffering from

20    post-traumatic stress syndrome and had

21    been taking medication.

22          MS. ODESSKY:  Okay.  Thank you.

23          Mr. Merritt, I'm just going to

24    ask, and I will send you a letter to

94278

25      follow up, if you could provide me with

42

1                    WYNDER

2      documentation regarding what you've just

3      said on the record, the medication and the

4      post-traumatic stress disorder causing

5      memory loss in the past.

6                    So I will send you a letter to

7      follow up to that effect.

8                    And I would just ask that once

9      we get into the substance of allegations,

10     I understand what you've just said on the

11     record, but I'll ask Mr. Wynder to just

12     answer to the best of his ability; and

13     he'll have an opportunity to review the

14     transcript once it's prepared, and if

15     there is something that he recalls that he

16     didn't recall today, certainly he'll be

17     free to fill that in.  Okay?

18                    MR. MERRITT:  No problem.

19     BY MS. ODESSKY:

20        Q.    Mr. Wynder, before we go on, I

21     just wanted to back up to something

22     regarding your education.

23                    I know you mentioned that you

24     had the degree in criminal justice from

25     John Jay.

94278

43

1                    WYNDER
2           Do you have any other schooling
3    beyond that?
4       A.    No.
5       Q.    Now, if we can just go back to
6    your time at SP Peekskill, I was asking
7    you regarding discipline and you mentioned
8    to me that a car was uninspected.
9           Was that your personal car?
10      A.    Yes.
11      Q.    Is that a requirement, that you
12   keep your personal car inspected?
13      A.    Correct.
14      Q.    Other than that, as far as you
15   can recall, were there any other instances
16   of discipline or counseling while you were
17   at SP Peekskill?
18      A.    No.
19      Q.    When you left SP Peekskill in
20   '92, why did you leave there?
21      A.    I went to State Police Albany to
22   be a basic counselor.
23      Q.    Was that by your choice?
24      A.    Yes, it was.
25      Q.    Was that something that you had

44

1                    WYNDER

94278

2      to make an application for?

3          A.      Correct.

4          Q.      What did that application

5      process entail?

6          A.      Memo to station commander.

7          Q.      Installation commander?

8          A.      Station commander.

9          Q.      Sorry.

10         A.      And then an interview with

11     troop.

12         Q.      Did you have an interview?

13         A.      Yes.

14         Q.      Let me back up.  Where was that

15     interview conducted?

16         A.      Poughkeepsie.

17         Q.      Who did you interview with?

18         A.      I don't recall.  I believe --

19     could have been Major Rabbit.  I'm not

20     quite sure who was the major at the time,

21     but after the interview, I was highly

22     recommended for the position.

23         Q.      What was the exact title of that

24     position?

25         A.      Basic counselor.

 

45

1                  WYNDER

2          Q.      What were the duties of a basic

3      counselor?

4          A.      To assist all new recruits in

94278

5    their adjustment to the Police Academy and

6    answer their questions and to be a

7    confidante to any problems that may exist.

8        Q.    Did the duties of a basic

9    counselor entail teaching at the Academy?

10       A.    No.

11       Q.    Did you go to the Academy

12   directly from the Peekskill station?

13       A.    Yes.

14       Q.    Do you remember when you arrived

15   at the Academy?

16       A.    I can't really recall.  I think

17   it was '92 -- it was two classes that I

18   did.  So the first one would have started,

19   I believe in September, if I'm correct, or

20   March.  I don't remember the dates.

21   Actually, it was in March.

22            I was a basic counselor, but I

23   did offer to tutor minority recruits when

24   I realized that they were selected and

25   they were inferior to other recruits, and

                                              46

1                 WYNDER

2    I was turned down by my lieutenant to be a

3    tutor for them.

4        Q.    When you say "they were inferior

5    to other recruits," what do you mean by

6    that?

7        A.    Well, we have -- first two weeks

                    Page 41

94278

8    of the Academy class, there's a process

9    where they are given 10 words a day and

10   they have to define it and then they have

11   to write a paragraph -- not paragraph, but

12   a composition on why they want to be a

13   State trooper.

14           Having read most or all of the

15   Academy class, I realized that the

16   minorities were well behind in

17   comprehension and reading, and I

18   approached the lieutenant and told him

19   that they would never make it through the

20   basic school unless they received tutoring

21   now before they get into core classes.

22       Q.   Can you tell me who the

23   lieutenant was that you approached?

24       A.   I don't recall.  I can't recall,

25   but he turned me down, and three weeks --

47

1                WYNDER

2    four weeks into the Academy he realized

3    that 95 percent of the minorities that was

4    in that class were failing, and he

5    approached me to come back and tutor the

6    recruits.

7       Q.   Did you do that?

8       A.   Yes, I did.  I told him I was

9    only doing it because they were minorities

10   and not because he asked me.

94278

11      Q.    Did you tutor the minority

12   recruits in one class year or two class

13   years?

14      A.    One.

15      Q.    Do you recall which year that

16   was?

17      A.    That was the first year, in

18   March.  I believe that was '92.  March of

19   '92.

20      Q.    Can you tell me, out of the

21   class, how many recruits were minorities?

22      A.    I would say they may have made

23   up maybe 5 percent, if that was -- if that

24   was lucky.

25      Q.    How large was the class in '92?

48

1              WYNDER

2      A.    I don't recall.  Could have been

3   120, 130.  I don't recall the exact

4   number.  I know there was probably 19 or

5   20 African Americans.  I'm not saying

6   African Americans -- minorities, African

7   Americans and Hispanic that we had, and

8   out of those 20, we only lost two since I

9   tutored them.

10      Q.    When you were at the Academy,

11   did you ever change your position from

12   counselor?

13      A.    Correct.

Page 43

94278

14      Q.     When did you change your

15  position?

16      A.     Well, I didn't change my

17  position.  It was changed for me.

18      Q.     How did that come about?

19      A.     During that class, I already had

20  endeared myself to the lieutenant as far

21  as I was a troublemaker, because I stuck

22  up for minorities when I went to him, and

23  told him that these minorities were going

24  to fail if they didn't get the proper

25  help, and he replied to me, "You are a

49

1                    WYNDER

2  basic counselor.  It's not your job and

3  it's not my job to see that they get out

4  of this Academy.  It's only our job to

5  make sure they get here."

6      Q.     Do you recall, as you sit here

7  now, who that lieutenant was?

8      A.     I can't remember his last name.

9  If the name was given to me, I would know

10  who it is.  That's something that you

11  could look up for the basic school -- they

12  have everybody listed who was -- you know,

13  captain, lieutenant, colonel.  Everything

14  is there.  So that's something that's

15  easily accessible.

16      Q.     During this time period, you

Page 44

94278

17    said your position was changed for you.

18    Were you forced --

19         A.    After I made that complaint that

20    the minorities weren't getting the proper

21    tutoring, the lieutenant came back to me

22    and asked me to do it, and I asked him,

23    quote, Is it because we're in penal law,

24    the first class and you are about to lose

25    most of minorities and you can't explain

50

1                    WYNDER

2    that to division?  And he said, "Correct,"

3    and that's when I tutored them.  But --

4         Q.    Was that a change in your

5    position as counselor?

6         A.    Yes.  Because most basic

7    counselors did not tutor.

8         Q.    Did you actually become a

9    different position or you were tutoring

10    them --

11         A.    Well, no, I was still a basic

12    counselor, but I offered my time because I

13    wanted to help the minority recruits.  I

14    became a tutor.  Not an academic

15    instructor but a tutor.

16         Q.    Did there come a time when you

17    actually did change from a basic counselor

18    to another actual position there?

19         A.    Yes.  Near the end of that

Page 45

94278

20    Academy class, I was given a performance

21    evaluation and I was told that I only

22    received an excellent when every other

23    non-white instructor got an outstanding.

24              I also was told that my services

25    for the next Academy class would not be

51

1                    WYNDER

2    needed due to the fact that I did not know

3    how to do carpentry and I did not run with

4    the recruits.

5         Q.    When you say "run with the

6    recruits," physically run?

7         A.    Physically run with the

8    recruits, which is not my job description

9    as a counselor.  I did that when I was a

10   recruit.

11        Q.    As far as your knowledge, did

12   anyone else at the an Academy, during the

13   entire time you were there, did they do

14   carpentry?

15        A.    Yes, there was one trooper who

16   basically, I thought -- I thought State

17   Police brought him up there to fix the

18   building, because he never did his job

19   description.

20        Q.    Who is that?

21        A.    Trooper Caridi (phonetic), Bob

22   Caridi from Troop F.

Page 46

94278

23      Q.      From Troop F?

24      A.      Yes.

25      Q.      He was a trooper there that did

52

1                      WYNDER

2      carpentry at the Academy?

3      A.      Yes, he did.

4              And there was another trooper,

5      Peter Selles, S-e-l-l-e-s, I believe.

6      That might not be his name.  If I saw his

7      name, I would remember him.

8              But he ran with the recruits

9      because he liked to run.  And what the

10     instructors wanted to do, especially in

11     the PT, which is physical training, is

12     they wanted to sit around the table and

13     eat doughnuts and coffee when they should

14     have been running with the recruits.

15             So what they would do is ask the

16     counselors if you wanted to run with the

17     recruits, and I told them I wasn't going

18     to run with the recruits.  It wasn't my

19     job to run with the recruits.

20     Q.      Was there anyone else, any other

21     troopers that you knew of, who ran with

22     the recruits?

23     A.      There was two others.  I don't

24     remember their names, but they used to

25     pick them to run with the recruits, and

Page 47

94278

53

WYNDER

1
2    they became favorites of the lieutenants
3    because they were doing the job of -- the
4    physical training, so they had time off.
5           We would have a morning run and
6    the physical trainer is supposed to be out
7    there.  They are in the cafeteria because
8    the counselors took them out for a run,
9    which was not their job description.
10       Q.     Is Trooper Caridi, who you
11   mentioned, a member of a minority?
12       A.     Nope, he's white.
13       Q.     How about Trooper Selles?
14       A.     All white.
15       Q.     Any troopers who are members of
16   a minority who did either the carpentry or
17   running with the recruits?
18       A.     No.  They were all white.
19       Q.     Do you recall the names of
20   anyone else?  You said there were two
21   other troopers who ran with the recruits?
22       A.     Not offhand.  I would have to
23   look at the Academy class again.
24       Q.     Anyone else who did the
25   carpentry that you recall?

54

94278

```
 1                WYNDER
 2      A.   Trooper Caridi did most of the
 3 carpentry.  He had a construction company
 4 and that's why I believe -- actually, I
 5 don't believe, that's why they brought him
 6 to the Academy, because he would walk
 7 around in jeans and T-shirts all day and
 8 fix the building.  Any project that needed
 9 to be done in that building, he did it.
10      Q.   So there came a time when you
11 changed your position from basic counselor
12 to a different position within the
13 Academy?
14      A.    Yes.  After meeting with Captain
15 Masterson, who informed me of what I just
16 informed you, that I had nothing to offer
17 the next class because I didn't do
18 carpentry work or running work, and I told
19 him that was not my job description and I
20 refused to do it and that I will return to
21 the next class, in which he told me over
22 his dead body will I return to the next
23 class; and I told him that I was not an
24 indentured servant or a slave to the State
25 Police.  I'm here to do a job as a
```

55

```
 1                WYNDER
 2 trooper, but that's what he made me feel
 3 like, and he said that if I don't do those
```

Page 49

94278

4      things I have to leave.

5          Q.    Did you leave the Academy?

6          A.    No, I went back and I contacted

7      EEOC, affirmative action, within the New

8      York State Police.

9          Q.    Who did you contact?

10         A.    I don't remember his name.

11     Lieutenant --

12              MR. MERRITT:   Lieutenant Cook?

13              THE WITNESS:   Cook.

14         Q.    What did you tell Lieutenant

15     Cook?

16         A.    I told him that I believed that

17     I was being discriminated against and that

18     Captain Masterson threatened to have me

19     thrown out of the next Academy class and

20     he didn't want me back.

21         Q.    Why did you believe that you

22     were being discriminated against?

23         A.    Because everybody else who --

24     usually, when you go up to the basic

25     school, you do one year, which is two

☐

56

1                   WYNDER

2      classes, and all the other white members

3      were being allowed to come back except for

4      me.

5          Q.    I don't know if I'm following

6      you.

Page 50

94278

```
7            You say they were allowed to
8    come back?
9       A.    Well, you do two basic schools.
10   So you would do -- we got there in March,
11   you would do the summer session, which
12   would be one Academy class, then you would
13   do the fall for that year.  It's a
14   one-year period.  Two classes. And all the
15   other counselors who arrived with me were
16   being allowed to stay except for me
17   because I refused to do, as I told
18   Lieutenant Cook, their slave work and I
19   wasn't going to be doing work -- job
20   performance that's not in my job
21   description nor that's expected of me.
22      Q.    Were there any other counselors
23   who were not invited back for the second
24   class?
25      A.    Everyone was invited back.
```

                                                            57

```
1                  WYNDER
2            I also told Lieutenant Cook that
3    I was offended that they wanted to get me
4    out and also that there were no black
5    academic instructors.
6       Q.    Of the counselors that were
7    invited back, were all of those counselors
8    white?
9       A.    I believe every single one of
```

Page 51

94278

10      them was white.  There may have been one

11      other minority counselor, if I can recall.

12          Q.    Was that other minority

13      counselor, as far as you know, invited

14      back?

15          A.    I think he got a promotion.  I

16      believe he left.  I don't recall if it was

17      that class or afterwards.

18          Q.    Do you recall the name of that

19      officer?

20          A.    No, I don't.

21          Q.    Other than that one other

22      minority counselor, was there anyone else

23      who was not white?

24          A.    Everybody else was white.

25          Q.    Now, how did it work that you

58

1                    WYNDER

2       went from a counselor to an academic

3       instructor?  How did that process work?

4           A.    Well, after I spoke to

5       Lieutenant Cook, he advised me to write a

6       letter explaining in detail what Captain

7       Masterson said to me, what he did to me

8       and the conditions under which I felt I

9       was an indentured slave, and also to the

10      fact that why there is no minority

11      academic counselors -- I referred to them

12      as -- that's the only thing that we're

94278

13    good for is just for muscle because there

14    was no minority academic counselors, and I

15    was told that it wasn't their job, by

16    Captain Masterson, to bring any highly

17    recommended minority academic instructors

18    to Albany.

19        Q.    To your knowledge, did any of

20    the other counselors who were invited back

21    who you say were all white, did any of

22    them refuse to do the tasks that you were

23    asked to do, the carpentry or the running

24    with the recruits?

25        A.    I don't -- I can't recall if

59

1                WYNDER

2    they were asked or did they volunteer.

3    That would be a personal thing that I

4    wouldn't be privy to.

5             After writing the letter, I -- I

6    wrote the letter, I submitted it on a

7    Friday.  When I returned Monday, I was

8    told that I would be returning to the next

9    class and that Captain Masterson was

10    overruled and that he was wrong, and I met

11    with Major Young who told me that my

12    findings and my observations were

13    absolutely correct, that they do need

14    minority academic instructors and that

15    they should bring academic instructors up

94278

16    and that Captain Masterson had no right to

17    do what he did and that he was being

18    overruled and I would be returning to the

19    class, and that they would handle my EEOC

20    internally so I wouldn't have to take it

21    outside. And at that point they told me

22    that they were forcing me -- if I wanted

23    to return, the only way I could return to

24    class was to be an academic instructor,

25    for which I had no training to be a

60

1                    WYNDER

2    teacher.

3        Q.    How did it, in general, not just

4    for you, but generally how did basic

5    counselors go from being a counselor to

6    being an academic instructor?

7        A.    They didn't go from being a

8    basic to an academic.

9              When we arrived, they would

10   submit on their -- prior education, that

11   they've taught before, and when we got

12   there, they would place us.  So they had

13   the requirements already.

14       Q.    So when you come in, when you

15   first start at the Academy, you would be

16   placed as either a basic counselor or an

17   academic instructor?

18       A.    Correct.  And then you would go

94278

19    through a certified instruction school to
20    get certified to teach, and then that
21    would be based on your past experience
22    with education and did you teach before,
23    which most of those guys, academic
24    instructors, did have prior teaching.  So
25    they were -- they were able to handle it.

61

1                     WYNDER
2    They had taught before.
3         Q.    When you came back for the
4    second class and you said you were then
5    given the position of academic instructor,
6    did you ask to be given that position?
7         A.    No.
8         Q.    How did it come about?
9         A.    I was forced to take it.  If I
10   didn't become an an academic instructor, I
11   could not come back.
12        Q.    Who told you that?
13        A.    Major Young.  And then that was
14   also reiterated to me by Captain
15   Masterson.
16        Q.    What was your understanding of
17   why they were saying that you could only
18   come back as an academic instructor?
19        A.    Because they wanted to set me up
20   in a position to fail.  I told them that I
21   never taught before, why would you want me

94278

22    to teach or do something I wasn't

23    qualified for when the careers of young

24    kids rely on me teaching them, and they

25    said, "No, you complained about there not

1                    WYNDER

2    being any black instructors, so you are

3    going to be one."

4              So to me it was a punishment.  I

5    wanted to come back as a basic counselor,

6    not as an academic instructor, but I

7    was told if I didn't come back as as an

8    instructor, I couldn't come back.

9        Q.    Did they say anything else to

10   you about why you were coming back as an

11   academic instructor other than that you

12   complained?

13       A.    Because I complained.

14       Q.    Any other reason?

15       A.    I also told them that if they

16   didn't have an academic instructor, that I

17   would go outside and sue EEOC, because I

18   felt that minorities going through the

19   Academy should be able to look up and see

20   at least one black instructor in the

21   Academy.

22       Q.    Prior to Major Young and Captain

23   Masterson telling you that you would

24   return as an academic instructor, you had

Page 56

94278

25      told them that if you did not see any

1                     WYNDER

2      minorities as an academic instructor, you

3      would go outside the agency to sue?

4          A.     Correct.

5                 But they acknowledged it.  They

6      acknowledged that I was right, that they

7      were being discriminatory and they weren't

8      bringing up black instructors to teach.

9      They were only bringing them up to do

10     push-ups.

11         Q.     Did you ever express to them

12     interest in you, yourself, becoming an

13     academic instructor?

14         A.     Never.

15         Q.     Did you particularly tell anyone

16     at the Academy that you did not want to be

17     an academic instructor?

18         A.     Lieutenant Cook.

19         Q.     Why did you tell Lieutenant Cook

20     you did not want to be an academic

21     instructor?

22         A.     Because I felt that I wasn't

23     prepared and I wasn't qualified for it.

24     Like I told you, before you come up

25     there -- I mean you are picked based on

94278

1           WYNDER
2    your prior experience.  You know,
3    everybody who was a trooper didn't roll
4    out of bed and become a trooper; they had
5    a career before they got there.  They used
6    people who had college degrees to be an
7    instructor, people who had taught, people
8    who had been in that capacity.  I was
9    never in that capacity.  Why would you put
10    me in that position?
11        Q.    Did Lieutenant Cook ask you
12    whether you wanted to be an academic
13    instructor during your conversation with
14    him?
15        A.    No.
16        Q.    Did anyone at the Academy ask
17    you, did you want to be an instructor?
18        A.    No, that was after I told them I
19    didn't want to do it.  That's when he
20    asked me why not.  And I told him I didn't
21    feel I was ready for it, but I took it
22    because I wanted to stay and finish out
23    the next class.
24        Q.    During the time that you were
25    the academic instructor in the next class,

1           WYNDER

94278

2    what did you teach?

3         A.    Well, I had to be certified, so

4    that was a two-week intense course.

5         Q.    Did you take that course?

6         A.    Yes, I did.

7         Q.    And then after that course was

8    completed, what did you teach?

9         A.    After I passed that, I was

10   surprised to see that I was thrown a core

11   course.  What I mean by "core course,"

12   there are certain courses that as a

13   recruit you could fail and still graduate

14   the Academy.  I was given a course that

15   was, one, very difficult, Vehicle and

16   Traffic Law, plus it was the first course

17   that the recruits would get, which means

18   if they failed in my class, they would not

19   move on.

20        Q.    What was the subject matter of

21   that course?

22        A.    Vehicle and traffic.

23        Q.    Were there other courses there

24   that you believe were less complicated?

25        A.    Of course.  There were plenty.

⊡

66

1              WYNDER

2    There were courses that as a new

3    instructor I should not have been given.

4    That was for teachers who already taught.

94278

5   You're talking about a guy's career here.

6   You put a teacher who's never taught

7   before in front of a class, if these guys

8   don't grasp what I'm trying to tell them

9   and then they fail, they get kicked out of

10  the Academy.

11        I believe they gave me that

12  course because they wanted me to fail, and

13  actually the captain -- Captain Masterson

14  sat in my class which caused a lot of

15  stress.  He sat in the back of the class.

16  That was the only class he sat in.

17        Q.   Let me back up for a moment.

18  You said that they gave you that course.

19        Do you have an understanding of

20  whose decision it was to give you that

21  course?

22        A.   Captain Masterson.

23        Q.   Why do you say that it was his

24  decision?

25        A.   Because he was in charge of the

67

1                 WYNDER

2   basic school.

3        Q.   When you say that he wanted you

4   to fail, did you have an understanding of

5   why he wanted you to fail?

6        A.   Yes, because he was embarrassed

7   of the fact that he had told everybody in

94278

8      the Academy, which is common knowledge,

9      that I would not return to that class over

10     his dead body, and when I wrote a letter

11     to EEOC and went over his head, he was

12     ordered by the Major that I had to come

13     back and he didn't like it, because he

14     told me that to my face, he said, "The

15     only reason why you here is because you

16     was ordered to stay here."  He told me

17     that he would be watching me and watch

18     everything that I do, and if he could find

19     a way to get rid of me he would.

20         Q.    Did he tell you that he gave you

21     the vehicle and traffic course because he

22     wanted you to fail?

23         A.    No, he didn't tell me that, but

24     he -- he's the one who assigned the

25     courses.

68

1                    WYNDER

2              Why would you, again -- I

3      reiterate, why would you give someone

4      who's never taught in front of a mass of

5      people a course that you need to move on

6      in the Academy, as a first-time

7      instructor?  That wasn't done.  All the

8      instructors who taught the core courses

9      had experience.  Okay.  They had to teach

10     other things first before they taught core

Page 61

94278

11    classes, except for me.  I was thrown

12    right into a core class.

13        Q.    Did you know of any other

14    academic instructor who was new to

15    teaching who was given the vehicle and

16    traffic course to teach?

17        A.    Nope.

18            MR. MERRITT:  Let me just

19    interrupt for a minute.

20            You had asked earlier of

21    Mr. Wynder if he had produced any of the

22    medications and any of the doctor's

23    records.

24            MS. ODESSKY:  Yes.

25            MR. MERRITT:  I just went into

69

1                WYNDER

2    the box that you gave me back, and Exhibit

3    18 has the doctor's records and the

4    medications and all those items that you

5    asked him if he had produced.

6            MS. ODESSKY:  Thank you.  I'll

7    take a look at that later.

8        Q.    Did anyone else besides Captain

9    Masterson tell you that the reason Captain

10    Masterson assigned you to the vehicle and

11    traffic course was because he wanted you

12    to fail?

13        A.    Yes, Lieutenant Cook and also --

94278

14      Q.      I'm sorry, when did Lieutenant

15   Cook tell you that?

16      A.      After I told him what course I

17   was teaching.  Everybody was startled to

18   the fact that I was given a core class.

19      Q.      When you say "everyone," who

20   else --

21      A.      All the academic instructors.

22      Q.      Do you know who?  Can you give

23   me names?

24      A.      I don't remember them.  I know

25   one was Sergeant -- Trooper Kirk.  That's

70

1                    WYNDER

2   the only one I could remember offhand. And

3   Trooper Morse.

4      Q.      You said that Captain Masterson

5   came and sat in the back of the class

6   while you were teaching the vehicle and

7   traffic course?

8      A.      Correct.  He sat there for

9   the -- for two days.

10      Q.      Do you know whether or not

11   Captain Masterson sat in on any other --

12      A.      I know for a fact that he did

13   not sit in on any other classes.

14      Q.      How do you know that?

15      A.      Because all the other academic

16   instructors informed me that he never sat

Page 63

94278

17    in none of their classes, and the class

18    before that, when I was a basic counselor,

19    he didn't sit in any of those classes.

20        Q.    How do you know that?

21        A.    I was there for that class.  I

22    was -- I used to go around and check up on

23    my recruits and I would go into the

24    classes.  He never sat in their classes.

25              And after the second day of

71

1                    WYNDER

2    sitting in my classes, Captain Masterson

3    requested that I be removed from my duties

4    as an academic instructor because I could

5    not cut it and I wasn't experienced enough

6    to teach the kids and he was getting

7    numerous complaints from the recruits that

8    I wasn't teaching right.

9        Q.    Did he tell you that directly?

10       A.    Yes, he did.  And he also told

11    the other academic instructors.

12       Q.    What were the complaints that he

13    was getting?  Were you told about who was

14    complaining?

15       A.    He never told me who.  He just

16    said numerous recruits, that they couldn't

17    hear me.  I wasn't speaking up.  I wasn't

18    conveying the information, my knowledge of

19    information wasn't good and that he

Page 64

94278

20    recommended that I be removed.  That was

21    common knowledge.  He tried to have me

22    removed.

23        Q.    Did you try to speak to any of

24    the recruits who you said were complaining

25    about you?

72

1                    WYNDER

2        A.    Well, the next class I asked,

3    was anybody having any problems, and they

4    said no.

5        Q.    Any other complaints that you

6    were aware of that Captain Masterson said

7    were made against you?

8        A.    Only that one, and also the fact

9    that -- one day we were in class and he

10    said something about blacks and minorities

11    making lawsuits, because I had EEOC'd

12    them.  I had heard that.

13        Q.    I'm sorry, Captain Masterson

14    said that?

15        A.    Yes.

16        Q.    Who did he say that to?

17        A.    He said it to me, and he said it

18    in front of my class.  This was during the

19    certification course, which he sat in on

20    that, too.

21             Ever since I became an academic

22    instructor, Captain Masterson started

94278

23    following me.  He already threatened me

24    that he was going to follow me and watch

25    me very carefully.  Anything that I did

73

1                     WYNDER

2    wrong he was going to have me thrown out

3    of the Academy, which he made obvious he

4    didn't want me there.  You know, when you

5    say, "You're not coming back over my dead

6    body," that's pretty clear and that was

7    told in front of everybody.

8        Q.    What was the comment that you

9    just mentioned, he said this -- you said

10    this was made during the two-week

11    certification course regarding blacks and

12    minorities?

13        A.    Yeah.  Well, I had did my

14    report -- you had to do a report at the

15    end of each class, and my final assignment

16    was you had to pick a topic and then you

17    had to show how you were going to do your

18    class for that.  So mine was racism based

19    on perception versus reality, and he made

20    comments and jokes about that.

21        Q.    What were the comments?

22        A.    Oh, that I was wrong and that,

23    "why did you pick racism to do as your

24    final project?  Are you trying to

25    insinuate that we're racist here?"

94278

```
1                    WYNDER
2        Q.    What did you say in response to
3   that?
4        A.    "Well, yes, you are."
5        Q.    Where did he make these
6   comments?
7        A.    He made it inside the class and
8   he also made it in the hallway, which I
9   then informed Lieutenant Cook again, and I
10  also informed Lieutenant Cook that he
11  tried to have me kicked out of the class.
12  And after informing Lieutenant Cook,
13  Lieutenant Cook, on his behalf, I was told
14  that I could continue the vehicle and
15  traffic course.
16       Q.    Let me back up for a moment.
17             When Captain Masterson made
18  these comments --
19       A.    I went to Lieutenant Cook.
20       Q.    -- he made them inside the
21  classroom.
22             Were other individuals present
23  there?
24       A.    Yes.
25       Q.    Who was present?
```

94278

```
 1              WYNDER
 2      A.    I don't recall.  There was about
 3   12 people.  12 other recruits, and I know
 4   one of them was Debra Campbell, she was
 5   the counselor -- I mean she was the
 6   instructor.
 7      Q.    I just want to be clear on what
 8   you are saying.  You said this was made
 9   inside your classroom when you were
10   teaching a course to the recruits?
11      A.    Yes, on why -- no, this was --
12   the comment on that was while I was --
13   after I had finished my presentation, I
14   had to do a final -- it was a final grade,
15   and he wanted to know why I picked that
16   subject.
17            He made a big -- he didn't yell
18   and scream, but he made his point to let
19   everybody know that he wanted to know why
20   I chose that as my topic.
21      Q.    But this took place inside the
22   classroom?
23      A.    Yes.
24      Q.    You were teaching --
25      A.    I had just finished -- I had
```

76

```
 1              WYNDER
 2   finished my final grade.  I wasn't -- it
 3   was a presentation.  This was my
```

94278

4    presentation.  This was other troopers.

5    We were all being certified to be --

6        Q.    This is part of the two-week

7    certification course?

8        A.    Right.

9        Q.    Before you started teaching the

10   vehicle and traffic?

11       A.    Right.

12       Q.    I just wanted to clarify that.

13   So the people that would actually be in

14   that class were either the instructor or

15   other people getting certified to be

16   academic instructors?

17       A.    Correct.

18       Q.    So one of those individuals, you

19   said, was Debra Campbell?

20       A.    She was an instructor.

21       Q.    She was instructing actually the

22   certification course?

23       A.    Yes, she was.

24       Q.    Was there anyone else there who

25   would have overheard the comments?

77

WYNDER

1

2        A.    I wouldn't recall right now.  I

3    know there was other people but I can't

4    recall.

5        Q.    Other than asking you why did

6    you pick racism as the topic for your

94278

7  project, was there anything else that

8  Captain Masterson said that you could

9  recall?

10      A.    Again, he just reiterated that

11  he would be watching me.  He made it very

12  known that he didn't like me, so....

13      Q.    How did he make it known that he

14  didn't like you?

15      A.    Well, he told everybody I

16  wouldn't return to the next class over his

17  dead body, and that I had no -- nothing to

18  offer the Academy class and that I was

19  lazy and I was -- and that I spoke back to

20  him, but not in an insubordinate way, but

21  he didn't like it that I didn't go along

22  with the program.

23          That's what he told me.  I'm not

24  the kind of trooper that goes along with

25  the program.

78

1                  WYNDER

2      Q.    What did he mean by that, "goes

3  along with the program," as far as you

4  understood?

5      A.    Basically be their indentured

6  slave.  Do what they say.  That's the

7  State Police motto, "If you don't what we

8  say, we won't like you."  He wanted me to

9  run with the recruits.  He wanted me to do

94278

10    carpentry.  He wanted me to make errands.

11    He wanted me to wash his car.

12          When you told that captain that

13    you didn't want to do these things, he

14    didn't like you.  I guess he thought our

15    job was for personal needs as a basic

16    counselor in that Academy class.  Most of

17    the guys did the basic needing and bidding

18    for the captain up there.

19          Q.    Were other individuals that were

20    up there as counselors or instructors, did

21    they do errands?

22          A.    Oh, yes, they did.  They went

23    along with the program.

24          Q.    What kind of errands did they

25    do?

79

1                    WYNDER

2          A.    "Go wash my car, go pick up

3    this, go drop off this."  I mean this was

4    a norm.  "Can you fix that mirror?  Can

5    you hammer this?  Can you carry this? "

6    That was basic.  You got up in the morning

7    and you had errands to do.

8          Q.    Who was asking for these errands

9    to be done?

10          A.    A lot of it was Captain

11    Masterson.  He would call you into the

12    office and tell you, "Go wash my car down

94278

13    the block.  We have an account there" --

14    basically it was Captain Masterson.  The

15    lieutenant sometimes would tell us -- when

16    I remember his name.

17        Q.    The other individuals who were

18    doing these errands, were they minorities?

19        A.    No, they were white, and that's

20    what Masterson meant by I wouldn't go

21    along with the program.  I wouldn't do

22    everything that they asked me to do.

23            He also brought up the fact that

24    when I got there I was overweight.

25        Q.    What did he say about that?

□

                                                    80

1                    WYNDER

2        A.    He told me I was overweight and

3    I replied to him that not only was I

4    overweight, I worked out and I got down to

5    my weight, and I told him that, "You are

6    also on the overweight program and you

7    have yet to get down to weight."

8            So I said, "I've conformed to

9    everything that was expected of me here in

10    this Academy, except that I'm not going to

11    do your personal bidding and I'm not here

12    to work for the State Police in anything

13    other than the capacity I was brought here

14    to do which is to be a basic counselor,

15    tend to my recruits and their needs and

94278

16    make sure they graduate."  I was not an

17    indentured servant, which I went above and

18    beyond.  I became -- I obligated myself to

19    be a tutor, which I didn't have to, and I

20    did that for the purposes of helping the

21    minorities graduate, because at the time

22    the State Police was supposed to have had

23    a minority federal lawsuit against them.

24         They said they had to bring in a

25    certain amount of minorities.  But that

81

1                    WYNDER

2    lawsuit only states that they have to

3    bring them in, they don't have to graduate

4    them, which I don't understand.  If you

5    bring in a certain amount of minorities,

6    you should make it your business to have

7    them graduated.  But I was told that that

8    wasn't their problem.  Their only problem

9    was to bring them to the Academy, and if

10   they couldn't make it through academic, so

11   be it, they failed, they kick them out.

12        Q.    Let me go back for a moment to

13   Captain Masterson.

14             You said that he said in front

15   of everyone that you wouldn't be returning

16   over his dead body, correct?

17        A.    Yes.

18        Q.    When you say "everyone," who do

94278

19    you mean?  Do you mean other counselors,

20    other instructors?

21        A.    Lieutenants, other colonels.

22    Anybody in the building, he was bragging

23    that I was leaving.  We also had --

24        Q.    Can you remember the name of any

25    particular individual?

82

1                    WYNDER

2        A.    Lieutenant Cook, all the basic

3    instructors.  The other lieutenant.

4    People in the cafeteria, because they

5    teased him, you know, they would tell him

6    that, "I guess you're dead, Captain,

7    because he's back."

8              So he hated me.  He tried to

9    make my -- which he did.  He made my last

10    six months at the an Academy so hostile

11    that I couldn't even do my job there, and

12    I tried and --

13        Q.    When you say you couldn't do

14    your job, what do you mean?

15        A.    I was stressed.  He was sitting

16    in my class.  He tried to get me thrown

17    out of my class.  He was watching me.

18    Everything that I did, Captain Masterson

19    was watching.

20        Q.    How do you know that he was

21    watching?

94278

22    A.    From what he told me, he sat in

23  my class.  The lieutenant would tell me

24  that he saw me doing this, he saw me going

25  here.

⧠

83

1              WYNDER

2    Q.    What kind of things was he

3  seeing you do?

4    A.    I left the building.  "Why did

5  you leave?"  I had reasons, I always had

6  reasons, but he wanted to know.

7    Q.    What other kinds of things --

8    A.    Anything I did.  Any movements

9  that I made in there.  "Why was you in the

10  waiting room?  You should have been

11  here."  When I told him, no, I was on my

12  lunch.  Anything he could find to bring me

13  up on charges, he tried.

14    Q.    Did you actually get written up

15  on charges while you were at the Academy?

16    A.    No.

17    Q.    How did it come about that you

18  left the Academy?

19    A.    Well, I was supposed to have

20  been -- I was supposed to have been

21  promoted during my time in the Academy.

22  It was known that when you go to Albany,

23  you get promoted to investigation.  And I

24  was promised to be promoted.

94278

25      Q.      Who promised you that?

84

1                     WYNDER
2        A.      Well, actually, before I went to
3    the Academy, I had my interview to go to
4    the BCI, which is the Bureau of Criminal
5    Investigation.
6        Q.      Who did you have that interview
7    with?
8        A.      Captain Burns, B-u-r-n-s.
9        Q.      That took place prior to you
10   going to the Academy?
11       A.      Yes, that took place, and that
12   is another reason -- I took that -- that
13   was done at SP Poughkeepsie at the time,
14   which I went to Poughkeepsie and I had to
15   be interviewed by one Captain Burns.   I
16   got there early.
17              At the time I interviewed, I was
18   told to go in, I went in, Captain Burns
19   was on the phone, and he told me to stand
20   at attention and he would be with me
21   shortly.  He then proceeded to stay on the
22   phone for a good 20 minutes while I stood
23   at attention in front of a mural painting
24   of the civil war with the victorious
25   troops holding a Confederate flag.

94278

85

1                    WYNDER
2        Q.    Was anyone else present in the
3    room at this time?
4        A.    No, it was me.  And I felt very
5    offended to the fact that I'm in a State
6    Police facility and here is hanging a
7    picture of the Civil War with the
8    Confederate flag waving, which to me
9    showed that they believe the Civil War
10    should have been won by the Confederate
11    people, and I felt very bad about the fact
12    that I thought this country had come a
13    long way from the Civil War.  I was
14    appalled.
15        Q.    Did you have the interview with
16    Captain Burns?
17        A.    Yes.  20 minutes after standing
18    in front of this picture.  He proceeded to
19    interview me and demean all my
20    accomplishments at SP Peekskill.
21        Q.    How did he demean your
22    accomplishments?
23        A.    "Oh, you had all these arrests,
24    DWIs, but they weren't -- how did you do
25    this?  Did you really do all this felony

86

1                    WYNDER

94278

2    work?" It's like he didn't believe me, and

3    the interview did not go well.  Even

4    though I reiterated to him that I was

5    always in the top three in activity in my

6    class.  I had excellent and outstanding

7    evaluations.

8       Q.    Did he say anything else to you

9    during the interview?

10      A.    He just told me that, you know,

11   he would let me know, but under his

12   recommendation he didn't believe I was fit

13   to be in the BCI.  I didn't show enough

14   promise.

15      Q.    Did he say that directly to you?

16      A.    Yes, he did.

17      Q.    Was anyone else present during

18   this time?

19      A.    No.

20            And after I left there, I went

21   directly to my station commander, told him

22   how the interview went and my station

23   commander, out of his own words stated

24   that, "That racist red neck bastard."

25      Q.    And that was --

87

1              WYNDER

2       A.    Sergeant Robert Welsh.

3       Q.    What did you do after that?

4       A.    Well, Sergeant Robert Welsh said

94278

5    he wasn't going to stand for that.  He
6    called Albany and Colonel Tagget
7    (phonetic), which is the confidante,
8    assistant, to the superintendent was told
9    of what happened, and that Colonel Tagget
10   would look into it.
11       Q.    Did you put anything in writing
12   regarding that?
13       A.    No.
14       Q.    What was the results, if any --
15       A.    When I got to the basic school
16   as a counselor, which was only like three
17   weeks later, I was pulled aside by Colonel
18   Tagget who informed me that that picture
19   was removed from the wall and that the
20   State Police would not tolerate that kind
21   of behavior or implications, that they
22   believe in the Confederate flag.
23       Q.    Did you do anything further with
24   regard to that interview with Captain
25   Burns?

88

1                 WYNDER
2        A.    I asked for another interview,
3    but I wasn't given one.
4        Q.    So would it be fair to say that
5    your first choice when you were at SP
6    Peekskill was to go to the BCI rather than
7    to the Academy?

Page 79

94278

8      A.    No, you always wanted to go get

9   promoted to the BCI.  I didn't mind going

10  to the Academy.  It was the norm.  You do

11  a year for the job, you walk the carpet,

12  you do the road work and then you get

13  promoted.  That was a norm.

14      Q.    So it was your understanding

15  that if you went to --

16          MR. MERRITT:  Let me interrupt

17  for a second.

18          I wish to object to the first

19  question that you asked because it was out

20  of sequence.

21          His testimony was that after

22  going to the Academy and achieving the

23  rank of instructor, the next normal

24  promotion would have been to BCI.  The way

25  you worded the question was would you

89

1              WYNDER

2   rather have gone to the Academy or to BCI,

3   and I think from his answer, previous

4   answer, the question was confusing.

5          MS. ODESSKY:  I'll rephrase it,

6   and I'd ask Mr. Merritt to please keep the

7   speaking objections to a limit, but I'll

8   rephrase the question.

9   BY MS. ODESSKY:

10      Q.    At the time, Mr. Wynder, that

94278

11    you were at SP Peekskill, your goal from

12    SP Peekskill was to go into BCI; would

13    that be fair to say?

14        A.    Correct.

15        Q.    But you went to the Academy and

16    it was your understanding that when you

17    spent two years in the Academy, that the

18    next step for you would be going from

19    there to the BCI; is that fair to say?

20        A.    Yes, the two classes.  That was

21    like, you know -- you go to the Academy,

22    you do something for us, we also do

23    something for you.  I was qualified.

24        My sergeant put in the papers

25    that I should have been in the bureau,

90

1                WYNDER

2    which is the BCI.

3        Q.    When you say that was your

4    understanding, what do you base that on?

5    Is that something --

6        A.    Presence of other troopers that

7    have been sent to the Academy.  They left

8    the Academy.  Numerous troopers, almost 80

9    percent of the troopers who go who are on

10    the list for BCI, leave the Academy and go

11    to the bureau.

12        Q.    Where do you get that statistic

13    from, 80 percent?

Page 81

94278

14   A.    Well, I can only go by my first

15   four years on the job.  Most of the guys

16   out of my station, when they went to the

17   Academy, you got promoted.

18   Q.    Did you know of any troopers who

19   spent two years at the Academy --

20   A.    Two classes.  Some didn't even

21   spend that much.  Some was only six months

22   and then get promoted from there.  I can't

23   recall the names.

24   Q.    Regardless of their names, were

25   you aware of any troopers who left the

91

1              WYNDER

2   Academy and did not go to BCI?

3   A.    There was some but they might

4   not have been on the list.  A lot of

5   people didn't want to go to Albany.  You

6   are leaving your station to go all the way

7   up to Albany to be surrounded by nothing

8   but captains, colonels and the

9   superintendent.  So a lot of them didn't

10   want to go there.  Basically they had to

11   entice you to get troopers to go up

12   there.  So it was troopers who wanted to

13   study for the sergeant's test while they

14   were up there or get promoted to the BCI.

15   Q.    I'm asking you, were you aware

16   of any troopers who did go to the Academy

Page 82

94278

17    for some period of time, two years or a
18    less period of time, that did not end up
19    getting the promotion to BCI?
20        A.    I wouldn't say did they get it
21    or not.  I don't know if they requested
22    it.  You have to request it.  You can go
23    to Albany and come back, if you didn't put
24    in for the BCI, you're not going to get
25    promoted so I wouldn't know -- I couldn't

☐

92

1                    WYNDER
2     tell you -- I just know I -- I physically
3     saw troopers who went to the Academy get
4     promoted to the BCI.  A lot of them got
5     promoted from Albany.
6         Q.    Do you know of anyone who had
7     put in, applied to go to BCI from the
8     Academy but was not permitted to do that?
9         A.    The ones in my station went.
10        Q.    When you say the ones in your
11    station --
12        A.    SP Peekskill.
13        Q.    So you are saying that everyone
14    from SP Peekskill who went up to the
15    Academy then went onto BCI?
16        A.    Yes.  As a matter of fact, I
17    could state on the record that when I got
18    to Peekskill in 1987, every trooper in
19    front of me was promoted to the BCI and

94278

20    almost every trooper below me who came in

21    after me was promoted to the BCI.

22        Q.    When you say came in after you,

23    how many years are you talking about after

24    you?

25        A.    A year, two years, had less

93

1                 WYNDER

2    seniority than me, got promoted before I

3    did.

4        Q.    Just so I'm clear, everyone that

5    you started with in SP Peekskill, as far

6    as you know, was promoted to BCI?

7        A.    Yes.   I can give you the names.

8        Q.    Okay.

9        A.    Trooper Dwyer, Trooper McKenzie,

10   Trooper Swanson, Trooper Pagan, Trooper

11   Brobola, B-r-o-b-o-l-a.

12       Q.    Anyone else?

13       A.    Trooper Dexter, Trooper Senik,

14   S-e-n-i-k.

15       Q.    Anyone else?

16       A.    Trooper Meybaum, M-e-y-b-a-u-m.

17       Q.    Anyone else?

18       A.    Trooper Titus, T-i-t-u-s;

19   Trooper Mergian, M-e-r-g-i-a-n; Trooper

20   Jules Renner.

21       Q.    Anyone else?

22       A.    Let me see.   Those are the ones

94278

23    I can recall.  They all requested it and

24    they all got it.  Peekskill was a

25    favorite -- in our troop, number 1 in

94

1                    WYNDER

2    activities, and basically everybody got

3    promoted out of their station except me.

4    After that, half of that list were on

5    before me, the other half came in after

6    me.

7         Q.    Of any of the troopers you

8    mentioned, are any of them minorities?

9         A.    Yeah.

10         Q.    Who would that be?

11         A.    Jules Renner is a minority.

12    Trooper Titus is a minority.

13         Q.    Anyone else?

14         A.    That was it.  Everybody else was

15    white.

16         Q.    Now, from the Academy, where did

17    you go when you finished there?

18         A.    Back to SP Peekskill.

19         Q.    Whose decision was it for you to

20    go back to SP Peekskill?

21         A.    My two academic classes were

22    over and I wasn't invited back to the

23    Academy, nor did I want to stay there

24    because I was so harassed by Captain

25    Masterson that I could no longer do my

Page 85

94278

```
 1                  WYNDER
 2    duties there as a counselor or as an
 3    instructor.
 4        Q.    Was it a possibility for you to
 5    have stayed more than two years?
 6        A.    Yeah.
 7        Q.    Had you wanted to?
 8        A.    Yeah.  Some of the other
 9    counselors did stay another class.  You
10    put in for it.
11        Q.    Was it your understanding that
12    had you specifically asked to stay at the
13    Academy you could have?
14        A.    I was told I was not being
15    invited back to the next class nor would I
16    ever be called back to the class to teach.
17        Q.    Did you ask anyone whether you
18    could be invited back?
19        A.    Of course.  I wanted to continue
20    to teach.  You have courses where troopers
21    come off the road and they come back just
22    to teach that two weeks, just to teach
23    those classes.  You don't stay but you
24    come in to teach a specific area.
25        Q.    Who did you ask whether you
```

94278

```
 1                    WYNDER
 2    could continue to teach?
 3         A.    Captain Masterson.  And he told
 4    me he would not call me back.
 5         Q.    Did he tell you why?
 6         A.    Of course.  He didn't like me.
 7    He told me he didn't want me there.  As
 8    long as he was there, if he could help it,
 9    I would never be there.
10         Q.    Did you talk to anyone else
11    about coming back to teach?
12         A.    Lieutenant Cook.
13         Q.    What did Lieutenant Cook tell
14    you when you asked him if you could come
15    back to teach?
16         A.    He said that I have that right
17    as a -- if the State Police just paid -- I
18    mean the course is a two-week intense
19    course, college credits.  I was certified
20    to teach.  I could go teach anywhere.  Why
21    wouldn't the State Police want to exercise
22    the commitments that they gave to me to
23    come back and teach.  He said, "We'll make
24    sure that you'll get called back." But
25    until my retirement I was never called
```

97

```
 1                    WYNDER
 2    back.
 3         Q.    Other than speaking to Captain
```

94278

4    Masterson or Lieutenant Cook about this,

5    did you ask anyone else whether you could

6    come back?

7        A.    Yes.  My station commander,

8    Sergeant Robert Welsh.

9        Q.    Anyone else?

10       A.    That was it.

11       Q.    Now, you went back to SP

12   Peekskill and that was about 1994?

13       A.    '93.

14       Q.    When you went back there, what

15   were your duties?

16       A.    A trooper again.  That was after

17   I had been promised to be promoted, and

18   then when the list came out, I was told

19   that I would not be promoted.

20       Q.    What were you promised to be

21   promoted to, what rank?

22       A.    Investigator.

23       Q.    Did that require you taking a

24   test?

25       A.    No.  That's appointed.  I had

98

1                WYNDER

2    already spoken to -- down here in the

3    city, which would be the DETF.

4        Q.    Who did you speak to there?

5        A.    Lieutenant -- it was a black

6    lieutenant and he called me, actually.

94278

7     Q.     How did that come about that he
8  called you?
9     A.     Well, he had been informed that
10  I was going to be promoted and he wanted
11  to talk to me and see if I was welcome to
12  down here.
13     Q.     Who informed him that you were
14  going to be promoted?
15     A.     He just said he had got a call
16  from Captain Masterson.
17     Q.     Captain Masterson told him that
18  you were going to be promoted?
19     A.     That he was told that I was
20  going to be promoted.  Captain Masterson
21  also told me, "Congratulations."
22     Q.     When did he tell you
23  congratulations?  Were you still at the
24  Academy at that time?
25     A.     Of course.  Right before the

99

1             WYNDER
2  list came out.
3     Q.     That was prior to you leaving
4  the Academy?
5     A.     Correct.
6     Q.     Was that in your second year at
7  the Academy?
8     A.     Second class, yes.
9     Q.     How did that come about?  What

94278

10    did Captain Masterson say to you?

11        A.    Well, he didn't say actually

12    "congratulations."  He just told me that

13    he has to look for another instructor to

14    finish up because I would be leaving

15    because I was -- he was told that I would

16    be promoted.

17        Q.    Who told him that, as far as you

18    know?

19        A.    He said troop.  That's where it

20    would come from, I assume.

21        Q.    What happened after that?

22        A.    Well, the list came out and my

23    name wasn't on it.

24        Q.    What was your understanding of

25    how that happened?

100

1                WYNDER

2        A.    The list came out, I looked on

3    it, my name wasn't on it.  I asked why,

4    and they told me that they wanted to pick

5    from another troop instead of Troop K.

6        Q.    Troop K is Peekskill?

7        A.    Troop K is Westchester.

8        Q.    So when the list came out, would

9    it be fair to say that all the troopers

10    that -- and they were on the list of

11    people you gave who were promoted, their

12    names were on that list and yours was not?

94278

13   A.   They didn't all go on that list

14   but they all got promoted but some of them

15   that was on there --

16   Q.   So there were troopers from

17   Peekskill?

18   A.   That got promoted.  Well, Troop

19   K.  You have to fill slots.  There's a

20   certain amount of numbers that come from

21   Troop K, Troop B, throughout the State,

22   and that's how they form a list.

23   Q.   Did you have an understanding of

24   who was responsible for your name not

25   being on that list?

101

1   WYNDER

2   A.   I was told that Captain

3   Masterson had something to do with it

4   because he had spoke to me prior to that,

5   and after the list came out, he never

6   spoke to me again.

7   Q.   When you say he spoke to you

8   before --

9   A.   Like he would speak and after

10   that he would -- he never spoke to me

11   again.

12   Q.   When you say you were told that

13   he had something to do with it, who told

14   you that?

15   A.   Other troopers, even my

94278

16    sergeant, Robert Welsh told me.

17        Q.    What did Sergeant Welsh say to

18    you about that?

19        A.    Well, he said that I messed up.

20    I went up to Albany and I ruffled some

21    feathers and that I wasn't going to get

22    promoted to investigator ever.

23        Q.    What else did he say about --

24        A.    He said if you want to move on,

25    you would have to take the sergeant's

102

1                    WYNDER

2    test, because you're not going to get

3    promoted.

4        Q.    Did he explain what he meant by

5    saying you messed up?

6        A.    Oh, yeah.  I had accused the

7    State Police of being discriminatory,

8    racist.

9        Q.    Anything else?

10        A.    No, that's what he told me.  He

11    said, "You went up and instead of going

12    along with the program" -- I made a name

13    for myself in the wrong way.  And that I

14    EEOC'd them.  State Police don't take

15    kindly to anybody who shows any kind of

16    resistance to their practices and

17    procedures.

18        Q.    When you went back to SP

94278

19  Peekskill, how long did you stay as a
20  trooper once you returned from the
21  Academy?
22      A.   Six months and then I
23  transferred to Hawthorne.
24      Q.   Why did you transfer to
25  Hawthorne?

103

1                    WYNDER
2      A.   Highway patrol.
3      Q.   Was that your choice?
4      A.   Yes, I put in for it.
5      Q.   Why did you put in for that?
6      A.   I wanted a change.
7      Q.   When you say you wanted a
8  change, why did you want a change?
9      A.   Highway.  No complaints.
10     Q.   You mean --
11     A.   SP Peekskill does everything
12  regular police officers do.  SP Hawthorne
13  is strictly highway.  So you write
14  tickets, accidents.
15     Q.   So you didn't want to have to
16  respond to individual --
17     A.   I just wanted a change.  I had
18  been doing it for five years, six years.
19  You know the town, you know the same
20  people.  I just got tired.
21     Q.   When you transferred to the

94278

22    Hawthorne highway patrol, what was your

23    position there?

24         A.    Still a trooper.

25         Q.    What did your duties consist of?

                                                              104

1                     WYNDER

2          A.    Writing speeding tickets.

3          Q.    Who is your commander there?

4          A.    Captain Spahl.  Well, at first

5     it was Captain O'Donnell.

6          Q.    How long were you with

7     Hawthorne?

8          A.    I was there until I retired on

9     disability.

10              MS. ODESSKY:  Off the record.

11              (Discussion off the record.)

12              (Luncheon recess:  1:25 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

94278

25

105

1                    WYNDER

2           A F T E R N O O N   S E S S I O N

3                    (2:05 p.m.)

4    K E N N E T H   N.   W Y N D E R,  having

5    been duly sworn was examined and testified

6    as follows:

7    CONTINUED  EXAMINATION

8    BY MS. ODESSKY:

9         Q.    Mr. Wynder, before we broke for

10   lunch, we were talking about your having

11   gone back to SP Peekskill after you left

12   the Academy.

13        A.    Correct.

14        Q.    You said that your troop

15   commander was first Captain O'Donnell and

16   then Captain Spahl?

17        A.    Correct. As I can recall, yes.

18        Q.    And you stayed at SP Peekskill

19   until your retirement --

20        A.    No, SP Hawthorne, until I

21   retired.

22        Q.    Sorry, SP Hawthorne, until you

23   retired.

24             Now, while you were at SP

25   Hawthorne, did you have occasion to be

94278

```
1                    WYNDER
2   disciplined?
3        A.    Yes.
4        Q.    What was that discipline for?
5        A.    The first discipline was an
6   off-duty incident that happened in SP
7   Newburgh -- just Newburgh.
8        Q.    In the Town of Newburgh?
9        A.    Town of Newburgh.  City of
10  Newburgh.
11       Q.    When did that incident occur,
12  approximately?
13       A.    Approximately '96.  '95, '96.
14       Q.    Would it be fair to say that you
15  were at Hawthorne for about two to three
16  years at that point?
17       A.    I would say about that, yeah.
18       Q.    What was the incident that
19  happened in the City of Newburgh?
20       A.    I was dropping off a friend at
21  his house and it was me, my friend and
22  another individual, all black males.
23       Q.    Can you tell me their names?
24       A.    One was Chris Scudder,
25  S-c-u-d-d-e-r.
```

```
1                    WYNDER
```

94278

2      Q.     Do you recall anyone else?

3      A.     Yes, but I don't quite remember

4   his name.  At that time he was an

5   associate.  We were just dropping him off.

6      Q.     So you were in a car?

7      A.     Correct.

8      Q.     You were driving?

9      A.     Yeah, I was driving.

10     Q.     So Chris Scudder and another

11  individual were in the car with you?

12     A.     Yes.

13     Q.     Anyone else in the car?

14     A.     No.

15     Q.     What happened?

16     A.     We pulled up to let him out.

17     Q.     Who were you letting out?

18     A.     The individual, not Chris

19  Scudder.

20     Q.     What happened then?

21     A.     There was an arrest in progress

22  by the City of Newburgh police.

23     Q.     Who was being arrested?

24     A.     A male subject.

25     Q.     Did you know who that person

108

1              WYNDER

2   was?

3      A.     No.

4      Q.     It was not someone known to you?

Page 97

94278

5      A.    No.

6      Q.    Did you see the officers were in

7   uniform?

8      A.    Correct.

9      Q.    And you recognized their uniform

10  as being the City of Newburgh?

11     A.    Yes.

12     Q.    Do you know who the officers

13  were?

14     A.    No.

15     Q.    Did you know them at the time?

16     A.    No.

17     Q.    What time of the day was this?

18     A.    This was approximately about --

19  it was nighttime.  I know that.  In the

20  later evening.  I believe after 9:00.  I

21  don't -- not really sure.  But we pulled

22  up, again, as I said, we waited until the

23  cops made their arrest.  We didn't want to

24  interfere in their arrest.

25     Q.    Now, when you say you pulled up,

109

1                    WYNDER

2   where was the arrest taking place?

3      A.    Well, we pulled up on the

4   street, on the left-hand side.  His

5   apartment was right there, and

6   approximately 50 to 100 feet, 200 feet up

7   maybe, City of Newburgh was effecting an

94278

8   arrest, which was the guy was resisting

9   and they finally got him down to the

10  ground and arrested him.  I told everybody

11  in the car to stay in the car, let's not

12  get in their way, so they won't have any

13  problems.

14      Q.    How many officers from the City

15  of Newburgh were there?

16      A.    There were at least two other

17  cars sitting there.  There was a crowd of

18  people.

19      Q.    Could you tell me how many

20  officers there were?

21      A.    Maybe about -- officers?  That I

22  could see right offhand, at least four or

23  five.  There was a crowd of about 10 or 20

24  that was following the incident.

25      Q.    Was the person white or black,

110

1                 WYNDER

2   Hispanic?

3       A.    I believe he was a white man.

4       Q.    So you said the person --

5       A.    I believe.  I'm sorry, I

6   believe.  I --

7       Q.    Not certain?

8       A.    Can't recall if he was white or

9   black.

10      Q.    You said the person was

Page 99

94278

11  resisting arrest but eventually the police
12  were able to get him down to the ground?
13      A.    Correct.
14      Q.    Was there any other individual
15  involved besides the person who was being
16  arrested?
17      A.    Not that I know of.
18      Q.    When you say the person was
19  resisting, what did you see them doing?
20      A.    Throwing him to the ground.
21      Q.    That's what you saw the police
22  doing?
23      A.    Yes, they forced him down and
24  then they effectively arrested him.
25      Q.    When you say that that

                                        111

1               WYNDER
2   individual being arrested was resisting,
3   what did you see that individual doing
4   prior to being thrown to the ground?
5       A.    He was running from them.
6       Q.    Would you say he was running
7   quickly?
8       A.    I don't know.  I just know they
9   were in pursuit of him.
10      Q.    Was this a long pursuit?  Did
11  they have to run after him a full block?
12      A.    That I wouldn't know.  When I
13  pulled up, they had just surrounded him

                    Page 100

94278

14      and then they grabbed him.

15          Q.     So did you actually see the

16      individual running at the time you pulled

17      up?

18          A.     Just for a little bit and then

19      another police officer stopped his path

20      from going another way and then they

21      surrounded him.

22          Q.     And then what happened after

23      they surrounded him and got him down to

24      the ground?

25          A.     They handcuffed him and they

112

1                  WYNDER

2       took him off.

3           Q.     What did you do next?

4           A.     At that point I said to my --

5       Chris Scudder and my other associate, I

6       told them, "Okay, let's get out and walk

7       him to the door so we can go home." You

8       know, and they said okay.  We got out of

9       the car, at which point we were approached

10      by the City of Newburgh police.

11          Q.     When they approached you, how

12      many officers approached you?

13          A.     Two.

14          Q.     What did they say?

15          A.     Well, they started questioning

16      us, asking us who are you and what are you

94278

17   doing here, and at that point I told the
18   police officer that "I was dropping my
19   friend off and we just pulled up and we
20   waited for ya'all to make your arrest, we
21   didn't want to get in your way and we were
22   going about our business."
23        Q.   What did they respond to you?
24        A.   They wanted to see ID and they
25   wanted to check my car.  At which time I

⬚

                                              113

1                    WYNDER
2   told them that my civil rights -- I said,
3   "I don't have to allow you to do that."
4   I said, "I haven't done anything."  And
5   then I said, "Officer, am I suspect?"  He
6   said, "I didn't ask you all of that."  I
7   said, "I'm going to ask you again,
8   Officer, am I a suspect?"
9        Q.   You identified yourself as a
10  State trooper at that point?
11       A.   No.
12       Q.   Why not?
13       A.   Because I didn't feel I had to
14  identify myself as a trooper in order for
15  a police officer to respect my rights.
16       Q.   Did the officers give you any
17  idea of why they wanted to see your ID?
18       A.   No.  I kept asking, "Why do you
19  want to see my ID?"  And they said, "Don't

94278

20    you know" -- "Didn't you just see we

21    arrested somebody?"  I said, "Yes, and

22    that had nothing to do with me and my

23    friends.  Is there a problem?"

24              And then they used a term that

25    is used to almost every suspect in the

                                                        114

1                    WYNDER

2    street.  "You look like somebody we were

3    looking for."

4         Q.    Who said that to you?

5         A.    The police officer.

6         Q.    Do you know which officer said

7    that?

8         A.    I don't recall.

9         Q.    What did you say in response?

10        A.    I said, "Really?"  I said, "Who

11   told you that we look like who you are

12   looking for?"  I said, "Who are you

13   looking for?  If I look like somebody,

14   then you should have a name."  He refused

15   to give me a name.

16        Q.    Did only one officer speak to

17   you or did other officers speak to you?

18        A.    One was speaking and the other

19   one was looking around in my car with his

20   flashlight and looking and everything.

21        Q.    Had you given them permission to

22   look in my car?

94278

23      A.      I told them no, they didn't have

24  permission to look in my car.

25      Q.      They were looking in your car

115

1                      WYNDER

2   without permission?

3       A.      Correct.

4       Q.      How did they get into the car?

5       A.      Well, they opened up the doors

6   and my friends got out and I told my

7   friends to stay in the car, "You didn't do

8   anything wrong.  We didn't do anything

9   wrong, what is the problem?"

10              They kept saying, "There's a

11  crime over here.  Didn't you see it?  You

12  could be a suspect."

13              "Now I'm a suspect?  Now you

14  telling me I'm a suspect?"

15              At which time me and him got

16  into an argument, because I told him, "I

17  didn't do anything and I'm not giving you

18  any ID until you tell me what you say I

19  did."

20      Q.      What did he say?

21      A.      He never told me.

22      Q.      Did there come a time when you

23  identified yourself as a State trooper?

24      A.      Yes, I did.

25      Q.      When was that?

94278

116

```
 1                    WYNDER
 2        A.    After I told him the -- I said
 3    I'm -- "The only reason I'm identifying
 4    myself now is that you are pushing this to
 5    the point where you have no right and what
 6    you are doing is wrong and you are
 7    violating my civil rights," and I said,
 8    "I'm not going to take it anymore."
 9            Once I showed them my shield, he
10    said, "Why didn't you do that in the first
11    place?"
12        Q.    What did you respond?
13        A.    I told him, "I don't feel I need
14    to tell you that I'm a cop to get you to
15    respect my rights as a citizen."  I said,
16    "I'm a citizen first, then a State
17    trooper."
18        Q.    How did that incident end?
19        A.    Well, he yelled and screamed and
20    I yelled and screamed at him and I told
21    him that I'm leaving.
22            I said, "Unless you want to
23    arrest me, I suggest you get out of my way
24    and I'm going to get out of here.  If you
25    want to arrest me, I'll go to the station
```

117

94278

1                    WYNDER
2    with you right now."
3        Q.    In the yelling and screaming,
4    did he use profanity at you?
5        A.    Yes, he cursed at me.
6        Q.    What types of things did he say?
7        A.    He told me, "who the hell you
8    think you are?  You being a smart ass.
9    Don't tell me you think you know the
10   law."
11            This is all before he found out
12   I was a trooper.
13       Q.    Did you use profanity to him?
14       A.    I don't recall.  I might have
15   told him to shut the hell up, but I didn't
16   curse directly at him.  I just told him I
17   wasn't going to give him my ID.  He wanted
18   my ID.
19            Finally I said, "I'll give you
20   my ID," that's when I showed him my
21   shield.
22       Q.    Did you end up going with them
23   to the stationhouse?
24       A.    No.  He told me I could go, and
25   then I told him, "why?  All of a sudden

118

1                    WYNDER
2    now, because I'm a trooper, you're not
3    going to continue to harass me and ask for

94278

4    me to come with you and what was I doing?"

5          All of a sudden all the

6    questions and everything stopped as soon

7    as I told him I was a State trooper.

8          Q.    Did you do anything further that

9    evening?

10         A.    Yes, as soon as I left him, I

11   went straight to the Newburgh

12   stationhouse.

13         Q.    What was your intention in going

14   there?

15         A.    To request to speak to a captain

16   or sergeant or his commander, to reflect

17   how I was harassed and I how I was

18   mistreated.

19         Q.    Did you speak to someone?

20         A.    Yes, I spoke to -- I believe it

21   was a sergeant on duty.  I don't recall

22   his name.

23         Q.    What did you tell him?

24         A.    I told him exactly what

25   happened.  I thought his cops were being

119

1                WYNDER

2    racist, they were picking on us.  There

3    was a whole lot of people there, 20 people

4    there, but they only stopped the three

5    blacks who got out of the car, and I said

6    I didn't appreciate that.

Page 107

94278

7          Then when I showed him I was a

8     trooper, all of a sudden he had no other

9     problems with me and let me go.  I said,

10    "Why is that?  If he really thought I was

11    a suspect and I did something, why all of

12    a sudden if I'm a trooper I'm okay?"

13         Q.    The officers that were involved

14    in the stop, were they all white?

15         A.    Yes.

16         Q.    When you spoke to the sergeant

17    and complained to him, what did he say in

18    response to you?

19         A.    He was very demeaning.  He told

20    me he wasn't going to do anything about

21    it.

22         Q.    How was he demeaning?  What did

23    he say?

24         A.    He was just being, really, oh,

25    really, why didn't you do this?  "I don't

120

1               WYNDER

2     believe they did that." Why you suggesting

3     that we're being this and that.  I said,

4     "Okay." I said, "If you are not going to

5     make a complaint, then I'm going to write

6     a letter." I said, "I want to fill out a

7     form to write a letter" and he wouldn't

8     let me do that.

9          Q.    Is that a form that they had at

Page 108

94278

10    the police station?

11        A.    Well, most police stations have

12    a complaint form.

13        Q.    If you want to make a complaint

14    against a police officer.  There's always

15    something you got to fill out.  I wanted

16    to leave a paper trail that I was in the

17    station and what happened to me wasn't

18    right, and I wanted these officers talked

19    to and I wanted an apology from them.

20        Q.    Were you able to fill out a

21    complaint form?

22        A.    He refused.

23        Q.    What did you do at that point?

24        A.    I left.  What could I do?  I

25    knew that this wasn't going anywhere.

121

1                    WYNDER

2    Actually, they requested that I leave the

3    station.  So I left.

4        Q.    Who requested that you leave?

5        A.    The sergeant requested that we

6    leave.

7        Q.    Why did they ask you to leave?

8        A.    Because they weren't going to

9    take a complaint, and as far as they was

10    concerned, it was closed.

11        Q.    Were you yelling and screaming

12    at the sergeant or anyone else there?

Page 109

94278

13    A.    No.  I was very -- very

14    professional.  I mean, they didn't do

15    anything to me.  Why would I yell at

16    them?

17    Q.    How did it come about that this

18    incident resulted in your being

19    disciplined?

20    A.    Well, as soon as I left the

21    station, by the time I got home, I

22    received a phone call from my troop

23    commander saying that Captain Spahl had

24    initiated a complaint he received from the

25    City of Newburgh for me being

122

1                WYNDER

2    uncooperative with the City of Newburgh.

3    Q.    Now, up until that time of this

4    incident with the City of Newburgh, how

5    was your relationship with Captain Spahl?

6    A.    It was so-so.  I didn't really

7    talk too much to him because I had been

8    out on sick leave for an injury.

9    Q.    Did you have any problems with

10    him up until that time of the City of

11    Newburgh incident?

12    A.    Not that I can recall.

13    Q.    How did you come to find out

14    that Captain Spahl had gotten a complaint

15    from the City of Newburgh?

94278

16      A.    He informed me and told me that

17   he had did a preliminary and he felt that

18   I was -- the complaint was warranted and

19   that it would proceed further.

20      Q.    Did that result in charges being

21   brought against you?

22      A.    Correct.

23      Q.    What were those charges, if you

24   can recall?

25      A.    I can't recall.  I think --

123

1                 WYNDER

2    bringing discredit upon the division, and

3    I believe not cooperating with a police

4    investigation.

5       Q.    Did you have an opportunity to

6    say whether you were guilty or not guilty

7    to those charges?

8       A.    Yes.  It was done in the manner

9    in which it was supposed to have been

10   done.  They took a statement from me.

11   They took statements from the other two

12   individuals in the car with me and then

13   after that they decided that I should be

14   given 20 days suspension or I could go to

15   a hearing.

16      Q.    What did you decide to do?

17      A.    At that time, not trusting my

18   PBA attorneys and not having an attorney,

94278

19    I took the 20 days, because I know I

20    wasn't going to win because I already had

21    spoken to the two individuals who were in

22    the car with me who told them that I did

23    nothing wrong and State Police didn't want

24    to believe their version, so I figured, if

25    they are not going to believe the two

124

1                    WYNDER

2    people that was in the car with me, what's

3    makes you think they are going to believe

4    me?

5         Q.    So you decided not to challenge

6    at a hearing?

7         A.    Correct.

8         Q.    When you say you did not trust

9    your PBA attorneys, why didn't you trust

10    them?

11        A.    Because from experience on the

12    job, they didn't do a job of defending

13    you.

14        Q.    What was your experience with

15    them that led you to believe that?

16        A.    Well, I had seen other troopers

17    get in trouble or disciplined and I've

18    seen the PBA and the New York State Police

19    numerous times violate their owns rules

20    and regs, and the PBA would never do

21    anything about it.

Page 112

94278

22    Q.    This was based upon what you saw

23   happen to other troopers, not your own

24   specific experience?

25    A.    Correct.  Well, yes, in my own

125

1                  WYNDER

2   experience, violating rules and regs, like

3   when I was at the Academy.  You know, when

4   didn't -- I was supposed to be a

5   counselor; they wanted to make me do other

6   things.  All the things that -- they just

7   never followed their own rules and regs.

8   Whatever they want to do, the State Police

9   does.

10    Q.    Can you tell me what State

11   Police rules and regs were violated by

12   what you were asked to do at the Academy?

13    A.    Well, as a counselor, I had a

14   job description.  They tried to make me do

15   other things, as I already expressed to

16   you.  That was violating their own rules

17   and regs.

18    Q.    Anything else?

19    A.    When I complained about the

20   EEOC, I never got the paperwork back that

21   I was promised that I would get back.  I

22   had wrote the letter, but I never got a

23   copy of the letter back and I never got

24   any dispositions as to what happened, were

94278

25     the other individuals in the State Police

126

1                     WYNDER
2      censured.
3          Q.     Who did you write to?
4          A.     The letter was to Lieutenant
5      Cook but to the superintendent of the
6      State Police.  I just cc'd it to
7      Lieutenant Cook.  It was to the
8      superintendent of the State Police.
9          Q.     Did you get a response to that
10     letter?
11         A.     I got --
12         Q.     To the superintendent?
13         A.     I got a verbal response from
14     Lieutenant Cook from what the
15     superintendent told him.
16         Q.     What was that?
17         A.     Again, that was the fact that,
18     while I was at the Academy, that the State
19     Police was wrong and that they should
20     recruit black instructors and that they
21     were going to implement.
22         Q.     Your understanding was
23     Lieutenant Cook said that was told to him
24     by Superintendent McMahon?
25         A.     Yes, and what he told me

94278

127

```
 1              WYNDER
 2    happened, I was allowed to return, Captain
 3    Masterson was supposed to apologize to me
 4    but he didn't.  All he did was threaten
 5    me, but he did tell me I was returning.
 6        Q.    Now, going back to the City of
 7    Newburgh situation, you received this
 8    20-day suspension and you did not have a
 9    hearing regarding that, correct?
10        A.    Correct.
11        Q.    After that, were you disciplined
12    again while you were at SP Hawthorne?
13        A.    I wasn't disciplined.  I was
14    harassed.
15        Q.    In what ways were you harassed?
16        A.    Well, after that incident, that
17    started a hostile environment at my job,
18    and one of the first incidents to happen
19    after that was that in July -- in May, I'm
20    sorry, we had switched to new gun belts
21    and I had an existing hernia condition and
22    the new gun belts, the way they were
23    situated now, brought on my hernia and it
24    had to be removed, so I went out on sick
25    leave.
```

128

```
 1              WYNDER
```

94278

2      Q.      Did you have your hernia

3   removed?

4      A.      Huh?

5      Q.      Did you have your hernia

6   removed?

7      A.      Before that incident, there was

8   another incident.  I'm sorry.

9              I was out -- I got into a car

10   accident on the job.  I got T-boned, hit

11   on the side on the lower Taconic.

12      Q.      Who hit you?

13      A.      A civilian.

14      Q.      Were you on duty at the time?

15      A.      Correct.  I was going to an

16   accident.

17      Q.      So you were going to the scene

18   of another accident --

19      A.      I was assigned to another

20   accident, scene of an accident, and I was

21   on my way to a property damage auto

22   accident.

23      Q.      Were you speeding at the time to

24   get to the accident?

25      A.      I would say not speeding but I

129

1              WYNDER

2   was lights and sirens, and as I pulled up

3   to an intersection, I had the green light,

4   I waited and I went to make a left and I

Page 116

94278

5      was hit from behind.

6           Q.    What happened in the accident?

7      Were you injured?

8           A.    Yes.

9           Q.    What injuries did you sustain?

10          A.    Neck and back injuries.

11          Q.    What kind of neck and back

12     injuries did you have?

13          A.    I had -- I don't recall what the

14     doctor said but I had a contusion or I had

15     bruises (indicating).

16          Q.    Do you recall, were you treated

17     at an emergency room following the

18     accident?

19          A.    They took me straight to the

20     emergency room.

21          Q.    What emergency room?

22          A.    Westchester Medical Center.

23          Q.    Then you were seen by your own

24     physician?

25          A.    I was seen by their physician

                                           130

1                 WYNDER

2      and then from there -- once you go out on

3      sick leave, you have to see a doctor if

4      you want to continue to get paid full pay.

5           Q.    Did you do that?

6           A.    Yes, I did.

7           Q.    How long were you out receiving

94278

8    full pay?

9        A.    Well, that -- I was out for

10   three months and then the State Police

11   said that I was fit -- they wanted me to

12   come back to duty and my doctor told them

13   that I wasn't ready, so they sent me to

14   their own doctor.

15        Q.    What did their own doctor say?

16        A.    That I wasn't recovered and I

17   wasn't 100 percent.

18        Q.    What was the total amount of

19   time that you were out with the car

20   accident?

21        A.    I don't recall.  It could have

22   been six months, seven months.  Finally,

23   State Police, my own doctor, their doctor

24   and another Workers' Compensation doctor

25   said that I wasn't fit for full strenuous

1              WYNDER

2    duty.

3        There is no light duty in the

4   State Police.  If you are not 100 percent

5   full duty, you cannot come back to work.

6   So upon hearing this, the State Police

7   sent me to a doctor down in Manhattan,

8   which I saw the doctor for exactly five

9   minutes.

10        Q.    What did that doctor say?

94278

11    A.    Well, it took me 45 minutes to

12    get home.  By the time I got home, there

13    was already a letter faxed to the station

14    ordering me back to work, that I was fit

15    for full strenuous duty.

16    Q.    Did you report to work?

17    A.    Yes, I did, because I was

18    ordered.

19    Q.    What happened when you reported

20    back?

21    A.    Well, I came back to work.  I

22    reported back to work and then I signed

23    out on sick leave that I was unable to do

24    my job due to the fact that I was still

25    injured.

132

1            WYNDER

2    Q.    Were you having pain when you

3    reported back to work?

4    A.    Of course.

5    Q.    What kind of pain did you have?

6    A.    Still having back and neck pains

7    and I still wasn't fit to do the job as a

8    trooper.  There's a criteria that you have

9    to fulfill in order to come back to duty,

10    which the State Police has in their

11    manuals and their physical fitness, and

12    this doctor that I saw for five minutes

13    never used it.  I saw him for five

94278

14    minutes.  I didn't list nothing, I didn't

15    put on my belt, I didn't put on my vest.

16    All the stuff that I would be working with

17    when I'm on the job, and he declared me

18    fit, but my own doctor said I wasn't fit

19    to go back, so I didn't go back.  So when

20    I went back, I signed out --

21         Q.    What does that mean that you

22    signed out?  Does that mean you sign some

23    piece of paper and you leave?

24         A.    Well, you have to come back to

25    work or you are brought up on charges for

133

1                    WYNDER

2    insubordination.

3         Q.    So you returned to Hawthorne?

4         A.    I had to, right.

5         Q.    Then you said you signed out?

6    What does that mean?

7         A.    You come in, you sign in for

8    duty and then I went to the blotter and I

9    physically wrote that I was unable to

10    perform my duties and that I'm going home

11    on sick leave now.

12         Q.    Did you have to have the

13    permission of someone there to do that?

14         A.    No.  I mean there's a procedure

15    in the manual that you can come in, sign

16    in, sign out that you are sick and

Page 120

94278

17  there's -- I believe it's a rule -- I

18  don't recall the rule right now, but it's

19  in the manual where you can contest that

20  you are still sick and you can go out on

21  sick leave if you have doctor's notes,

22  which I did.  And then I requested a

23  hearing for that purpose.  Everything is

24  set up so you can do that.

25      Q.    Did you get that hearing?

134

1                  WYNDER

2      A.    Well, while I was doing that

3  hearing, while I was calling my PBA

4  delegates, I was told to leave the station

5  by Captain Spahl.

6      Q.    Let me make sure I'm clear about

7  this.

8              On a particular day, after you

9  had been out for a number of months, you

10  returned to SP Hawthorne on one particular

11  day, after seeing that doctor from State

12  Police, correct?

13      A.    Correct.

14      Q.    That day, you went and you

15  signed out on the blotter that you wanted

16  to leave, go home on sick leave, correct?

17      A.    Correct.

18      Q.    And that same day, while you

19  were still at SP Hawthorne, you were

94278

20    calling your PBA delegates to do the

21    hearing?

22        A.    Correct.

23        Q.    How long had you been in the

24    stationhouse at that point while you were

25    up to calling the PBA delegates?

135

1                    WYNDER

2        A.    I don't recall.  Could be 45

3    minutes to an hour, because sometimes you

4    got -- the delegate's on the road.  You

5    got to beep him.  You got to wait for him

6    to call you back.  It took a while for

7    anybody to call me back.

8        Q.    Was that part of the

9    regulations, that once you signed out as

10    sick on the blotter and went out, that you

11    had to reach the PBA delegates that same

12    day?

13        A.    No, but I wanted to because I

14    wanted to resolve the situation quickly so

15    that I wouldn't burn my own sick leave

16    time.

17        Q.    When you say burn your own sick

18    leave time, what do you mean?

19        A.    When they order you back to

20    work, the State Police stops paying you

21    full pay for being out without you using

22    your own time.  Once you come back and you

Page 122

94278

23      go out on your own sick leave which you

24      have a right to, you are using your own

25      sick leave.

☐

1                          WYNDER

2           Q.    So you wanted to resolve the

3       situation so that you could go out and not

4       have to use your sick leave time, correct?

5           A.    Correct.

6           Q.    Were you able to reach the PBA

7       delegates that day?

8           A.    Yeah.  Well, not from the

9       station because I was kicked out of the

10      station.

11          Q.    So you were in the process of

12      calling them when you were kicked out?

13          A.    Sergeant came up to me, Sergeant

14      Smoskey.

15          Q.    What did he say?

16          A.    He advised me that the

17      captain -- that Captain Spahl had informed

18      him that I had to leave the station.

19          Q.    Did you have any sick time of

20      your own at that point?

21          A.    Yes.

22          Q.    So Sergeant Smoskey said that

23      Captain Spahl had said you had to leave

24      the station?

25          A.    Correct.

94278

1              WYNDER
2        Q.    Were you given a reason why you
3    had to leave?
4        A.    Yes.
5        Q.    What was the reason?
6        A.    He said that if I was out on
7    sick leave, I'm not allowed in the
8    station.  I told the sergeant that that
9    was wrong and that as long as you're not
10   suspended, you have access to any State
11   Police facility in the State of New York.
12       Q.    What did you base that on?
13       A.    It's in the manual.
14       Q.    Did you have a conversation with
15   Captain Spahl directly at that time?
16       A.    No, you can't.  You have to go
17   chain of command.  So I was already being
18   told by my sergeant, so I couldn't go over
19   his head.  What I had to do, the sergeant
20   told me was I had to leave, at which time
21   I told him I was going to file a
22   grievance, which I did after I left the
23   station.
24       Q.    With who do you file a
25   grievance?

94278

1                    WYNDER
2        A.    Troop command.  With my
3    sergeant.  I filed it with my sergeant and
4    it goes up the chain of command.
5        Q.    So did you file it while you
6    were there in SP Hawthorne that day before
7    you left?
8        A.    No, I came back.
9        Q.    When did you come back?  How
10   long after you were told to leave?
11       A.    I guess it was a day or two.  I
12   typed up the memo and I gave it to my --
13   actually, I didn't come in the station, I
14   had him come out, because I wasn't in the
15   station.
16       Q.    What was the result of the
17   grievance?
18       A.    I got a phone call saying that I
19   was allowed back in the station and that
20   Captain Spahl was censured for his
21   wrongful orders for me leaving the
22   station.  I then asked for a copy of this
23   letter of censure and they refused to give
24   me one.
25       Q.    Who was telling you that you

139

1                    WYNDER
2    were allowed back in and Captain Spahl was
3    censured?

Page 125

94278

4    A.    Well, my sergeant -- my

5    immediate sergeant told me that I was

6    allowed back in the station.

7    Q.    Sergeant Smoskey?

8    A.    At that time -- yes, Sergeant

9    Smoskey.  Or it could have been Sergeant

10   Zemanek, Z-e-m-a-n-e-k.

11   Q.    So either Sergeant Smoskey or

12   Sergeant Zemanek, either of those told you

13   that you were allowed back in and Captain

14   Spahl was censured?

15   A.    Yes.

16   Q.    Did you go back to SP Hawthorne

17   at that point?

18   A.    Well, I was still out on sick

19   leave, but now I was allowed to come in

20   and do official business and do my memo or

21   whatever I needed to do, pick up my check.

22   Q.    How long did you stay out on

23   sick leave from that day on?

24   A.    I don't recall.  I think I was

25   out another maybe two months.

140

1         WYNDER

2    Q.    Was that on your own sick leave

3    or was that paid as part of the accident?

4    A.    Well, what happened was my own

5    sick leave.  Then you have a hearing from

6    Workers' Comp and  Workers' Comp

94278

7 determined that I was injured in the

8 course of my duties which would have given

9 me full pay, and when I told the Workers'

10 Compensation that I didn't want any money

11 from my injuries, I wanted my time

12 restored, they told me that the State

13 Police refused to accept my time restored,

14 which was illegal by Workers' Compensation

15 law.

16    Therefore, I -- the State Police

17 took from me over two months of sick

18 leave.

19  Q. Who told you that?

20  A. Who told me that?

21  Q. Yes.

22  A. It's in the rules of the

23 Workers' Compensation.

24    Workers' Compensation told me

25 that the State Police refused to take my

1    WYNDER

2 time back, which is what they were

3 supposed to do if you were injured on the

4 job.

5  Q. Did you do anything to fight

6 that decision?

7  A. Yes, I wrote memos, I asked

8 Workers' Comp and Workers' Comp said there

9 was nothing that they could do about it.

94278

10    And the State refused to pay me -- all

11    that time I was out I got half pay, which

12    I should have got paid full pay.

13         Q.    So your understanding was that

14    you were basically denied half of your pay

15    for that time period?

16         A.    That was a fact, that I was

17    denied pay for the time that I was out for

18    an injury that was sustained in the course

19    of my business and that the State Police

20    never contested.  Once the State Police

21    doesn't contest an injury, they have to

22    pay you.

23         Q.    Do you have an understanding of

24    who made that decision not to accept the

25    time restored?

⬜

142

1                   WYNDER

2         A.    All I was told from Workers'

3    Comp was that Albany would not -- payroll

4    would not accept the time back from

5    Workers' Comp.

6         Q.    You said you wrote to Workers'

7    Comp.  Did you write to anyone else?

8         A.    No, just to Workers' Comp.

9         Q.    Did you seek any help from any

10    other agency regarding that?

11         A.    No.  I spoke to my sergeant and

12    he made a couple of phone calls for me,

Page 128

94278

13    but he said, "They don't want to pay

14    you."

15         Q.    Did you file anything with any

16    outside agency regarding that other than

17    Workers' Comp?

18         A.    Not that I recall.

19         Q.    Did you go to any court

20    regarding that?

21         A.    Not that I recall.

22         Q.    After that, there came a time

23    when you returned back to work.

24               Was there any other time that

25    you were disciplined after you returned

                                                  143

1                    WYNDER

2    from the car accident?

3         A.    Well, when I came back from the

4    accident, we had switched to new guns.  We

5    had switched to new guns and that's when

6    the case of the hernia presented itself.

7         Q.    When you say "new guns," what

8    was the new gun now?

9         A.    The .357 Magnum was carried in a

10   different position.  It was carried in the

11   same position, but the ammunition was slid

12   into slots, extra bullets.  But when we

13   changed to automatics, you had two huge

14   cases that held extra clips and they --

15   when you sat down, they pushed down on you

                   Page 129

94278

16    and that caused my hernia to flare-up, and

17    I had to have it removed, so I went out on

18    sick leave again.  I used my own sick

19    leave because it wasn't job related.

20        Q.    What happened as a result of

21    that?

22        A.    Upon returning, I returned on a

23    Sunday, Monday there was a supposedly

24    random drug test that was done at SP

25    Hawthorne.

144

1                    WYNDER

2        Q.    When you say "supposedly," why

3    do you say that?

4        A.    Well, DOT establishes guidelines

5    for random drug tests.

6        Q.    Is that the New York State

7    Department of Transportation?

8        A.    Federal Department of

9    Transportation In that mandate, each

10   member is supposed to have a 45-minutes

11   class on why you are subjected to random

12   drug testing, why you -- you know, why

13   they can do it, and if you are found -- if

14   you are found tested positive, what is

15   your recourse and what do you have to do.

16   It also outlines how procedures are going

17   to be done.

18             Example, everybody's Social

94278

19     Security number or the whole station.  And

20     up to this point, Hawthorne had never,

21     ever been drug tested.

22          Q.    How long had the procedure been

23     in effect at the point when this random --

24               MS. ODESSKY:  Strike that.

25          Q.    How long had this procedure for

145

 

1                    WYNDER

2     the random drug testing been in effect at

3     the time you were to be tested at SP

4     Hawthorne?

5          A.    There was never a procedure in

6     place.  That's why I said supposedly

7     random drug testing.  There was never

8     established, by the State Police, a

9     protocol and systematic system in which a

10     random drug test can be held.

11          Q.    So when you returned on the

12     Sunday, were you drug tested on that day?

13          A.    No, that was an off day.  All

14     captains and Internal Affairs do not work

15     the weekends, so it was based on my return

16     which was the next day, the Monday.  And

17     when they random drug tested me -- when I

18     say random -- and supposedly it was

19     because they only did -- you have three

20     tours that the State Police works in the

21     day.  You have what they call the A line

94278

22    which is 11:00 p.m. to 7:00 a.m. in the

23    morning; a B line which is 7:00 a.m. to

24    3:00 p.m. in the afternoon; and a C line

25    which is from 3:00 p.m. to 11:00 at

146

1                  WYNDER

2    night.

3              On this particular day, my

4    second day back to work, we had a drug

5    test.  They only drug tested the B line,

6    which I was working, and the C line that

7    had just came in.  They did not drug test

8    the A line and they did not drug test

9    individuals that were still hanging around

10   in the station that had worked the A

11   line.  They didn't even test them.  So I

12   felt that this was targeted at me and that

13   this was because I had just returned to

14   work and they only did my tour.

15        Q.    Why did you think that it was

16   targeted at you?

17        A.    Well, because of my experience

18   with Captain Spahl, the fact that he

19   didn't like the fact that he had just been

20   censured, and I felt that I was being

21   picked on because the color of my skin,

22   because I was very vocal, also.

23        Q.    When you say "very vocal," in

24   what way were you very vocal at Hawthorne?

Page 132

94278

25      A.      At Hawthorne, if somebody was

147

1                       WYNDER
2       wrong, I was very studious to rules and
3       regulations, and when anybody was ever
4       mistreated, I would advise them that --
5       read the manual, this is your procedures
6       you can do.  They can't do this or that to
7       you.
8           Q.      Can you give me an example of a
9       particular officer who you thought was
10      mistreated who you advised?
11          A.      There was a couple.  Timothy
12      McKenney.
13          Q.      How he was mistreated?
14          A.      No, he -- the State Police would
15      just do -- like the sergeant would tell
16      you to do something, or the job would tell
17      you to do something, like with the drug
18      test, after they finished drug testing me,
19      I asked them could I go see my own doctor.
20          Q.      Hold on a second, because I was
21      asking you particularly about Timothy
22      McKenney, and you said that that was one
23      trooper that you advised him when he was
24      being mistreated.
25              So I'm asking you specifically

94278

```
 1                    WYNDER
 2   about him, how was he being mistreated and
 3   what did you advise him to do?
 4        A.    Oh, I would tell him to get his
 5   PBA rep --
 6        Q.    What was the mistreatment?
 7        A.    Well, they would accuse him of
 8   doing other things that -- like not
 9   writing enough tickets, not doing his job,
10   when other white troopers weren't writing
11   tickets and they weren't brought up on
12   charges.
13        Q.    Was he African American?
14        A.    Yes, he was.
15        Q.    Did he get his PBA
16   representative?
17        A.    I believe he did.  I'm not quite
18   sure.
19        Q.    Can you tell me about any other
20   troopers that you felt were being
21   mistreated who you advised?
22        A.    There was a few at Hawthorne.
23        Q.    Who were they, if you can
24   recall?
25        A.    Trooper David Blake.
```

```
 1                    WYNDER
```

94278

2      Q.      How was he being mistreated?

3      A.      Again, the same.  You know,

4  Hawthorne was predominantly a black

5  station and all the commanders were white

6  and you were sent to SP Hawthorne, it was

7  considered to be the misfit of the State

8  Police.  That's where troublemakers and

9  troopers that they didn't like went to --

10      Q.      How did you get that

11  impression?  Where did you get that from?

12      A.      A lot of the guys that was in SP

13  Hawthorne at one time had problems with

14  the job and we were all sent there and the

15  whole station was black, which was unusual

16  for the State Police.

17      Q.      When you say the whole station

18  was black, what do you mean?

19      A.      All the troopers were black.

20      Q.      Were there any troopers who were

21  not black?

22      A.      I think there was one trooper

23  who was white and he got transferred back

24  to SP Hawthorne after he got involved in

25  an investigation in which he was

150

WYNDER

1

2  disciplined and demoted and he was sent to

3  Hawthorne.

4      Q.      Do you know who that was?

Page 135

94278

5       A.      Trooper Sagilabenni,

6    S-a-g-i-l-a-b-e-n-n-i.

7       Q.      Going back to the drug testing

8    that occurred on the second day after you

9    returned, did you have an understanding

10   whether there had been any drug testing at

11   Hawthorne prior to that day?

12      A.      What do you mean?  I don't

13   understand.

14      Q.      Prior to that day, that was the

15   second day you returned back to work from

16   being out on the sick leave --

17      A.      Okay.

18      Q.      -- was it your understanding

19   that this was the first time there had

20   ever been any drug testing at SP

21   Hawthorne?

22      A.      Correct.

23      Q.      So up until that time, would it

24   be fair to say that they never did any

25   drug testing whatsoever at SP Hawthorne?

151

1                    WYNDER

2       A.      Correct.

3       Q.      How do you know that?

4       A.      I was informed by the dispatcher

5    and by a sergeant who had been there for

6    years and one of the cleaners.

7       Q.      Did you ask anybody about why

94278

8      only the B and the C lines were tested?

9          A.    Of course.  I asked Internal

10     Affairs, who ironically was administering

11     the drug test.

12         Q.    When you say you asked Internal

13     Affairs, were they at SP Hawthorne to

14     administer the drug test?

15         A.    They collected the samples, yes.

16         Q.    Who did you ask at Internal

17     Affairs?

18         A.    I don't recall who was the lead

19     officer that day.  I only remember one I

20     know was there.  His name was Investigator

21     Kopy.

22         Q.    What did Investigator Kopy tell

23     you as to why only those lines were being

24     tested?

25         A.    He wouldn't answer my question.

152

1                  WYNDER

2      I asked him if this was random and

3      shouldn't everybody in the station be

4      tested.  And they wouldn't answer me.

5      They just said, "We're going to" -- I

6      said, "How can you tell me this is random

7      when you are doing two out of three

8      tours?  That's not random to me."

9          Q.    At the time that this drug test

10     was done, would it be fair to say that all

Page 137

94278

11    the troopers at SP Hawthorne were black?

12        A.    No, at that time Benny

13    Sagilabenni was there.

14        Q.    Other than him, all the other

15    troopers there were black?

16        A.    As I recall is, I believe they

17    were.  I don't know for sure, but for a

18    while when I was there, we were all

19    black.  Then Trooper Sabilabenni came back

20    and then I think we had one more white

21    trooper that again was transferred because

22    he got in trouble.

23        Q.    Who was that?

24        A.    Trooper Kakavas.

25        Q.    So would it be fair to say when

153

1              WYNDER

2    they tested -- on that second day after

3    you returned, they tested the B and the C

4    lines and all the officers, except for

5    possibly Trooper Sabilabenni and Trooper

6    Kakavas, who were tested were black?

7              MR. MERRITT:  Let me object to

8    that question just because of --

9              MS. ODESSKY:  Mr. Merritt, I

10    asked you please not to do speaking

11    objections.  I note your objection for the

12    record, but I'll ask you to let

13    Mr. Wynder --

Page 138

94278

14          MR. MERRITT:  He's not going to
15   answer that question.
16          MS. ODESSKY:  What is the basis
17   of your objection?
18          MR. MERRITT:  That's what I was
19   just going to tell you before you
20   interrupted me.  You want to interrupt me,
21   you can.  You said all the officers.  He
22   has testified that we have troopers in the
23   State Police and we have officers.
24          MS. ODESSKY:  I understand.
25   I'll clarify.

                                            154

1                WYNDER
2          MR. MERRITT:  All I was trying
3   to do was clarify your question so it's
4   easier to answer and you jumped down my
5   throat.  I don't think that's a good idea.
6          MS. ODESSKY:  Off the record.
7          (Discussion off the record.)
8   BY MS. ODESSKY:
9      Q.    Mr. Wynder, just as relating to
10   troopers who were subject to the drug test
11   on that day that you're speaking about,
12   those troopers, with the exception
13   possibly of Trooper Sabilabenni and
14   Trooper Kakavas, were all black; is that
15   correct?
16      A.    On that day, those two tours
                   Page 139

94278

17   were all black, yeah.

18       Q.   Did you have an understanding as

19   to who made the determination about what

20   lines would be tested?

21       A.   After the testing, I was very

22   upset.  I asked -- I raised my hand and I

23   asked the head of the Internal Affairs

24   Department, whoever came down, I don't

25   remember his name, I told him, "Can I

155

1                WYNDER

2   leave and go have my own" -- I said, "Can

3   I leave" -- "can I take time off to go to

4   the doctor's?"

5            He asked me, "Why?"  And I told

6   him, "I wanted to go to my doctor and have

7   my own blood tested."

8            He said, "Why would you do

9   that?"

10           I said, "Because I feel that

11   this is a set-up and that you picked --

12   you picked this tour, you came down here

13   and you picked this tour and you only do

14   two-thirds of the station, which leads me

15   to believe that this is a set-up, and also

16   to the fact that why would Internal

17   Affairs be at a drug testing?  Internal

18   Affairs is only after something has been

19   commenced that is wrong.  So why would

Page 140

94278

20    Internal Affairs be there collecting
21    samples?"
22        Q.    Did you feel at that point that
23    Internal Affairs had some reason to be
24    targeting you in particular?
25        A.    Of course.   It was common

156

1                     WYNDER
2    knowledge -- everybody in Troop K knew who
3    they were looking for.   They were looking
4    for me.
5        Q.    When you say "everyone in Troop
6    K," who do you mean?
7        A.    Everybody.   Everybody in SP
8    Peekskill, SP Hawthorne.   Even the
9    sargeants knew.   Even they knew why they
10   were down here.   I mean, you know, it's
11   ironic that I'm out for three months and
12   then as soon as I come back, the next
13   day -- the next business day, the State
14   Police is down there taking a piss test
15   from everybody.
16       Q.    When you say that everyone knew
17   that Internal Affairs was looking for you,
18   what do you mean looking for you?
19       A.    They were trying to catch me
20   using drugs.   They believed that I was a
21   drug user.
22       Q.    What is your understanding about

Page 141

94278

23    why they believed you were a drug user?

24        A.    Well, to me, the way you

25    discredit a black man is associate him

157

1                    WYNDER

2    with drugs.

3        Q.    Did anyone tell you specifically

4    that someone in State Police thought you

5    were using drugs?

6        A.    Well, put it this way:  I didn't

7    find that out until my Workers'

8    Compensation hearing when I was labeled a

9    drug dealer and a murderer.

10        Q.    Let me back up for a minute.

11              On the day that the drug test

12    was taken, you said after the drug test

13    was taken, you were very upset and you

14    came back and you complained about the

15    tests being done of only B and C lines,

16    correct?

17        A.    Correct.

18        Q.    On that day, did you have an

19    understanding that you were being singled

20    out?

21        A.    Yes, by the end of that day, I

22    was -- I was called -- people called my

23    cell phone, people called the station and

24    even the sargeants told me they believed

25    that this drug test was targeted at me,

Page 142

94278

158

1                    WYNDER
2    and at that time I found out that, through
3    my PBA president, which I called at that
4    time, my delegate, that this test was
5    originally scheduled for July -- I believe
6    July 29 of that year and they found out
7    that I was still on sick leave and then
8    they -- they held it off until I returned
9    to work.
10        Q.    Who told you that?
11        A.    I was told by my president,
12   Trooper Al Wolford (phonetic), and by my
13   station commander.
14        Q.    Who was that?
15        A.    I believe at the time it was
16   Zemanek or Zone Sergeant Antalek.
17        Q.    So it's your testimony that
18   these individuals told you specifically
19   that the drug test was held off until you
20   returned from sick leave?
21        A.    Correct.  And the question that
22   I was told to the PBA was that they said
23   that they didn't have enough manpower at
24   that time to do it on July 29, but the
25   question was raised was, why would you --

159

94278

1            WYNDER

2    if it's random, which, again, as I told

3    you, there was no random drug testing,

4    this was set up, because the random drug

5    testing, if you pull a station to be drug

6    tested or individual to be drug tested, if

7    that person is not there on that day, it

8    goes back into the bend.  You don't hold

9    it off until the person comes back in.  In

10   fact, the State Police said we're coming

11   down in July.  When they found out I was

12   on sick leave, they postponed it, and as

13   soon as I came back to work, they

14   scheduled the drug test.

15       Q.    Was there anyone else whose name

16   you can tell me who told you that the test

17   was held off until you returned?

18       A.    Trooper Wolford who spoke to

19   colonel -- it was -- head of employee

20   relations.  Colonel Corbett (phonetic).

21       Q.    Is it your understanding that

22   Colonel Corbett told Trooper Wolford that

23   the test was held off until you returned

24   to work?

25       A.    Correct.  And I also -- after

160

1            WYNDER

2    that, because I made such a stink that

3    this was not random, a preliminary drug

Page 144

94278

```
 4    testing program was drafted, which I
 5    have -- I believe I saw a copy of.  The
 6    PBA had a copy of a drug testing that was
 7    supposed to be set up because the drug
 8    testing that they administered was wrong,
 9    it was illegal.
10        Q.    How was it illegal?
11        A.    Because it wasn't in the
12    manual.  You go to any other police
13    agency, you open up the manual, it will
14    tell you why they are drug testing, it
15    will -- for example, NYPD, at, Social
16    Security numbers are pulled randomly, you
17    are notified that you have to come to One
18    Police Plaza, which is a civilian unit
19    inside One Police Plaza which is medical,
20    no Internal Affairs, no nothing, you
21    submit your urine test and you go home.
22    If you are found positive, Internal
23    Affairs will contact you.  If you are not
24    working that day, you're not scheduled to
25    work the day that your Social Security
```

161

```
 1              WYNDER
 2    number is pulled, it goes back into the
 3    bunch and they'll get you whenever your
 4    Social Security number comes up random.
 5    It's a set formula.  The State Police did
 6    not have it in place, which is federal
```

94278

7    guidelines.

8        Q.    Is it your testimony that they

9    put this formula in place because of the

10   complaints that you made regarding the

11   drug testing done at SP Hawthorne?

12       A.    No.  They never put in a

13   formula.  They just came down and decided

14   to take urine from me to see if I was

15   using drugs.

16       Q.    Right, I understand.  But you

17   are saying now that there is a procedure

18   put in place for drug testing.  You were

19   talking to me about there's a preliminary

20   drug testing program.  You are telling me

21   now that there's a procedure put in place

22   for doing the drug testing, correct?

23       A.    No, there's still not one.

24       Q.    Then I misunderstood you.

25             What were you telling me just a

                                              162

1                WYNDER

2    moment ago about a drug testing program?

3        A.    I was the only one who

4    complained about the test being illegal.

5    So, therefore, after that the PBA was

6    trying to get the State Police to enact

7    one.

8        Q.    So you are telling me as of --

9    as far as you know, there's not one in

94278

10   place?

11        A.    To this day, no, the State

12   Police does not have a certified drug

13   testing program.

14        Q.    You said that on that day when

15   you were drug tested, Internal Affairs was

16   down there for the drug testing, correct?

17        A.    Correct.

18        Q.    And that was, in your

19   understanding, that was unusual, that

20   Internal Affairs would come down to do the

21   drug testing?

22        A.    Well, I would think so being

23   Internal Affairs is there to investigate

24   any crimes or any misbehavior by a

25   member.  Why would they be there if I'm

163

1                  WYNDER

2    giving a sample of urine to a cup that

3    hasn't been tested yet?

4         Q.    What is your understanding about

5    who should be conducting the drug testing

6    at the various troops?

7         A.    It should be anybody -- it

8    should be -- actually, it should be a

9    medical professional person.  You can have

10   a trooper there for security purposes but

11   why should Internal Affairs be there?

12        Q.    Now, have you been aware since

94278

13     that date of the time when you were drug

14     tested, were you aware of any other dates

15     on which drug testing occurred at SP

16     Hawthorne?

17          A.     Since I've left that station?

18          Q.     Since that day.

19          A.     There has never been another

20     drug testing in that station.

21          Q.     So that day, which was two days

22     after you came back from your sick leave,

23     was the only day on which a drug test was

24     done at SP Hawthorne?

25          A.     Correct, of my knowledge.

⬚

164

1                     WYNDER

2               MR. MERRITT:  Why did you say

3     two days?

4               MS. ODESSKY:  I'll clarify

5     that.

6          Q.     You returned on a Sunday to work

7     and do you have that -- as you sit here

8     today, do you have that exact date?

9          A.     State Police would have it.

10          Q.     So the second day --

11          A.     First business day.

12          Q.     The first business day but the

13     second day that you were actually at work,

14     that was the date of the drug testing,

15     just so we're clear, and we'll get that

94278

16    exact date for the record.

17        A.    That's correct.

18        Q.    So my question was to you, since

19    that particular day on which you were drug

20    tested after you returned to work, to your

21    knowledge, there's never been another drug

22    test at SP Hawthorne?

23        A.    From that day to the day -- from

24    that day to the day that I retired, there

25    was no drug testing at SP Hawthorne.

165

1                WYNDER

2        Q.    And you retired in 1999?

3        A.    1999.

4        Q.    Have you been in touch with

5    anyone from the State Police who would

6    tell you about whether tests were done at

7    SP Hawthorne from '99 to the present?

8        A.    Correct.  I've been in touch

9    with some of the troopers and sargeants

10   and they've all told me that they've never

11   had another drug test there.

12       Q.    As far as you know, from that

13   date when you returned from sick leave to

14   the present day, today, there's not been

15   any further drug test at SP Hawthorne?

16       A.    Correct.

17       Q.    Do you have any familiarity with

18   drug testing at other troops?

94278

19      A.      What do you mean by

20  "familiarity"?

21      Q.      Do you have any understanding of

22  whether random drug testing or any type of

23  drug testing was done at troops other than

24  SP Hawthorne?

25      A.      I had heard that other stations

166

WYNDER

1

2  had been randomly drug tested, also, but

3  the rumors of that was, if it was random,

4  how can one station be tested three times

5  in one year, actually within nine months

6  and again they used the same system, they

7  only went down and tested only certain

8  tours, and the reason why I say again it's

9  a tool used by Internal Affairs, because

10  the State Police -- as a trooper you have

11  your schedule for a month, so for the next

12  30 days, anybody in the State Police knows

13  when you're working and when you're not

14  scheduled to work.

15      Q.      When you say that the station

16  was tested three times in a month, what

17  station are you referring to?

18      A.      SP Newburgh.

19      Q.      You never worked at SP Newburgh,

20  correct?

21      A.      Correct.

Page 150

94278

22        Q.    Do you know when this was, what

23    year this was that the SP Newburgh was

24    tested three times in a month?

25        A.    Had to be prior to my testing.

167

1                    WYNDER

2        Q.    Do you know the racial

3    composition of the troopers at SP

4    Newburgh?  Whether they are primarily

5    black or white or other races?

6        A.    At that time I couldn't tell

7    you.  I would believe that station was

8    more minority than white.

9        Q.    I'm just going to go back to

10    some other things and then we'll come back

11    to your time at SP Hawthorne.

12              Prior to being employed with the

13    State Police, have you been employed in

14    other capacities, prior to your time when

15    you joined the State Police?

16        A.    I worked on Wall Street.

17        Q.    Who did you work for?

18        A.    Started with DLJ.

19        Q.    What is DLJ?

20        A.    Donaldson, Lufkin & Jenrette.

21        Q.    What is that?

22        A.    It's a brokerage firm.

23        Q.    What did you do for them?

24        A.    I worked in the mail room.

Page 151

94278

25     Well, I worked with the stockbrokers.   I

1                    WYNDER

2     handed out anything that they needed.

3          Q.    Was that your first job out of

4     high school?

5          A.    Full-time job, yes.

6          Q.    Prior to that, did you have

7     part-time jobs?

8          A.    Yes.

9          Q.    What part-time jobs did you

10    have?

11         A.    Worked at a shoe store.

12         Q.    What shoe store?

13         A.    Shoe In.

14         Q.    Where was that?

15         A.    Based in New Jersey and

16    Lexington Avenue.

17         Q.    What town or city in New Jersey?

18         A.    Fort Lee.

19         Q.    How long were you there?

20         A.    During the summer.

21         Q.    Anyplace else?

22         A.    Nope, that was it.

23         Q.    When you worked at DLJ, did you

24    have a supervisor there?

25         A.    Yes, I did.

94278

```
 1                    WYNDER
 2        Q.    Who was that?
 3        A.    I couldn't recall.
 4        Q.    How long did you work there?
 5        A.    I really don't recall.
 6        Q.    The entire time that you worked
 7   there, did you work in the mail room or
 8   you worked somewhere else?
 9        A.    No, I worked on the floor.  All
10   the mail was delivered to me.  I didn't
11   work in the mail room.  I was just in
12   charge of handing out all the mail and
13   supplies.
14        Q.    Did you have any other position
15   there?
16        A.    No.
17        Q.    From there, did you work at any
18   other place prior to State Police?
19        A.    I left there and I went to
20   Shearson, Lehman and American Express.
21        Q.    What did you do there?
22        A.    I worked in the cash unit which
23   handled all the inventory -- all the sales
24   that went through the company.
25        Q.    Do you know who your supervisor
```

```
 1                    WYNDER
```

94278

2    was there? Do you recall?

3        A.    No.

4        Q.    How long did you work there?

5        A.    Couple of months.

6        Q.    Why did you leave DLJ?

7        A.    More money, and I wasn't allowed

8    to finish my Series 7 course, but

9    basically more money.

10       Q.    When you say you weren't allowed

11   to finish your Series 7, what do you mean?

12       A.    Well, I wasn't going to be a

13   stockbroker there, so they didn't want to

14   pay for it.

15            MR. MERRITT:  Just let the

16   record reflect a Series 7 seems to be the

17   question here -- Series 7 is a testing

18   program to become a stockbroker registered

19   with the Exchange.

20       Q.    Just so I'm clear, when you were

21   working for DLJ, they did pay for you

22   initially to take the first part of the

23   Series 7?

24       A.    Correct.

25       Q.    And then you wanted to take the

171

1                WYNDER

2    second part, but they did not want to pay

3    for that?

4        A.    Correct.

Page 154

94278

5     Q.     Did they give you a reason why

6   they didn't want to pay for that?

7     A.     I just told you they told me

8   that they wouldn't hire me as a

9   stockbroker, so they weren't going to let

10   me finish up the course, they weren't

11   going to pay for it.

12     Q.     Did they give you a reason as to

13   why they wouldn't hire you as a

14   stockbroker?

15     A.     They just said they weren't

16   going to hire me as a stockbroker.

17     Q.     Did you make any complaint

18   regarding DLJ or that determination?

19     A.     No.  I just offered to pay for

20   it myself and they said no.

21     Q.     When you went to Shearson,

22   Lehman, did they have the opportunity for

23   you to take that Series 7 test?

24     A.     I didn't want to.

25     Q.     Just so I'm clear, the Series 7

172

1                    WYNDER

2   course is something that you have to take

3   through a company that you work for or

4   it's given in an outside place?

5     A.     They -- any of us here could go

6   take it.  But back in 1983, '84, back at

7   that time you had to be sponsored by the

Page 155

94278

8   company that you work for.

9        Q.    So, in other words, even if you

10   were offering to pay for it, you still

11   needed them to sponsor you?

12        A.    Correct.

13        Q.    At Shearson, Lehman, how long

14   were you there, approximately?

15        A.    About four months.

16        Q.    Why did you leave there?

17        A.    They had layoffs, so I was the

18   last one in, first one out.

19        Q.    After that, did you have another

20   job before State Police?

21        A.    I went to work directly for

22   Paine, Webber.

23        Q.    What did you do for them?

24        A.    Cash dividends.

25        Q.    Do you remember your supervisor

173

1                  WYNDER

2    there?

3        A.    No.  Yes, his name was Jose,

4    that's all I remember.

5        Q.    How long did you work there?

6        A.    I can't recall.

7        Q.    Why did you leave there?

8        A.    More money.

9        Q.    Where did you go from there?

10        A.    Oppenheimer.

94278

11      Q.      What did you do there?

12      A.      Mutual funds.

13      Q.      What was your position?

14      A.      Mutual fund -- supervisor of

15  mutual funds.

16      Q.      Did you have a supervisor there?

17      A.      Yes.

18      Q.      Who was that?

19      A.      I can't remember his name right

20  now.

21      Q.      How long were you at

22  Oppenheimer?

23      A.      For about a year and a half,

24  until I went to the State Police.

25      Q.      What made you decide to leave

⬚

174

1                       WYNDER

2   there and go to State Police?

3       A.      I had taken all civil service

4   tests and I wanted to be a trooper, and

5   stability.  There wasn't a lot of

6   stability at Wall Street.  I saw people

7   coming and going.

8       Q.      So Oppenheimer was your last job

9   before the State Police?

10      A.      Correct.

11      Q.      Were you ever disciplined on any

12  of the jobs that you had prior to State

13  Police?

Page 157

94278

14        A.    No.  That I can recall.

15        Q.    Did you ever receive any type of

16    counseling letter or anything like that?

17        A.    Not that I can recall.

18        Q.    Now, during the time that you

19    were employed, during your entire time

20    being employed with New York State Police,

21    did you have outside employment?

22        A.    Did I work for somebody else?

23        Q.    Yes.

24        A.    I worked for a mortgage broker.

25        Q.    Who was that?

175

1                    WYNDER

2        A.    I don't recall.

3        Q.    When did you do that?

4        A.    I don't recall what year it was.

5        Q.    You were with State Police for

6    12 years.  So of those 12 years, was it

7    early on in your career, later?

8        A.    Early on.

9        Q.    So you would say within the

10    first few years?

11        A.    I would say the first few years,

12    yes.

13        Q.    Was it within the first year?

14        A.    No.

15        Q.    In the second year?

16        A.    I don't recall, but I know it

Page 158

94278

17    wasn't in the first year.

18        Q.    Where was the mortgage broker

19    located?

20        A.    White Plains.

21        Q.    What did you do for them?

22        A.    Basically I just referred people

23    to get mortgages, try to take mortgages.

24        Q.    Did you have to get permission

25    from State Police to do that?

176

1                     WYNDER

2        A.    Yes.

3        Q.    Who gave you permission to do

4    that, if you can recall?

5        A.    My sergeant signed off on it.

6        Q.    Was that Sergeant Welsh?

7        A.    I believe, yes, it would have

8    been, yes.

9        Q.    That was while you were at

10    Peekskill?

11        A.    Correct.

12        Q.    Other than that, any outside

13    employment where you worked for someone

14    else?

15        A.    I formed my own company.

16        Q.    What company was that?

17        A.    For You Enterprises.

18        Q.    When did you form that company?

19        A.    I don't recall.  '94, '95,

Page 159

94278

20    somewhere around there.

21        Q.    What type of company was that?

22        A.    T-shirts and promotions.

23        Q.    What you say "promotions," what

24    do you mean?

25        A.    We promoted a concert.

                                                         177

1                    WYNDER

2    Basically, we were trying to promote other

3    concerts, but basically we did one concert

4    and then we wanted to sell T-shirts.

5        Q.    When you say "we," did you have

6    other individuals who were in the company

7    with you?

8        A.    Yes.

9        Q.    Who were they?

10        A.    My wife, Chandra Wynder, at the

11    time and Christopher Downing.

12        Q.    Christopher Downing?

13        A.    And Terrence Williams.

14        Q.    Christopher Downing and Terrence

15    Williams, are they related to you?

16        A.    No.

17        Q.    How did it come about that you

18    formed this company?

19        A.    We were friends and we wanted to

20    sell T-shirts and maybe promote a concert

21    here or there.

22        Q.    Did you get permission from

                    Page 160

94278

```
23      State Police to do this outside work?
24          A.    Well, I wasn't working.  We
25      formed a company.  I was not working.
```

178

```
 1                  WYNDER
 2          Q.    Did you have an understanding
 3      that you had to have the permission of
 4      State Police to enter into this outside
 5      company?
 6          A.    They said I had to, so I typed
 7      up a memo and I submitted it and it was
 8      approved by sergeant -- my sergeant signed
 9      off on it.
10          Q.    Was that Sergeant Welsh again?
11          A.    No.
12          Q.    What sergeant was that?
13          A.    Smoskey, S-m-o-s-k-e-y.
14          Q.    Were you actually incorporated
15      as a company or was it a partnership?
16      What was the --
17          A.    Incorporated.
18          Q.    Did you let the State Police
19      know about the company or did they come to
20      you and say, you know, you need to fill
21      out paperwork?
22          A.    I came to them.
23          Q.    Who did you approach regarding
24      the company?
25          A.    Sergeant Smoskey.
```

Page 161

94278

1                   WYNDER

2          Q.     Other than the For You

3    Enterprises, were you involved in any

4    other companies during the time that you

5    were in the State Police?

6          A.     No, not that I can recall.

7          Q.     How long did you have that For

8    You Enterprises?

9          A.     We had it up until I started

10   having problems with the State Police.

11         Q.     When was that?

12         A.     I would say right around 1997.

13         Q.     What happened to the business?

14         A.     We dissolved it.

15         Q.     Why did it dissolve?

16         A.     Because all of a sudden three of

17   the members in the corporation were being

18   harassed by their job.

19         Q.     Now, when you say "three of the

20   members," you're referring to yourself,

21   Christopher Downing and Terrence Williams?

22         A.     Correct you are.

23         Q.     And Christopher Downing and

24   Terrence Williams also work for State

25   Police?

94278

1           WYNDER

2      A.    Terrence Williams worked for the

3   State Police.

4      Q.    Who did Christopher Downing work

5   for?

6      A.    U.S. Customs.

7      Q.    Where in the State Police did

8   Terrence Williams work?

9      A.    SP Hawthorne.

10     Q.    Does Terrence Williams still

11  work for State Police?

12     A.    Yes, he does.

13     Q.    Do you know where he currently

14  works?

15     A.    SP Hawthorne.

16     Q.    You say that the three members,

17  Mr. Downing, Mr. Williams and yourself

18  were being harassed by State Police.  In

19  what way were you being harassed?

20     A.    Well, at my hearing in 1998,

21  while on the stand, Lieutenant Barbaria

22  said that I was being criminally

23  investigated for a murder that took place

24  in California in 1989 and that it was over

25  a drug deal that went bad.


                                        181


1           WYNDER

2      Q.    What is your understanding about

3   where this information came from?

Page 163

94278

4     A.    Well, at the hearing, they told

5     us that they couldn't reveal where it came

6     from, a confidential source.

7     Q.    Is it your understanding that

8     State Police have a confidential source

9     for this information?

10    A.    Well, we asked during the

11    hearing to produce the confidential

12    informant and also to produce the

13    confidential informant's paperwork, and

14    the State Police said they had no such

15    paperwork.  We requested it again at

16    Workers' Compensation and we had the same

17    thing, that there was no paperwork.

18    Q.    As you sit here today, do you

19    believe that State Police had a

20    confidential informant for the

21    information?

22    A.    No.

23    Q.    Going back to the time when you,

24    Mr. Downing and Mr. Williams were engaged

25    in the For You Enterprises, did you

⬜

182

1           WYNDER

2     actually sell T-shirts?

3     A.    We did at one concert, yes, we

4     did.

5     Q.    What concert was that?

6     A.    It was a concert in Westchester

94278

7   County.

8      Q.    What group was playing?

9      A.    I don't recall.  It was a dance

10  concert.

11     Q.    What year was that?  Do you

12  remember?

13     A.    No, I don't recall.

14     Q.    Where in Westchester County was

15  the concert?

16     A.    White Plains.

17     Q.    Was it at the center there?

18     A.    Correct.

19     Q.    Did you actually promote that

20  concert?

21     A.    Yes, we did.

22     Q.    Were there any other concerts

23  that you promoted?

24     A.    No, not that I can recall.

25     Q.    Was there anyone else besides

183

1            WYNDER

2  yourself, Mr. Downing and Mr. Williams

3  that were involved in that business?

4     A.    There was a gentleman who knew

5  artists.  He helped out, but I can't

6  recall his name right now.

7     Q.    You said that you were being

8  harassed.  who particularly was doing the

9  harassing of yourself, Mr. Downing and

94278

10    Mr. Williams?

11        A.    The New York State Police.

12        Q.    Who particularly within the New

13    York State Police?

14        A.    Internal Affairs.

15        Q.    Who particularly within Internal

16    Affairs?

17        A.    Captain Masterson, Captain Spahl

18    who had just came out of Internal

19    Affairs.

20        Q.    Anyone else?

21        A.    Captain Klusacek.

22        Q.    Anyone else?

23        A.    Superintendent.

24        Q.    Superintendent McMahon?

25        A.    Yes.

184

1                    WYNDER

2        Q.    Anyone else?

3        A.    At what period are we talking

4    about?  At that time, during the

5    concerts?

6        Q.    Well, let me go back.

7             I believe your testimony was,

8    and correct me if I'm wrong, that -- I

9    asked you why the business dissolved and

10    you said that it dissolved because of the

11    harassment by the State Police, correct?

12        A.    Correct.

Page 166

94278

13    Q.    So we're talking about the time
14  period when you, Mr. Downing and
15  Mr. Williams were involved in the
16  business?  That entire time period?
17    A.    Correct.
18    Q.    Anyone else besides Captain
19  Masterson, Spahl, Klusacek and the
20  superintendent?
21    A.    Preston Felton.
22    Q.    Who is Preston Felton?
23    A.    At that time he was a lieutenant
24  in Internal Affairs.
25    Q.    Anyone else?

185

1         WYNDER
2    A.    Not that I can recall right now.
3    Q.    I want to go through the
4  harassment.
5         Now, Captain Masterson,
6  particularly what was he doing to harass
7  you, Mr. Downing and Mr. Williams at that
8  time?
9    A.    Well, he was personal friends
10  with Captain Spahl and the two of them
11  constantly stayed in touch.
12    Q.    What did they do to harass you?
13    A.    Whenever I did something wrong,
14  Captain Spahl would call Captain Masterson
15  and then charges would start coming my

Page 167

94278

16    way.

17         Q.    Can you give me an example of

18    what you did wrong and what charges came

19    your way?

20         A.    Okay.  One was while in the

21    station, numerous times Captain Spahl felt

22    that he wasn't saluted, so he brought me

23    up on charges for failing to salute an

24    officer.

25         Q.    This was at SP Hawthorne?

                                                    186


1                   WYNDER

2         A.    Correct.

3         Q.    Had you saluted him?

4         A.    No, I did not.

5         Q.    Is it customary for troopers to

6    salute the captain?

7         A.    Yes, if they are outside with

8    their Stetson on and they are not busy.

9    The manual states that if -- when you

10    don't salute an officer is when it's an

11    inconvenience to you or inconvenience to

12    that officer, at which time I stated --

13    during that time Captain Spahl had

14    Internal Affairs come down and take a

15    statement from me for failing to salute an

16    officer which is not Internal Affairs'

17    job.  Internal Affairs only comes if

18    there's a criminal matter that's been

                      Page 168

94278

19    involved -- that's why it's called

20    Internal Affairs.

21              That incident should have been

22    handled by my sergeant and then by troop

23    command, but of course because Captain

24    Spahl was good friends with Captain

25    Masterson, he brought in Internal Affairs

187

1                   WYNDER

2    to try and scare me and try and take a

3    statement from me and bring me up and

4    charges.

5         Q.    Did they take a statement from

6    you?

7         A.    Yes, they did.

8         Q.    Who took the statements?

9         A.    I can't recall who the two

10    Internal Affairs officers were.  If I saw

11    the names, I would remember them.

12        Q.    After the statement was taken,

13    what was the results of the charges

14    brought against you?

15        A.    Well, that's the problem that we

16    have here.  Any complaint that started in

17    the New York State Police has to be

18    finished with a disposition, either

19    unfounded or founded, and for some odd

20    reason that complaint never was furnished

21    with founded or unfounded.  It also was

94278

22    done out of chain of command and in

23    violation of State Police rules and

24    regulations.

25        Q.    Whose responsibility do you

188

1            WYNDER

2    believe it is for the way that that

3    occurred?

4        A.    I don't understand what you're

5    trying to say.

6        Q.    That was unclear.  I will

7    restate that.

8        Who do you believe was

9    responsible for getting you a decision as

10    to whether it was founded or unfounded?

11        A.    That's in the rules and regs

12    which is overseen by Superintendent James

13    McMahon, and because I felt because I was

14    black and this was the first time any

15    trooper had ever been brought up on

16    charges for failing to salute their

17    superior officer --

18        Q.    How do you know that that was

19    the first time?

20        A.    Because nobody has ever been

21    brought up on charges for failing to

22    salute an officer.

23        Q.    How do you know that?  What's

24    the basis of that information?

94278

25      A.    Well, the PBA told me that and

189

1                 WYNDER

2    they have records of all incidents.

3        Q.    Who in the PBA told you that?

4        A.    Al Wolford.

5        Q.    Did you have a hearing as a

6    result of these charges?

7        A.    No.  Again, another violation of

8    rules and regs.  Once they took a

9    statement, there should have been a

10   hearing or there should have been a letter

11   saying that it was unfounded, none of

12   which was ever provided to me till this

13   day, which led me to believe that this was

14   a witch-hunt and Captain Spahl and Captain

15   Masterson were single-handedly going to

16   make sure that they made my working

17   conditions so hostile that I wouldn't be

18   able to do my job.

19       Q.    After the statement was taken

20   from you, did you ask anyone as to what

21   the results of these charges were?

22       A.    Of course.

23       Q.    Who did you ask?

24       A.    I asked my sergeant.

25       Q.    Who was that at the time?

94278

190

```
 1              WYNDER
 2      A.    That was Sergeant Antalek.  I
 3  asked my PBA rep.  I asked the PBA
 4  president.  I called Internal Affairs,
 5  Captain Masterson.
 6      Q.    You spoke with Captain Masterson
 7  directly?
 8      A.    I believe I spoke to him and
 9  asked him where was the disposition of
10  these charges?  We requested it at my
11  hearing, we requested it at my Workers'
12  Compensation hearing, and till this day,
13  we've been denied this letter that is
14  supposed to be there.  If this was a
15  legitimate complaint, it should have been
16  documented, it should have been
17  investigated and it should have been
18  closed with a disposition.
19          And it has not been done and
20  that was because I was black, it was the
21  color of my skin, and Captain Spahl was
22  trying to make my job so bad that I
23  wouldn't work there.  I mean every trooper
24  was shocked, being brought up on charges
25  for failing to salute an officer.
```

191

```
 1              WYNDER
```

94278

2      Q.    Let me ask you, have you seen

3  any paperwork relating to these charges?

4      A.    No.  Not even my statement that

5  was administered.  You're supposed to get

6  a copy of your statement because you're

7  supposed to initial it.  There's no

8  paperwork that's ever been shown.

9      Q.    Did you suffer any discipline as

10 a result of that charge?

11     A.    What do you mean?

12     Q.    Were you suspended for any

13 amount of time?  Were you given a letter

14 of censure?

15     A.    No.  I was just being

16 scrutinized.  I had to be pulled off the

17 road to take a statement.  I was stressed

18 out.  I was threatened.

19     Q.    When you say you were

20 threatened, who threatened you?

21     A.    I was threatened by Captain

22 Spahl.

23     Q.    What was the threat?

24     A.    That he was going to make sure

25 that I followed rules and regulations,

⬜

192

1                 WYNDER

2  which I was doing, and that he was going

3  to keep a constant eye on me.

4      Q.    So would it be fair to say that

Page 173

94278

5   other than the statement that you gave and

6   the interaction you had with Captain

7   Spahl, you never lost any time on the job

8   as a result of the failing to salute,

9   correct?

10      A.    No, the only thing I lost was

11   credibility.  I lost a couple of friends.

12   People now started to shy away from me

13   because they were starting to see a

14   pattern of every time you turned around, I

15   was being brought up on charges.

16      Q.    When you say you lost

17   credibility, what do you mean?

18      A.    Well, they started questioning

19   everything that I did in the station.

20   Captain Spahl.

21      Q.    Who is --

22      A.    Captain Spahl.

23            I'll give you an example.  I was

24   sitting at the desk -- we have what we

25   call desk duty.  I decided to -- we

193

1                WYNDER

2   have -- the troopers in the morning, we

3   usually have -- one trooper runs and gets

4   coffee and bagels for everybody, and at

5   this point I told them that I would go,

6   since I was going to be on the desk and

7   inside all day, I wanted to go on the road

Page 174

94278

8      for a while.

9              So I said, "I'll go and get it."

10     That was accepted.  Everybody was asked

11     for money to buy a bagel and a coffee,

12     everybody in the station, Captain Spahl,

13     sargeants, everybody.  I went, picked up

14     the bagels and the coffee, I came back.

15     Must have been in my seat five minutes and

16     a phone call came in and they asked for --

17     may I speak to station commander -- not

18     station commander, can I speak to Zone

19     Commander Captain Spahl.  And I

20     transferred the call to him.  10 minutes

21     later the sergeant comes up to me and

22     tells me that he needs a memo from me and

23     there's going to be an investigation

24     into -- there were allegations that a

25     trooper was receiving free food at this

194

1                  WYNDER

2      bagel shop.

3          Q.    Had you actually received free

4      food at the bagel shop?

5          A.    No, we did not, we paid for the

6      bagels and the coffee.

7          Q.    Who is "we"?

8          A.    It was just me.  I was the only

9      one that went and picked it up.  That was

10     the whole deal.  One trooper had to pick

Page 175

94278

11    up all the stuff.

12         Q.     So there was no one else with

13    you, it was you who picked it up?

14         A.     Yes.

15         Q.     What was the name of the bagel

16    shop?

17         A.     I don't recall.  Hawthorne

18    Bagels.

19         Q.     Is there more than one bagel

20    shop in Hawthorne?

21         A.     I can't recall that.  I am --

22    I'm quite sure the State Police knows,

23    because he took down their name and he

24    said that I had to have a memo and he

25    wanted an investigation done into why

195

1                    WYNDER

2    troopers were taking free food, and

3    somebody -- that telephone call was a

4    complaint saying that a black trooper came

5    in and cut the line and went up and got

6    free food.

7         Q.     Had you done that?

8         A.     No, I did not.  I waited on line

9    and I paid for our food.

10              And once Sergeant Smoskey who

11    was the head of the investigation, he told

12    everybody that he -- being that he was

13    doing the investigation correctly, he said

94278

14  he needed a memo from everybody, including

15  Captain Spahl on his dollar that he put in

16  for his coffee and bagel.

17      Q.    Did everyone do that?

18      A.    No.  At that time Captain Spahl

19  thought about it and came back and out and

20  realized that his entrapment for me would

21  include himself, considering he had a

22  bagel and coffee ordered, too, and at that

23  time he refused then to have the

24  investigation completed.

25      Q.    What was your understanding of

196

1              WYNDER

2  who was responsible for initiating the

3  investigation in the first place?

4      A.    I believe it was Captain Spahl,

5  and one reason is most people -- not most,

6  almost every person who calls the station

7  does not know that our captain is called

8  our zone commander.  They asked for him

9  specifically as zone commander, which

10  means it had to have been somebody who was

11  familiar with the State Police functions

12  and workings.

13      Q.    Do you believe that the

14  individuals from the bagel shop actually

15  made the phone call?

16      A.    The individuals at the bagel

Page 177

94278

17      shop did not make the phone call.

18          Q.     So is it your belief that the

19      fact that a phone call came from the bagel

20      shop was totally fabricated?

21          A.     I didn't say the call came from

22      the bagel shop.  I said a call came in and

23      said that they witnessed a black trooper

24      cut the line and get free food.

25          Q.     So you believe a call was made,

197

1                    WYNDER

2       but that it was not necessarily made by an

3       individual who was actually at this bagel

4       shop?

5           A.     I can't attest to that.

6       Actually, it had to have been somebody who

7       was at the bagel shop because they claimed

8       that a black trooper -- how many people

9       knew that I went to the bagel shop?

10          Q.     Do you have any understanding of

11      who it was that made the phone call?

12          A.     I don't understand what you

13      mean.  Do I understand or do I have a

14      belief?

15          Q.     Do you have a belief as to who

16      made the phone call?

17          A.     I believe the whole situation

18      was fabricated by Captain Spahl.

19          Q.     I'm a little unclear.  How are

                    Page 178

94278

20    you saying that Captain Spahl fabricated

21    the phone call?

22         A.    Well, because the person who

23    called asked for him by zone commander,

24    and in my years at the desk, nobody had

25    called and said, May I speak to your zone

198

1                     WYNDER

2    commander unless it's another State Police

3    personnel member.

4         Q.    So is it your testimony that

5    another State Police member was asked by

6    Captain Spahl to call in and make this

7    complaint?

8         A.    Correct.  Could have been

9    Internal Affairs.  I believe it was

10    Internal Affairs, because Internal Affairs

11    was surveillancing me.  So I believe it

12    was Internal Affairs, yes, I do.

13        Q.    Are you saying it was Captain

14    Spahl or Internal Affairs?

15        A.    It was Captain Spahl who ordered

16    Internal Affairs, in my opinion, to make

17    the phone call.

18        Q.    What do you base that on?

19        A.    Again, my reasoning.  One, I had

20    sat at the desk in Hawthorne for nearly

21    four years and I've never picked up a

22    phone and had a civilian ask for my

Page 179

94278

23    captain as a zone commander.

24            Secondly, Captain Spahl

25    immediately initiated an investigation,

199

1                    WYNDER

2    and then when he himself would be a target

3    of the investigation because he also

4    ordered a bagel and coffee, he

5    automatically drops the investigation.

6        Q.    Were you disciplined in any way

7    because of this bagel incident?

8        A.    Yeah, I was reprimanded that I

9    couldn't go to the bagel shop.

10        Q.    After that day, did you ever go

11    to the bagel shop again?

12        A.    I stayed away from the bagel

13    shop.

14        Q.    Other than being told that you

15    couldn't go to the bagel shop, was

16    anything else done?

17        A.    Again, my reputation, I mean the

18    guys laughed.  You know.  They would order

19    the bagels and coffee and say, "Kenny, you

20    want to go get it?  Sorry, you can't go

21    there, we'll go."

22            I was ridiculed.  Everything I

23    did was being scrutinized by Captain

24    Spahl.  My work at Hawthorne was so

25    hostile I couldn't do anything right.  If

Page 180

94278

200

```
 1                    WYNDER
 2    I came in late, he was watching the Purse
 3    29.  It's a form that you sign in when you
 4    come in.  My job became where I couldn't
 5    do my job anymore.
 6        Q.    When you said you couldn't do
 7    your job, in what way couldn't you do your
 8    job?
 9        A.    Well, I already gave you two
10    incidents.  One, the other troopers also
11    found a lieutenant, Preston Felton, behind
12    SP Hawthorne, hiding down in a car.
13        Q.    Who found that?
14        A.    I think it was -- I don't
15    remember the trooper's name, but they came
16    in and told me he was in the back.
17        Q.    That was another trooper who was
18    at SP Hawthorne with you?
19        A.    Of course, yes.
20        Q.    What did Lieutenant Felton's
21    hiding have to do with you?
22        A.    Well, he was there to watch me,
23    from what I was told by this trooper.
24        Q.    At that point, when Lieutenant
25    Felton was hiding --
```

201

94278

1           WYNDER

2           MR. MERRITT:  Could we clarify

3    that?  His name is Felton Preston.

4           MS. ODESSKY:  It's Felton

5    Preston?

6           MR. MERRITT:  It's Felton

7    Preston.

8      Q.    So Lieutenant Preston; is that

9    correct?

10     A.    Correct.

11     Q.    At that point, how many troopers

12   would you say there were at SP Hawthorne?

13     A.    I can't recall.

14     Q.    Were there more than 10?

15     A.    What do you mean?  At the

16   station --

17     Q.    who were assigned to the

18   station.

19     A.    Assigned or working that day?

20     Q.    Well, let's take working that

21   day.

22     A.    Probably, B line, probably no

23   more than four maybe.  I can't recall.

24     Q.    Why did you believe that the

25   lieutenant was watching you particularly?

202

1           WYNDER

2      A.    Well, for one, he was never back

3    there for anybody else; and secondly, this

94278

4    was not the first time that I heard that I

5    was being surveillanced.  The first time

6    came from my neighbors at my residence in

7    the Town of Newburgh -- I mean the Town of

8    New Windsor.

9        Q.    We'll go back to that in a

10   moment.  Just where the lieutenant was,

11   did you actually see him watching that

12   day?  Did you yourself observe him hiding?

13       A.    Who, me?

14       Q.    Yes.

15       A.    After it was pointed out by the

16   trooper, yes.

17       Q.    Where was he?

18       A.    Well, he was in the back of

19   Hawthorne and at that time -- it's changed

20   now so you wouldn't know -- there was a

21   hill and there was residences up there,

22   and you could see that his car was parked

23   back there and he never came through the

24   station.  Most officers, if they come

25   through the station, bring their car in,

203

1                    WYNDER

2    they will come inside and sign in, and he

3    didn't do any of that that day.  And he

4    didn't even gas up which is usually --

5    those are the two reasons you come

6    through, to gas up and to sign up in, go

Page 183

94278

7    through the station and leave.  He stayed

8    back there for a while and never came

9    through the station.

10       Q.    Why did you believe that the

11   lieutenant was watching you particularly

12   rather than, say, the other three or four

13   people who were in the station working at

14   that time?

15       A.    Because I had been told just

16   prior to that by my neighbor in the Town

17   of New Windsor where I lived at my

18   residence that they had asked him, could

19   they set up shop in his garage to watch my

20   house.

21       Q.    When you say "just prior," how

22   long before this incident with Lieutenant

23   Preston did this neighbor tell you you

24   were being watched?

25       A.    I would say two weeks, a week.

204

1                    WYNDER

2    He said that they wanted binoculars and

3    they were watching.  I saw Preston

4    Felton --

5               THE WITNESS:  Felton Preston?

6        A.    (Continuing) But I knew that I

7    was being surveillanced.  My neighbors

8    came over and told me that the State

9    Police had requested their permission to

94278

10   set up surveillance cameras.

11          Q.     Can you give me the names of the

12   neighbors that told you that?

13          A.     You're talking -- you're talking

14   eight, nine years.  I think his name is

15   Ed, but I don't remember his last name but

16   he -- he came up to me and he told me he

17   told them no and that he would testify on

18   my behalf because they tried -- and they

19   also told him that I was -- I was being

20   criminally investigated and they needed to

21   set up shop and watch me; and I also knew

22   that at that time, prior to that, was the

23   fact that they had went to my bank and

24   tried to issue an illegal subpoena with

25   reference to my records.

205

1                      WYNDER

2          Q.     When did that occur in

3   connection to when you say the lieutenant

4   was in back of SP Hawthorne watching you?

5          A.     This was all -- this was like in

6   '97.  This was coming towards the end of

7   1997, and I'm quite sure of that.

8                 MS. ODESSKY:  Off the record.

9                 (Discussion off the record.)

10                MS. ODESSKY:  At the agreement

11   of the parties, at this point we're going

12   to adjourn and resume this deposition on

Page 185

94278

13    Monday morning at 11:00 or shortly
14    thereafter.  It's about 3:55 right now.
15            MR. MERRITT:  I just submitted
16    one exhibit today.  I think it was Exhibit
17    B.  Just so I have a complete record that
18    I'm able to get copies --
19            MS. ODESSKY:  Yes, I will make
20    them for you before you go.
21            MR. MERRITT:  There's one other
22    exhibit that you may or may not have.  I
23    found it in the box, but you had asked the
24    witness about whether or not he had got
25    approval for outside employment while he

                                                    206

1                    WYNDER
2    worked for the State troopers and he had
3    testified that John S. Smoskey had
4    submitted the request and it's signed by
5    -- it looks like a J.M. Perez but we do
6    have -- a copy of that approval.
7            MS. ODESSKY:  I'll take a copy
8    of that -- I may have had that in the box,
9    but let me just take a copy and I'll make
10   copies of these for you before you go.
11           (Time noted:  3:57 p.m.)
12
13
14
15
                    Page 186

94278

16

17                    KENNETH N. WYNDER, JR.

18

19    Subscribed and sworn to before me

20    this    day of            , 2005

21

22

23

24

25

☐

                                                                207

1

2              C E R T I F I C A T I O N

3

4

5

6        I, TAMMY O'BERG, a Shorthand

7    Reporter and a Notary Public, do hereby

8    certify that the foregoing witness,

9    KENNETH N. WYNDER, JR., was duly sworn on

10    the date indicated, and that the foregoing

11    is a true and accurate transcription of my

12    stenographic notes.

13        I further certify that I am not

14    employed by nor related to any party to

15    this action.

16

17

18
                    Page 187

94278

19

20

21

22                    TAMMY O'BERG

23

24

25

⬜                                                        208

1

2                    E X H I B I T S

3

4     DEFENDANTS'

5     EXHIBIT           DESCRIPTION              PAGE

6

7     A                 Third Amended Complaint  3

8

9     B                 Judgment                 26

10

11    C                 Letter dated 12/28/99    37

12

13

14

15

16

17

18

19

20

21

94278

22

23

24

25

209

1

2      EXAMINATION BY                          PAGE

3

4

5      MS. ODESSKY                              4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

94278

25

210

1

2                    LITIGATION SUPPORT INDEX

3

4

5            DIRECTION TO WITNESS NOT TO ANSWER

6            Page        Line        Page        Line

7             20          12

8

9

10           REQUEST FOR PRODUCTION OF DOCUMENTS

11           Page        Line        Page        Line

12

13

14

15              INFORMATION TO BE FURNISHED

16           Page        Line        Page        Line

17             19          6

18

19              QUESTIONS MARKED FOR A RULING

20           Page        Line        Page        Line

21

22

23

24

25

Page 190