94979

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
99CV0772

-----------------------------------------x

KENNETH WYNDER,

Plaintiff,

- against -

JAMES MCMAHON, DAVID SPAHL, ROBERT JONES, LOUIS B. BARBARIA, CRAIG MASTERSON, JOSH KEATS, Individually, and JOHN DOE employees One through Ten of the NEW YORK STATE POLICE who violated the Constitutional Rights of Plaintiff while operating under Color of law or direction from named Defendants,

Defendants.

-----------------------------------------x

August 15, 2005
11:25 a.m.

Continued Deposition of KENNETH N. WYNDER, JR., taken by the Defendants, pursuant to Adjournment, held at the offices of New York State Attorney General, 120 Broadway, New York, New York, before Tammy O'Berg, a Shorthand Reporter and Notary Public of the State of New York.

212

94979

A P P E A R A N C E S:

RICHARD J. MERRITT, ESQ.
Attorney for Plaintiff
2 Birs Avenue
Lindenhurst, New York 11757

STATE OF NEW YORK
Office of Attorney General
Eliot Spitzer
Attorneys for Defendants
120 Broadway
24th Floor
New York, New York 10271
BY: SUSAN H. ODESSKY, ESQ.

213

MS. ODESSKY: For the record, this is the deposition of Kenneth Wynder

which is being continued from Friday.

K E N N E T H N. W Y N D E R, J R.,

having been previously duly sworn,

testified further as follows:

CONTINUED EXAMINATION

BY MS. ODESSKY:

Q. Good morning, Mr. Wynder.

A. Good morning.

MS. ODESSKY: I note for the record the time is now 11:25.

BY MS. ODESSKY:

Q. Mr. Wynder, when we met on Friday, we were talking about a number of incidents. One particular incident we spoke about was Captain Spahl's complaining that you did not salute him and that occurred at the Hawthorne barracks; is that correct?

A. Correct.

Q. To the best of your knowledge, was that one particular occasion that he

was complaining about or more than one occasion when you did not salute him?

A. He just made the complaint, and when Internal Affairs came down to interview me, which was against rules and regulations, it turned out to be that he

94979

claims it was five incidents.

Q. Five incidents.

What was your recollection of how many incidents it was in which you did not salute him?

A. Probably about that.

Q. You would agree with him that there were about five occasions?

A. Well, five occasions that he thought I didn't salute him.

First of all, under rules and regs, paramilitary, you did not salute indoors.

Q. Let me ask you, before we go into that, Mr. Wynder, on how many occasions do you recall that you saw Captain Spahl that you did not salute him?

A. Only one that I can recall was

215

WYNDER

one.

Q. Only one.

Do you remember what was happening during that time?

A. Yes, I do.

Q. What was that?

A. We were all in the squad room and the captain came in and one person stood up, everybody stood at attention and

stopped what they were doing and one person saluted him.

Q. Who was that person?

A. I don't recall. It was one of the troopers in the room.

Q. How many other troopers were there in the room who did not salute?

A. Probably another five or six that did not salute.

Q. Is it five or six besides yourself?

A. Yes.

Q. That's the only incident that you can recall in which you did not salute Captain Spahl?

WYNDER

A. Correct.

Q. What were you doing at the time when Captain Spahl came into the squad room and you did not salute him?

A. I was doing paperwork.

Q. Why did you not salute him at that time?

A. Protocol is when an officer enters the room, one person can salute for all of them. It's a protocol that's used throughout the State Police. Protocol that was issued in the Academy.

When I was as instructor, one of the recruits would stand and salute. Again, you did not salute indoors.

Q. Is that written down in one of the State Police policies or procedures?

A. Well, it's military code. State Police is military.

Q. But if I looked at the State Police rules and regulations, would I find in there that you do not salute someone indoors?

A. No, what you would find is we're

not to salute when it's an inconvenience to either you or the officer.

Q. On that day, was it inconvenient for you to salute Captain Spahl?

A. Correct, if I'm doing paperwork.

Q. The other incidents, were you aware of the other four incidents that Captain Spahl said you did not salute him on? Do you have an understanding of what those other incidents were?

A. According to Internal Affairs, who said that I was working the desk and he was standing there and I didn't salute him, which I don't have to. He knows that.

Q. Do you remember that incident?

A. I don't remember the incidents he put down. He claims he needed to be saluted. There was no reason to salute indoors. I had been on the job almost eight or nine years; I had never saluted indoors.

Q. Have you ever saluted Captain Spahl at any time?

WYNDER

A. Of course. Outside or when you go into his office, when he calls you into his office.

Q. During the time that you worked at Hawthorne, at SP Hawthorne, how many times would you say you saluted Captain Spahl?

A. I don't recall that.

Q. Would you say it was more than 10?

A. I don't recall that. I was there for a couple of years.

Q. Would it be less than 10?

A. Indoors? Never saluted indoors. Like I said, unless I went into his office, or we were outside or we had our hats on.

Q. In general, I'm asking whether

it was indoors or outdoors the total number of times?

A. I don't recall.

Q. We also spoke on Friday about an incident in which you had an interaction with City of Newburgh police officers.

You recall that?

A. Correct.

Q. Is it your understanding that there was another officer who was African American who had a similar type of complaint filed against him for an interaction with local police officers and was allowed to apologize?

A. Rephrase the question.

Q. Do you recall that there was another African American officer who you were aware of who had a complaint filed against him similar to the complaint that was made against you by City of Newburgh police officers?

MR. MERRITT: I have to object. You haven't given a time frame.

Are you talking about from the beginning of time until the present time or are you talking about a year in particular? Are you talking about any

94979

officer who had a complaint against the town of Newburgh?

It's a ridiculous question, I'm

220

WYNDER

sorry, but you have to pin it down to some time frame at least so we have some idea how the witness can answer that question.

MS. ODESSKY: Okay.

Can I get this marked, please.

(Two-page charge of discrimination marked Defendants' Exhibit D for identification.)

Q. Mr. Wynder, I'm going to show you what I've had marked as Defendants' Exhibit D. Do you recognize this?

(Witness perusing document.)

A. Okay.

Q. What do you recognize that to be?

(Witness perusing document.)

A. Yes, there was another trooper in another station --

Q. Can we just back up, and I want to identify for the record what this document is.

A. It's an EEOC charge of discrimination complaint filed.

Q. That's a complaint filed by you?

WYNDER

A. Correct.

Q. Does it have a date there as to when you filed that?

A. 9/15/97.

Q. Thank you.

Does that complaint in the second paragraph, on the first page, make reference to another black trooper?

A. Yes.

Q. Does that refresh your recollection about whether or not you were aware of another black trooper who was accused of a similar complaint?

A. I believe so, yes. He was out of another station.

Q. Can you recall as you sit here now who that was?

A. I don't recall. If I'm not mistaken, it could be Trooper McKenney.

Q. Where was he working out of, if you recall?

A. I believe at that time SP Peekskill. I don't know. He transferred later on.

WYNDER

Q. Do you have a recollection of what the complaint against Trooper McKenney was?

A. From what I heard, it was just an incident -- a stop with him and another police officer.

Q. Was that other police officer a member of New York State Police or a local police officer?

A. I don't recall.

Q. Do you have an understanding of what the complaint was against him because of that stop?

A. Uh-uh. Just that he was stopped and they had words.

Q. That he had words with another officer?

A. Correct.

Q. When you say from what you heard, did you hear this directly from Trooper McKenney or from someone else?

A. I believe from other troopers at SP Peekskill.

MS. ODESSKY: Right now, without

223

WYNDER

the documents, Exhibit D, have you disclosed that in disclosure at any

point? I don't have it in any way.

MR. MERRITT: Yes.

MS. ODESSKY: Do you have the number for that?

I don't have a Bates number on my copy, but this was in a packet of material that should have been disclosed. It's actually a document written by Mr. Wynder. I'll be happy to give you a copy of that.

MR. MERRITT: Before we leave, I would like to have a copy of each one of the exhibits we've used.

MS. ODESSKY: I believe you have a copy of everything that we did on Friday, because you should have in the box the copies with the original exhibit tabs on there. I'll make you a copy of this before you leave, Exhibit D.

BY MR. ODESSKY:

Q. In that second paragraph on Exhibit D, you indicate that the officer

224

WYNDER

was not suspended but was allowed to apologize.

What was your understanding about that?

A. I don't have any understanding

about that. I just know that he wasn't brought up on charges.

Q. How do you know that?

A. That's what was told to me from people -- other troopers at SP Peekskill.

Q. What was Trooper McKenney's race?

A. Black.

Q. On Friday we also spoke about you being out on sick leave from the New York State Police at various times.

Can you tell me, to the best of your recollection, how many separate times you were out on sick leave while you were with the New York State Police?

A. The first sick leave, off duty, I was burned.

Second, I hurt an ankle.

Third was a car accident on

duty, ankle was on duty, and then the last is a hernia.

Q. For the burn, you said that occurred while you were off duty?

A. Correct.

Q. Did you file any Workers' Compensation for that?

A. No, it was off duty.

Q. Did you use your sick time for that?

A. Yes, I did.

Q. Approximately how much time did you take off?

A. I don't remember. I may have missed two weeks.

Q. Now, with your ankle, what was the cause of the ankle injury?

A. Chasing a prisoner. Chasing -- not a prisoner but chasing a suspect.

Q. What happened to your ankle?

A. I twisted it and I tore -- I stretched the ligaments in it.

Q. How long were you out for that?

A. About three months.

226

WYNDER

Q. Did you file for Workers' Compensation for that?

A. Yes, I did.

Q. Were you given Workers' Compensation?

A. Yes, I was.

Q. So you did not have to use your sick time for that?

A. On-duty injury as per policy, and Workers' Compensation.

Q. Well, the car accident --

A. Before the car accident, I was out one more time. I had developed, because of the ankle injury, I developed DBTs, blood clots.

Q. So were you out at the same time as for the ankle or did you --

A. No, I came back from the ankle and because they immobilized my ankle it caused blood clots.

Q. How long were you out with the blood clots?

A. Eight months, nine months maybe.

Q. Did you get Workers'

Compensation for that time?

A. Yes, I did.

Q. Now, the car accident we spoke about on Friday, you received Workers' Compensation for that, correct?

A. No, I did not. Well, I received Workers' Comp. It was an on-duty injury, and according to Workers' Compensation rules and the State Police rules, if you do not contest an injury within 25 days, which is a C-7 form, they cannot dispute the disability nor the injury and they must compensate you. And I was not compensated for that incident.

Q. So you never received any Workers' Comp?

A. No, I received Workers' Comp, but according to rules and regulations, the New York State Police Manual, I'm supposed to receive full pay. I received full pay until the State Police decided that they wanted me to come back to work and they forced me back to work and that's when I came in and signed in and signed

back out, and that's when the State Police refused to pay me.

Q. So it's your contention that you should have been paid from that time when you came back to work and that was -- was that in September of 1996, approximately?

A. Yes. But it's not my contention. That's the rules. After I was awarded a Workers' Compensation decision that said I was injured on the job and the State Police refused to credit back my time.

Q. Now, how about the hernia. We discussed that on Friday, as well.

That was due to the change in the gun and the gun belt situation?

A. Correct.

Q. How much time were you out for that?

A. About two months.

Q. Did you receive Workers' Comp for that time?

A. No.

Q. Why did you not receive Workers'

229

WYNDER

Comp for that time?

A. It was not an on-duty injury. Workers' Compensation is only for on-duty injuries.

Q. Any other sick leave time that you can recall?

A. Yes, when I went out on disability, stress.

Q. When did you go out on that disability?

A. 12/28/1997 I signed out of the blotter, unable to perform my duties due to the hostile work conditions that was being forced on me.

Q. Did you return to work after that?

A. No.

Q. You were ultimately awarded Workers' Compensation following the hearing, correct?

A. No, I wasn't. After I went out on sick leave, State Police refused to pay me full-duty pay, which they were supposed to. Again, State Police violated their

own rules and regulations and Workers' Compensation law.

You have 25 days to file a C-7 in which to contest an injury. The State Police failed to file this form and I should have been paid from the time I was out, but, again the State Police, because of the color of my skin, decided not to pay me, and until this date, the State Police still owes me $30,000 in back pay.

Q. What does that 30,000 cover? What time period?

A. Over four months -- actually, over a year and a half of full pay.

Q. What is the actual time period? Does that time period begin on December 28, 1997?

A. Correct. Until 1999, when I retired.

Q. Just a little confused.

You said it was four months of pay that they owed you?

A. No, they owe me a year and a

half from the time I retired -- 18 months,

WYNDER

which according to the manuals, you are allowed to be paid full pay for 18 months, and the State Police refused to pay me.

Q. What money have you received from Workers' Compensation to date?

A. Well, to this date, Workers' Compensation paid me like they were supposed to which is up to $400 a week.

Q. When did you start receiving that money?

A. After four years of fighting a Workers' Compensation contested claim that the State Police never contested. It took four years. 27 hearings.

Q. So what was the date on which you first received your first Workers' Compensation benefit?

A. I don't recall it offhand. It had to be -- I'm guessing, somewhere in 2002, 2003.

Q. When you received your first benefit, did you get any amount retroactive or did you just begin to get a weekly payment?

WYNDER

A. From?

Q. From the time that you got the decision saying that you were entitled to Workers' Compensation, when you received your first check, was that just a weekly check starting up or was there a retroactive?

A. No, that was retro.

Q. There was a retroactive amount that you received?

A. Correct.

Q. Can you tell me what amount that was?

A. I can't recall right now.

Q. When you say that the benefit was up to 400 a week, are you still receiving a weekly benefit?

A. No.

Q. When did you stop receiving a weekly benefit?

A. August of 2004.

Q. Why did you stop receiving the weekly benefit then?

A. Settlement.

233

WYNDER

Q. What did that entail, the settlement?

A. Five years.

Q. So, in other words, the settlement was that you received five years of Workers' Compensation?

A. Yes.

Q. When you say that the payment was up to $400 a week, was that the amount that you were receiving, 400, or was it something less than that?

A. No, I received $400 a week, but there was one period of payment that they didn't pay me at $400 a week so....

MS. ODESSKY: Mr. Merritt, I'm going to ask for the total amount of Workers' Compensation that Mr. Wynder has received to date and I'll send you a letter to that effect.

(Information requested.)

Q. Mr. Wynder, you indicated to me on Friday that State Police contacted your neighbors and asked your neighbors about you and asked for permission to film

234

WYNDER

you -- of your neighbors, correct?

A. Correct.

MR. MERRITT: Let me go back to

your previous request. It's my understanding that you are representing of the State of New York; isn't that correct?

MS. ODESSKY: Yes.

MR. MERRITT: The State of New York is the one who paid Mr. Wynder's Workers' Compensation, so you have full access to those Workers' Compensation payments. They are not something that I necessarily have to produce if you already have them.

MS. ODESSKY: That's fine. We can take that up at another time.

MR. MERRITT: My point is the State has paid Mr. Wynder, and they fully accounted for the payments and you are representing --

MS. ODESSKY: Actually, you are incorrect there. I don't represent the State of New York. I work for the State

of New York. My clients in this case are the individual State Police members that are being sued.

MR. MERRITT: Under contract with the State of New York. You are representing those individuals as the

94979

State of New York.

MS. ODESSKY: Workers' Compensation is a separate agency. I do not represent Workers' Compensation.

MR. MERRITT: I wish that were true, but during our Workers' Compensation period, I represented Mr. Wynder, and it was constantly brought to our attention that the State of New York was making the payments.

MS. ODESSKY: Right, but that was -- that hearing was conducted by the State Insurance Fund. I do not work for the State Insurance Fund.

I don't want to spend the time now to argue that. We can take that up at a separate time.

BY MS. ODESSKY:

236

WYNDER

Q. Mr. Wynder, going back to my question about your neighbors being questioned by State Police, it's your understanding -- who did the questioning, as far as you know?

A. What do you mean "who" --

Q. Who questioned your neighbors? What individuals?

A. Internal Affairs.

Q. Do you recall the names of any individuals who questioned your neighbors?

A. No, I don't.

Q. Whose request was it that your neighbors be questioned by Internal Affairs?

A. I believe he said -- if I'm not mistaken, that's what my neighbor told me, it could have been Captain Klusacek.

Q. Anyone else that your neighbor said it could have been?

A. He said he kind of remembered that name, but there was two other gentlemen with him.

Q. Did your neighbor tell you that

he actually spoke with Captain Klusacek?

A. Yes, he did.

Q. What neighbor was that again?

A. I don't remember his last name, but his first name is Ed. He lived across the street from me.

Q. If this matter were to go to trial, would you call your neighbors in to testify on your behalf?

MR. MERRITT: Objection.

Q. You can answer.

MR. MERRITT: You are asking for

conjecture.

MS. ODESSKY: I believe I'm entitled to know, Mr. Merritt, who the possible witnesses will be.

If Mr. Wynder doesn't know at this time, he's free to tell me that he doesn't know.

MR. MERRITT: You are asking would he --

MS. ODESSKY: I'm asking who are your witnesses, particularly regarding the statement that State Police questioned

238

WYNDER

your neighbors.

A. I don't know who I'm going to be calling as a witness yet.

Q. As you sit here today, do you have the name of one particular neighbor that you would call as a witness?

A. There's a few, if they still live there. I've moved from that area, so I'd have to see if I can contact them.

Q. During the time that your neighbors were contacted, were you out on sick leave at that point?

A. I don't recall. I could have been. I could have been -- coming back off my hernia operation. It was around

that time, in 1997.

Q. Is it your understanding that New York State Police has in the past done some investigation when troopers or other members of State Police are on sick leave?

A. Not when you are on hernia sick leave.

Q. So is it your understanding that the -- speaking to your neighbors

WYNDER

regarding you was an unusual situation?

A. Well, unusual in the fact that he told me that they weren't there to see if I was sick. They were there to watch my activities which had nothing to do with being sick.

Q. How do you know it had nothing to do with your being sick?

A. Well, he asked them that and he said they were there, they wanted to check for the activities and the fact that I may have been doing criminal activity.

Q. What criminal activity did they tell your neighbor that they were watching for?

A. That they didn't disclose to him, and they told him to keep it a secret.

Q. Mr. Wynder, at some point you met with someone from the EEOC, correct?
A. Correct.
Q. Did you actually have an in-person interview?
A. Correct.

WYNDER

Q. Do you recall who it was that you met with in person?
A. No.
Q. Did you meet with somebody more than once?
A. I went to EEOC numerous times.
Q. Did you have interviews in person on more than one occasion?
A. I can't recall. I could have spoken to numerous people. I spoke to as many people as I possibly could.
Q. What was your understanding about the result of your going to EEOC?
A. What do you mean "understanding"?
Q. Did they give you the resolution that you were looking for?
A. Yeah.
Q. What did they tell you?
A. Well, they told me two things.
One, even if they took the case,

there was nothing they could do to the State Police.

And the other one was that I

WYNDER

needed a letter -- right to sue.

Q. Did they give you a right-to-sue letter?

A. Yes, they did.

Q. Other than giving you the right-to-sue letter, did they take any other action?

A. Did EEOC take any other action?

Q. Yes.

A. No, they never do.

Q. Did they give you any indication as to whether your complaints to them were founded or unfounded?

A. They just said they weren't going to investigate it at this time and that I'd be better suited by taking it to court.

Q. Do you know whether anyone at the EEOC ever expressed an opinion to you about the merit of your case?

A. They told me I had a good case.

Q. Who told you that?

A. Like I said, I don't recall who I spoke to.

94979

242

WYNDER

Q. The person who told you you had a good case, what particularly did they say?

A. That I should fight it.

Q. When you said "fight it," what did they mean?

A. Sue the State Police, which is what they gave the right-to-sue letter for.

Q. Mr. Wynder, since leaving the New York State Police, have you been employed?

A. Yes, I have.

Q. When you left New York State Police, what was the first employment you had?

A. When I first left the State Police, I didn't work for a while. I was out on sick leave seeing doctors.

Q. When you were out on sick leave seeing doctors, what doctors did you see?

A. Dr. Hugh Butts.

Q. Who else?

A. And then I saw the State

243

WYNDER

disability doctor.

Q. Was that a psychiatrist?

A. Yes, it was, for the State Disability Board.

Q. Do you remember who that was?

A. No -- not offhand.

Q. Who else did you see?

A. Well, those are the only doctors that I saw, which was kind of interesting considering the State Police Manual rules and regs said when a member goes out on sick leave the State Police is supposed to have them see a doctor within 30 days.

Q. And you did not see a doctor within 30 days?

A. No. State Police again failed to follow their rules and regs, because if they made me go see a doctor, they would have had to pay me. So by not sending me, they were able not to pay me. Again, another discriminatory action by the State Police.

Q. Did you at this time see a family doctor?

244

WYNDER

A. I was seeing Dr. Butts.

Q. Other than that, did you have a

family physician that you regularly saw?
A. If I was sick.
Q. Did you speak to your family physician regarding the situation with State Police?
A. Family physician? No.
Q. Do you have a family physician to this day?
A. Yes, I do.
Q. Who is your family physician?
A. Dr. Burns.
Q. Can you spell that?
A. B-u-r-n-s.
Q. The first name?
A. I forgot his first name.
Q. Where is he located?
A. Peekskill, New York.
Q. Did you see Dr. Burns during this time period when you were working for State Police or when you went on sick leave from State Police?
A. I always saw Dr. Burns or

WYNDER

Dr. McGurty.
Q. Dr. --
A. McGurty.
Q. Besides Dr. Burns, Dr. McGurty and Dr. Butts, did you see anyone else

regarding --

MS. ODESSKY: Strike that.

Q. -- anyone else during the time that you were out on sick leave?

A. Whoever Dr. Burns referred me to. I went to see Dr. Burns for stress disorder. He wanted to make sure that I was okay and he set me up for tests.

Q. Who did he send you to for tests?

A. I don't recall.

Q. What kind of tests were you sent for?

A. Stress test. Heart test -- I don't --

Q. Was it Dr. Burns who referred you to Dr. Butts?

A. No.

Q. Who referred you to Dr. Butts?

A. I don't recall who referred me to Dr. Butts.

Q. Was it on your attorney's advice?

A. No.

MR. MERRITT: I'll object to that question, as well.

One question, we haven't

stipulated -- I assume we are using the standard stipulations.

MS. ODESSKY: That's correct.

MR. MERRITT: My objections will be to the form of the question and all other objections are reserved.

Q. Mr. Wynder, when did you begin working again after leaving the State Police?

A. I believe sometime in May 1999.

Q. When you began working in May of 1999, where did you work?

A. The Wiz.

Q. What did you do there?

A. Sales associate.

Q. What store was that? Where is

that located?

A. Queens, Steinway Street.

Q. Did you have a supervisor there?

A. Yes, I did.

Q. Who was that?

A. Chris Molda.

Q. Chris -- can you spell that?

A. M-o-l-d-a.

Q. How long were you there?

A. Till they closed.

Q. When did they close?

A. I don't recall. 2001, 2002.

Q. Was that a full-time or part-time job?

A. Part-time hours.

Q. What hours did you work?

A. It varied. They were open seven days, 16 hours a day.

Q. During that time, did you have another position?

A. No.

Q. When that store closed, did you work someplace else?

A. Yes.

WYNDER

Q. Where did you work?

A. New York Mets.

Q. What did you do for the Mets?

A. Supervisor.

Q. When you say "supervisor," who did you supervise?

A. All the union people in the stadium.

Q. What were the jobs of the union people that you supervised?

A. They all have different jobs. Concessions, ticket takers, ushers, security.

Q. As the supervisor, what was your

job? What were your duties?

A. Just to observe and make sure that they did their job.

Q. Do you know when you started working there?

A. I believe right around the same time The Wiz closed. 2002.

Q. Who did you report to?

A. Who did I report to there?

Q. Yes.

A. Bruce Smith.

Q. What is Mr. Smith's position there?

A. He's my boss.

Q. What was his title?

A. He's a supervisor, too, but he's my boss.

Q. Is he still there, Mr. Smith?

A. Yes, he is.

Q. When you started working there in 2002, did you work part-time or full-time?

A. It's seasonal, so it's part-time.

Q. When it was seasonal, did you work full days or part days?

A. When the Mets were in town.

Q. When they were not there, did you have another position?

A. Nope. Same, supervisor. I would work occasionally, a weekend, for them if I had to cover for somebody, but other than that, basically we worked during the summer and I collect

unemployment during the winter.

Q. Was there any travel involved in your position with the Mets?

A. Of course.

Q. What was the travel that was involved?

A. From my house to the Mets.

Q. Other than your commuting, was there travel involved?

A. No.

What do you mean by "travel"? Did I travel with the team?

Q. Yes.

A. No.

Q. Did you as part of your work, were you required to carry a gun or any type of weapon?

A. No. My job is to supervise and observe.

Q. Did you have anything to do with

security?

A. We just watch. They check bags, they do all security work.

Q. So it would be fair to say that

WYNDER

you yourself did not participate in security for the Mets?

A. We observed the security and make sure they do their job, but as far as physically doing security work, no. We supervise.

Q. Do you have this job to the present day?

A. Yes.

Q. Other than The Wiz and the Mets, are there any other jobs that you've had since leaving the State Police?

A. No.

Q. Mr. Wynder, have you ever been arrested?

A. No.

Q. I assume you've never been convicted of a crime?

A. No.

Q. I'm going to show you what I had marked previously as Defendants' Exhibit A, and is it fair to say, Mr. Wynder, that this is the third amended complaint in

this federal lawsuit?

WYNDER

A. That's what it says. I'm looking for the date. Yes, May 24, 2004. Five years after we filed the lawsuit. Correct.

Q. Is it your understanding that this is the current complaint that is in effect in your lawsuit?

A. May 24 -- yes, this was right after court appeals decision to reinstate my case, correct.

Q. Have you seen this complaint before just now?

A. Of course. I signed it.

Q. Is that your signature that appears on the last page of the complaint?

A. Yes, it is.

Q. Where does it appear? I think it's actually Mr. Merritt's signature that appears on there.

A. Yes.

Q. I think it's fair to say your signature had appeared on previous complaints --

MS. ODESSKY: I'll strike that.

WYNDER

Q. Mr. Merritt is your attorney who is representing you in the deposition today, correct?

A. Yes, he is.

Q. Did you assist Mr. Merritt in preparing this complaint?

A. Yes, I did.

Q. Now, without telling me what you discussed with Mr. Merritt, just a yes or no, did you discuss the contents of this complaint with Mr. Merritt?

A. I don't understand your question.

Q. I don't want you to tell me what you discussed, but I just want you to tell me, yes or no, have you and Mr. Merritt discussed what's contained in this complaint, the allegations contained in this complaint?

A. Oh, did I tell him everything that happened to me?

Q. Did you discuss with him the allegations that are contained in the complaint?

254

WYNDER

94979

A. Yes, I did.

Q. To the best of your knowledge, are all the statements that are contained in this complaint true and accurate?

A. Yes, they are.

MR. MERRITT: I just might add there's only one thing missing from the complaint, that's the EEOC complaint which was incorporated in the first complaint. So since it's incorporated in the first complaint, it wasn't included in the subsequent complaints.

MS. ODESSKY: Thank you.

Q. Mr. Wynder, during the time of each of the incidents that are mentioned in the complaint, did you ever keep a journal or a diary?

A. No.

Q. I'm going to ask you to turn to page 8 and take a look at paragraph 27. Page 8, paragraph -- the pages are on the bottom left-hand corner. Paragraph 27.

A. Yes.

Q. That reads, "After suffering a

255

WYNDER

hostile work environment, being denied promotions, suffering inferior work assignments and suffering severe

discrimination, plaintiff experienced a complete nervous breakdown and was granted a disability retirement from NYSP."

Did I read that correctly?

A. Yes, you did.

Q. Is it your understanding that you experienced a complete nervous breakdown?

A. According to my doctor, Dr. Butts, yes, I did.

Q. When did that occur?

A. Still occurring. Still haven't recovered.

Q. Were you hospitalized in connection with suffering a complete nervous breakdown?

A. No. I was just on Prozac.

Q. Did Dr. Butts ever suggest that you be hospitalized?

A. No. Only if I needed to, but I was basically home doing nothing, so I

didn't have to be hospitalized.

Q. I'm going to ask you to turn now to page 16, paragraph 69.

It reads as follows: "Upon information and belief, prior to plaintiff returning to work Internal Affairs Bureau,

IAB, Captain Klusacek, under orders from McMahon, went to Marine Midland Bank in Vailsgate, New York, and demanded access to plaintiff's bank records without a subpoena or authorization to access the records."

Did I read that correctly?

A. Yes, you did.

Q. How do you know that this occurred?

A. How do I know this occurred? Well, one, Brenda Bennie.

Q. Who is Brenda Bennie?

A. Branch manager.

Q. Is that B-e-n-n-i-e?

A. Yes.

Q. Did Ms. Bennie tell you that this had occurred?

WYNDER

A. Yes, she did. She called me and stated that the State Police was trying to access my records without a legal subpoena.

Q. Who did she say she had spoken to?

A. Captain Klusacek.

Q. Now, you start by saying, "Upon information and belief"; what do you mean

when you say "information and belief"?

A. Well, I spoke to her and then I filed a complaint against the New York State Police and Captain Klusacek for violating rules and regulations of disseminating derogatory information about a member, and also revealing an ongoing criminal investigation towards a member.

Q. Now, in the middle of that paragraph, you say, "Captain Klusacek, under orders from McMahon."

How did you know that Captain Klusacek was acting under orders from McMahon?

A. Well, they stated that they were

doing a criminal investigation and all rules and regulations are adhered and signed off by Superintendent James McMahon. Everything that you do as a trooper is under the orders of James McMahon.

Q. Other than that, do you have any other reason to believe that Captain Klusacek was acting under orders from McMahon?

A. Of course. He works for the State Police.

Q. Any other reason that you believe Captain Klusacek was acting under orders from Superintendent McMahon?

A. Again, I'll clarify it: Regulations, rules and regulations, any job performances or job descriptions that you do is under the orders of James McMahon, superintendent of the New York State Police.

Q. Taking a look at paragraph 70, that reads, "Bank executive Brenda Bennie denied Captain Klusacek access to

plaintiff's bank records."

Again, how do you know that?

A. Again, verbally, she told me that the State Police violated rules and regulations and came in with an illegal request for my bank records.

Q. Why was it an illegal request?

A. Well, for one reason, at that time they did not have a subpoena, and if you wanted records, you would go to the branch -- to the headquarters which was in Buffalo, New York, not to the branch.

Secondly, under public officer's law, State Police must request any records against me from me first. If I deny them,

then they have a right to issue an administrative subpoena, signed by a judge, not by the State Police.

Also, no subpoenas under administrative law can be issued unless a hearing date is defined.

Also, a subpoena must state reasons why they request the records and a specific item that they are looking for.

WYNDER

They cannot be vague, because it's on the same ground rules as a search warrant.

Q. Was it your understanding that the State Police did not comply with any of these requirements that you've told me about?

A. I know they didn't comply with it.

Q. And that's based upon your discussion with Ms. Bennie?

A. Of course.

Q. Anything else that it's based upon?

A. Based on the fact that I have a copy of the subpoena. As a matter of fact, numerous subpoenas, but we'll stick to this one right here.

Yes, I have a copy of the

subpoena, which was in violation of federal rules and regulations. Any subpoena issued against anybody's bank, financial institutions must be notified.

Q. And you were not notified?

A. Of course not. As testified at

WYNDER

Workers' Compensation, State Police wanted to keep it a secret.

Q. Going onto paragraph 71 that read as follows: "After being denied access to plaintiff's bank records, Captain Klusacek, in violation of NYSP policy, divulged that plaintiff was under a criminal investigation for, one, alleged drug sales; two, alleged money laundering; and three, alleged gun smuggling."

How do you know that?

A. Again, after Miss Bennie informed me that the State Police was trying to violate my right to privacy, she told me that she asked why were they looking for my records, because she knew me, and she said she had known me for a few years and that I was an upstanding person, and she asked why. Captain Klusacek said that I was spending too much time away from my job and I was under

investigation for drugs, money and guns, and that I was living above my means.

Q. Did Captain Klusacek say

anything else to Miss Bennie that you know of?

A. She told me that he was very mad that he couldn't get the records that he wanted and he said he would be back.

Q. Did Captain Klusacek say anything else to Miss Bennie regarding you that you know of?

A. Again, as I stated, that I was under criminal investigation, and that actually she told me that she should not talk to me and stay away from me.

Q. In fact, Miss Bennie contacted you after speaking to Captain Klusacek, correct?

A. Yes, she has a fiduciary duty to contact me being that I'm a customer of her bank and that an entity or agency is attempting to access information that is not granted unless signed by a legal subpoena.

Q. Prior to that date that Miss Bennie contacted you to let you know about Captain Klusacek trying to get your

WYNDER

records, how long had you known her?

A. Like I said, I've known her for -- since I opened up my account at Marine Midland Bank.

Q. Had you known her just through your banking business or known her for other -- in other areas?

A. Just through my banking business.

Q. When did you open that account, approximately?

A. I don't recall.

Q. At the time that Captain Klusacek spoke to Miss Bennie, had you had that account for more than five years?

A. I don't recall.

Q. I'm going to ask you to turn now to -- on page 17, paragraph 73; do you see that right there?

A. Uh-huh.

Q. It reads: "On information and belief, IAB, under orders from McMahon, sent officers to plaintiff's neighborhood to conduct surveillance and to gather

94979

WYNDER

information from plaintiff's neighbors."

Did I read that accurately?

A. Yes, you did.

Q. Again, what is your understanding of --

MS. ODESSKY: Withdrawn.

Q. What do you understand to be the reason that the officers acted under orders from McMahon?

A. Again, Internal Affairs and all rules and regulations and job duties are done under the orders of McMahon and the New York State State Police, which he is the New York State Police.

Q. Do you have any other information that you base that statement upon?

A. Again, rules and regulations, whatever members do on the job is under the orders of James McMahon. He has to notify and be told of subpoenas, surveillances. You think that Internal Affairs does things and the superintendent doesn't know?

265

WYNDER

Q. What is your basis for saying that the superintendent knew what Internal

Affairs was doing?

A. Well, according to the State Police, I was a criminal. You don't think they would not talk to the superintendent about how to handle this?

Q. Do you have any knowledge as you sit here today that the superintendent was aware of Internal Affairs contacting your neighbors?

A. Yes, I do.

Q. What do you base that on?

A. Well, considering I wrote him a letter and explained to him everything that was going on, he sent down his confidential assistant, Colonel Tagget (phonetic), who spoke with me for a good two or three hours.

Q. What was the result of that conversation?

A. The hostile work environment and the racial discrimination against me was stepped up to even more than what it was.

266

WYNDER

Q. When you say that, what do you mean?

A. The State Police continued to investigate me and destroy my career and my life even more after I spoke to the

Colonel.

Q. Can you tell me when you spoke to Colonel Tagget?

A. Somewhere between September and November of '97.

And that was after I had wrote the President of the United States. That's why he came down to talk to me, also, because he didn't believe that I wrote the President of the United States.

Q. Did you ever speak directly to Superintendent McMahon?

A. Not allowed to speak directly to the superintendent.

Q. I'd like to ask you to turn your attention to paragraph 74, which reads as follows: "That upon information and belief, under orders from McMahon, officers from IAB falsely told plaintiff's

neighbors that he was, one, a drug dealer; two, a gun smuggler; and three, a money launderer in a malicious effort to pressure plaintiff to quit his position as a New York State trooper."

Did I read that paragraph correctly?

A. Yes, you did.

Q. Again, what is the basis for your belief that the officers from IAB were acting under orders from McMahon?

A. Again, rules and regulations and chain of command. They cannot do anything without chain of command. They have to ask their officer for permission, that officer has to ask their superior officer for permission and eventually the superintendent signs off on all investigations.

Q. I'd ask you to turn to paragraph 76 at the bottom of page 17, it starts, "Upon information and belief, Spahl, McMahon and others falsely told other troopers that New York State Police wanted

to terminate a dirty cop, causing plaintiff to be shunned and avoided by other New York State troopers."

Did I read that correctly?

A. Yes, you did.

Q. Is it your understanding that Defendant Spahl directly told other troopers that New York State Police wanted to terminate a, quote, dirty cop?

A. Yes, he did.

Q. What is your information that he

did that?

A. He told other members of the State Police.

Q. How do you know that?

A. Well, they told me.

Q. Your testimony is that Captain Spahl directly told you that he told other troopers that New York State Police wanted to terminate a, quote, dirty cop?

A. Well, he stated that I was under criminal investigation and that I was dirty and that I should be stayed away from, which other members of SP Hawthorne

stayed away from me, my neighbors stayed away from me, even Brenda Bennie, after she had contacted me about the illegal subpoena, Captain Klusacek called her back and threatened her job and her career.

Q. What did he say to her?

A. He told her that she was the leak to this investigation and how dare she tell me and inform me of the criminal investigation that was going on.

Q. What did she say in response?

A. Well, she told him that she had had friends or family that were State troopers and that she was not scared of

him, and she told him that she had no other words to say to him.

Q. Did Miss Bennie lose her job or have any trouble on her job?

A. Yes, she did. She had a lot of problems on her job after that.

Q. What were those problems?

A. Well, they were mad at her, her management. They was trying to fire her. Then all of a sudden they started picking

on her.

Q. Does she still work with that bank -- Marine Midland, correct?

A. Correct.

I can't answer that question.

Q. When was the last time you spoke with Miss Bennie?

A. The last time Miss Bennie spoke to me was after her branch told her that she could not communicate with me anymore.

Q. When was that in relation to when the records were requested?

A. Again, right after that, because, according to the New York State Police documents, which you should have in your possession, they forwarded her and

94979

they even wrote that she was a person of non-moral character and that she was the leak to the criminal investigation and she was the one who informed me that they were doing a criminal investigation.

Q. Going back to paragraph 76, what do you base your information upon saying

271

WYNDER

that McMahon falsely told other troopers that NYSP wanted to terminate a dirty cop?

A. Told? Of course he told. He's the one who initiated the investigation and as we have in our possession now, after numerous, as I call, perjured testimony from Lieutenant Barbaria who claimed there were statements alleging a criminal investigation for my conduct which was revealed to us recently that I had went to California, committed a murder eight years ago. Actually, 1989. And that I was a drug dealer and that I worked out of my mother's house as a drug dealer. So apparently McMahon ordered this and knew that I was a dirty cop, which is why he signed off on the investigation against me.

Q. As you sit here today, Mr. Wynder, do you have any information

that Superintendent McMahon directly told other troopers that you were a dirty cop?

A. He signed off on my investigation.

WYNDER

Q. Now, taking a look at paragraph 77 which is on page 8 and reads as follows: "That by releasing the false information, defendants McMahon and Spahl intended to chill plaintiff's free speech with other troopers and to restrict his right to free association with other workers in direct violation of first amendment rights."

Did I read that correctly?

A. Correct.

Q. What was the speech that you were chilled from making, the free speech?

A. Well, it's a known fact, if I say anything derogatory about the State Police, they'll go after you, start bringing you up on charges.

Q. What was it particularly that you were saying?

A. That they were racist.

Q. Anything else?

A. That they were discriminating against me because I was black.

Q. Anything else?

WYNDER

A. And that they were violating their own rules and regs and nobody cared because the State Police is a paramilitary organization who thinks they can do whatever they want and they are above the law.

Q. Anything else?

A. That's about -- in a nutshell.

Q. In that same paragraph, you talk about them restricting your right to free association with other workers.

What do you mean by that?

A. Well, by all the charges being brought against me and all the accusations and all the attempted complaints, nobody wanted to work with me, nobody wanted to ride with me. As a matter of fact, the joke was stay away from me or you wouldn't have your job neither.

Q. Did people actually stay away from you?

A. Yes, they did. Wouldn't you?

Q. Can you tell me the names of any particular individuals who made that joke

WYNDER

about staying away from you?

A. SP Hawthorne, the whole barracks. Everyone knew division hated me.

And I mean division, because any complaints generated against a trooper, if there's a problem with them, will go from the bottom of the chain up, which means your station commander, your sergeant. If there's any complaints with you, it will start from there and work its way up. All my complaints against me started from Albany in division and worked their way down.

Q. We spoke yesterday about SP Hawthorne, and I believe you told me that around this same time when you started having these incidents, you said that SP Hawthorne was primarily the troop -- the troopers there were primarily African American; is that correct?

A. Yes.

Q. During this same time when you are saying that no one wanted to ride with

275

WYNDER

94979

you and the troopers wanted to stay away from you, would it still be fair to say that at that time the troopers at SP Hawthorne were primarily African American?

A. Yes.

Q. I just want to go back for a moment to something we discussed Friday.

We talked about the drug test that was given in July of 1997?

A. It was given in September of '97.

Q. I'm sorry, September of '97.

You said that that was a test that you believe was postponed until you returned from your sick leave?

A. I believe there was -- I believe it was affirmed that it was postponed.

Q. When you say "it was affirmed," who was it affirmed by?

A. Well, Colonel Corbett (phonetic).

Q. Anyone else?

A. Al Wolford (phonetic), PBA president.

276

WYNDER

Q. And they affirmed the fact that the test was postponed specifically for you to return from your sick leave?

94979

A. Oh, yes. And the sergeant said it, too. The station commander who knew that the test was in July and then said then they asked when was I coming back to work and it was in September, because your schedule is always 30 days ahead, so you would know what days to come down or what days a member is working.

Q. Who was the sergeant?

A. I believe at that time it was Zemanek, Antalek, could have been one of those, Smosky. I have no recollection of who at the time handled that.

Q. As a result of that drug test, you weren't found to have any drugs in your system, correct?

A. No.

Q. Was anyone who was tested on that day found to have drugs in their system?

A. Yes.

277

WYNDER

Q. Who was that?

A. I believe Trooper Sagilabenni.

Q. You mentioned on Friday, I believe, that Trooper Sagilabenni was one of the few troopers at Hawthorne during that time period who was white?

A. Yes, he was the only one, I believe, at the time -- might have been somebody else.

And he was put at SP Hawthorne, again, as I explained to you -- SP Hawthorne was, if you look at TV, it was F Troop, where all the bad troopers went or the troopers that division didn't like, and I believe that Trooper Sagilabenni was already at that station for previous misconduct and also for the fact that he was already from what was given -- disciplinary action from another case. He was actually from Troop F.

Q. Do you know if any discipline was issued to Trooper Sagilabenni because he was found to have drugs in his system as a result of that drug test?

278

WYNDER

A. I believe he was brought up on charges.

Q. Do you know the result of those charges?

A. He was terminated.

Q. I'm going to ask you to turn now to paragraph 79 on page 18. It reads as follows: "Upon information and belief, Spahl and McMahon intentionally postponed

the drug test in an attempt to catch plaintiff when he returned to work and to further chill his right to free association with other workers."

Is it your contention, Mr. Wynder, that Captain Spahl intentionally postponed the drug test?

A. Yes.

Q. What do you base that on?

A. I base it on the fact that I was out with my hernia operation, the fact that the test was originally scheduled in July, okay, and in the 23 years that the maintenance guy and one of the other sarges had worked at State Police there

had never been a drug test at SP Hawthorne.

Q. Is it also your contention that Superintendent McMahon was involved in postponing the drug test?

A. Of course.

Q. What do you base that is on?

A. Who else would have the right to postpone a drug test? You have to give him a reason why he was postponing the drug test. Why would you pull a date -- as I quoted to you, the State Police has

no policy for drug testing, but they claim it was random. So if you pull a date to test troopers on that date, wouldn't you think you would test them on that date, not postpone it for three months later, and also to the fact that I know that drug test was for me, okay, was because since then there has never been another drug test at SP Hawthorne, to my knowledge, and also it was not intended as the rumor was that they came down to get me and they found one of their own. They found

280

WYNDER

another white trooper that they didn't intend on getting because they knew he was taking drugs.

Q. So it's your contention that Superintendent McMahon specifically set the date for the drug test in order to make sure that you would be present?

A. Of course. If he wanted to -- I mean, just cop analysis, Sagilabenni had been in that station for, what, all the months I was out on sick leave? So if it was targeted at him, why didn't they have it then? Why did they wait for me, the first business day that I returned from having a hernia operation?

Q. What direct information do you have to support your claim that Superintendent McMahon postponed the drug test specifically for you?

A. Again, Internal Affairs has to have authority to postpone a drug test. The only authority they are going to get it from is Superintendent McMahon, and then to reschedule it, it has to come from

Superintendent McMahon.

Q. Do you have direct knowledge that Superintendent McMahon spoke to anyone particularly and told them to postpone the drug test?

A. He doesn't have to speak to anybody. His chain of command. They have to get his approval for the drug test, and they have to get his approval for postponing. Chain of command. It starts from the superintendent and works its way down. IAB is not going to say we're going to drug test them without his approval. If you read the manual, it states Superintendent McMahon, on the first page, everything contained in this manual is under his orders.

Q. When you were working for New

94979

York State Police yourself, everything that you did in the course of your duties you were ordered to do by Superintendent McMahon?

A. Well, it was by my sarges who was ordered by their captains who was

WYNDER

ordered by their superiors which was set out by the rules and regs. Yes, my job was based on what Superintendent McMahon ordered me to do, do my job.

(Brief recess taken.)

BY MS. ODESSKY:

Q. Mr. Wynder, would you turn to paragraph 81, which is on page 19 of the third amended complaint.

Do you see that?

A. Yes.

Q. That reads as follows: "Upon information and belief, Spahl, McMahon and others leaked the reason for postponement of the drug test to other troopers in an effort to cause troopers to disassociate themselves with plaintiff."

Did I read that correctly?

A. Yes, you did.

Q. What information do you have that Captain Spahl particularly leaked the

94979

reason for postponement of the drug test to other troopers?

A. On the fact that the sarges knew

283

WYNDER

that they postponed it before I came back -- until I came back, and also for the fact that Spahl has his own commander that's in charge of SP Hawthorne. He also has authority to request that it be postponed, also.

Q. What particular information did you have, not that he postponed it, or requested for it to be postponed, but specifically that he leaked the reason for the postponement?

A. I don't understand.

Q. I know you've said that you believe that Captain Spahl himself requested the postponement, correct?

A. Correct.

Q. But in paragraph 81 you say that Spahl, McMahon and others leaked the reason for the postponement; in other words, they told other troopers, according to you, why the test was being postponed, correct?

A. Yes.

Q. What do you base that on?

WYNDER

A. Knowledge that the troopers told me and sarges told me that they were told that it was postponed until I came back. And everything -- again, everything is done by chain of command and everybody knew in SP Hawthorne that I was a target of division.

As I spoke to you before, I had no problems with my sarges, station commanders. I was an outstanding, excellent evaluated trooper. I never had any problems that started from my immediate superiors. All my complaints, allegations came from division.

So it was common knowledge throughout division, the grapevine in the State Police is very quick and very real and everybody knew that Trooper Wynder was being targeted to be fired by the Division of New York State Police.

Q. Did any officer or trooper or sergeant specifically tell you that Captain Spahl told them why the drug test was being postponed?

285

WYNDER

A. I believe it was one of my sarges in station command said that he was postponing it until I came back.

Q. And the sergeant told you that Captain Spahl specifically told him that?

A. Well, Captain Spahl asked for the Purse 29 which is also in the future schedules and requested to know when I was returning to work, and that's when Spahl reiterated the fact that he needed to know when I came back to work so they can have the drug test.

Q. Who did he tell that to?

A. The sarges.

Q. Was that Zemanek, Antalek and Smosky?

A. Or Smosky. It would either be one of those three.

Q. But you don't remember now which one it could have been?

A. No, again, I was out on sick leave.

Q. So how did you learn that Captain Spahl asked one of these three

286

WYNDER

sarges about when you were returning to work? How did you get that information?

Did they tell you?

A. Again, for the record, when the tests came that day, the first business day that I returned, everybody in the station laughed and said, "We know who it's for."

I mean I am a trained trooper, law enforcement. It doesn't take an idiot to realize that there's never been a drug test in this station, and as soon as I come back to work, the first day, Internal Affairs is there.

Q. I don't want to cut you short, but I think you might have misunderstood my question. My question was specifically -- you said that one of three sargeants, either Sergeant Zemanek, Sergeant Antalek or Sergeant Smosky, was told by Captain Spahl that he wanted to know when specifically you were returning to work so that he could do the drug test then, correct? Am I correct?

287

WYNDER

A. Correct.

Q. How do you know that Captain Spahl told one of those sargeants?

A. One of them told me. I don't remember which sergeant it was, but,

again, as I told you, what I'm telling you is what was said to me.

Q. One of those three, although you can't be certain which one, one of those three told you that?

A. Correct.

Q. Now, also in paragraph 81, you say: "Upon information and belief, Spahl, McMahon and others leaked the reason."

What is your information that McMahon leaked the reason for postponement of the drug test?

A. Again, everything is done by chain of command. Everything that has to be done has to have the approval of McMahon. This is how the State Police works. It's a paramilitary organization. You do not do anything unless you have approval from your superior officers.

Q. Now turning to paragraph 82, it reads as follows: "As a consequence of the actions of the defendants, plaintiff has been and continues to be denied equal employment opportunity and subjected to retaliation in violation of constitutional rights."

When you say you were denied

equal employment opportunity, what you do you mean?

A. I was no longer allowed to do my job as a New York State trooper.

Q. How were you not allowed to do your job?

A. Well, every time I turned around, I was being brought up on charges, ridiculous charges that have never been brought up on troopers at the station. I was being harassed by my commanding officer -- at that time was a zone commander which was Spahl. So I was unable to do my job, which I had a right to do my job. A job which, again, I had outstanding and excellent evaluations. I

led my station in all activities, tickets, arrests, penal law, DWIs. I had all kinds of letters for outstanding work, but I was not allowed to do my job.

And also, after some of my hearings were over, after I was found not guilty, the State Police continued to harass me by contacting the FBI, the United States Department of Justice, the DA --

Q. We'll get to that. I don't mean

to cut you off, but we're getting to that.

I'd ask to you to turn to paragraph 185 on page 20. That reads: "Upon information and belief, Spahl and Masterson communicated frequently to utilize the full power of IAB against plaintiff."

Did I read that correctly?

A. Yes, you did.

Q. When you say that "Spahl and Masterson communicated frequently," are you referring to them talking in person,

them talking on the phone or in writing? How would they communicate?

A. Probably by phone, probably in person. Spahl used to work for Masterson in Internal Affairs. As a matter of fact, he had just left Internal Affairs to come to SP Hawthorne.

Q. How do you know that they communicated by phone?

A. Well, a couple of times I picked up the phone and it was Captain Masterson asking to speak to Captain Spahl.

Q. Do you know what he was asking to speak to him about?

A. That was none of my business, ma'am.

Q. I'm going to ask you to look at paragraph 86. It reads as follows: "Upon information and belief, under orders from McMahon and Masterson, plaintiff's name was placed on a blackboard in IAB and outlined in red to signify that plaintiff had been singled out for specific discriminatory treatment by NYSP."

WYNDER

Did I read that accurately?

A. Yes, you did.

Q. Where was that blackboard?

A. In Internal Affairs' office in Albany, New York.

Q. Did you see this blackboard?

A. No, I was told by the president of PBA, Al Wolford, and Trooper McKenney.

Q. What did Al Wolford tell you specifically about the blackboard?

A. That he was in the office and he could not believe that when the door closed, my name was highlighted in red on a board.

Q. Did Wolford know who had put your name on the board?

A. It's an Internal Affairs' board,

so apparently we deducted from our police training that Internal Affairs is the ones who put it up there.

Q. Was he able to tell you any specific officers that put the name there?

A. They were all black names that were on the board.

Q. But was Al Wolford able to tell you specifically what officer from Internal Affairs actually put your name on the blackboard?

A. No.

Q. You said there was someone else besides Al Wolford who told you about the blackboard?

A. Trooper McKenney.

Q. What did he tell you?

A. He couldn't believe that his name was up there, also, along with other black troopers and investigators.

Q. Did Trooper McKenney tell you specifically that he had seen the blackboard?

A. Yes, he did.

Q. Other than your name being on the blackboard, was there anything else that was on the blackboard besides your

name?

A. It was just outlined in red.

Q. Was yours the only name that was outlined in red?

WYNDER

A. I believe that's what he told me, that mine was the only one.

Q. Did Officer McKenney tell you specifically which officer put your name on the blackboard?

A. Again, him and Wolford saw it at the same time. They did not see who put the names up there.

Q. Looking at paragraph 87 that reads as follows: "Upon information and belief, other troopers were allowed to view the IAB board and were told why plaintiff's name was placed on the board and outlined in red to further chill plaintiff's right to free association with other workers."

Again, did I read that correctly?

A. Yes, you did.

Q. Again, the information in paragraph 87, does that come from Al Wolford and Trooper McKenney?

A. Yes, they were told that I was

94979

targeted, that they were going after my --

294

WYNDER

they were investigating me because I was, again, as you stated before, where do they get the dirty cops from, that I was dirty.

Q. Other than the fact that you were being investigated for being dirty, were they told anything else?

A. No, that I was investigated because I was dirty. They didn't get into specifics. Just that they were told that I was a target.

Q. Other than Al Wolford and Trooper McKenney, was anybody else aware of your name being placed on that board and the fact that you were being told that you were on the board because you were a dirty cop?

A. I believe one or two other troopers, I don't remember their names, they were on the board. They found out that they were on the board, also, and they inquired and they said it was for dirty cops.

Q. Other than Al Wolford and Trooper McKenney, did you ever visit this

WYNDER

situation regarding the blackboard with anyone else that you can recall?

A. I spoke to my PBA and Don Postals (phonetic), which was my Troop K delegate, he also knew about the blackboard and he also knew how I felt about it.

Q. Did you tell him about the blackboard or did he tell you?

A. He already knew.

Q. What did he tell you?

A. He had heard. He was shocked that Wolford, who had told him who was his president, and also Trooper McKenney confirmed what had happened.

Q. Did Don Postals tell you anything else about the blackboard?

A. That he would look into it and see what he could do to find out why my name was up there.

Q. Did he ever get back to you?

A. No.

Q. I'd ask you to turn to paragraph 91 on page 21 that reads as follows:

296

WYNDER

94979

"During 1989 plaintiff properly reported a weapon stolen while he traveled on a flight from New York to California."

Did I read that correctly?

A. Yes, you did.

Q. Can you explain to me the circumstances under which your weapon was stolen when you traveled from New York to California?

A. Yes. It was myself, inspector Chris Downing, Trooper Keith Forte, and we took a vacation trip to Los Angeles.

Q. Is Christopher Downing the individual who you were in the business with?

A. Correct.

Q. Was he working for the Department of Customs at the time?

A. Yes, he was.

Q. Why did you go to Los Angeles?

A. Vacation.

Q. Did your trip also have anything to do with your business?

A. No.

297

WYNDER

Q. What happened when you arrived at Los Angeles?

A. Before we left, we flew out of

LaGuardia. As required by law, we went, put all our weapons into Keith Forte's weapon's storage box. We had the airport declare firearms declaration --

Q. Can I ask you how many weapons you had that you put into the storage box?

A. We each carry one weapon each.

Q. What was your weapon?

A. Nine millimeter Smith & Wesson, 669.

Q. What happened once you put it into the storage box?

A. They locked it up, they put the declaration tag -- at the time we thought they put it on correctly, but apparently they put it on wrong. The declaration tag is supposed to go inside the box. They put it on the outside of the box, and then we were told to go to the plane and we'll pick up our weapons when we -- when we arrive in California.

298

WYNDER

Q. Did you pick up the weapons in California?

A. No. What happened was we had a delay, we had hydraulic problems. We had the FEM -- transferred us to another airline -- they call it FEM, where they

transfer you to another airline because we no longer had a direct flight to California.

Q. If you didn't go directly, where did you go?

A. I think we went to -- I'm not quite sure. It could have been St. Louis, Arizona. I don't know where the plane landed. We picked -- we got on another plane and we arrived in California.

Q. What happened when you arrived in California?

A. We went back to the hotel and we were getting ready to go out to meet associates of Keith Forte --

Q. Prior to leaving the airport in Los Angeles, did you retrieve the storage box?

WYNDER

A. Yes, we did.

Q. Who retrieved the box?

A. Keith Forte.

Q. Where did he get the box from?

A. From wherever you pick up your luggage.

Q. Were you with him when he retrieved the storage box?

A. We were all together, but he had

to go in and sign for it because it was his personal case.

Q. Then you went back to the hotel. What hotel did you go to?

A. I don't recall.

Q. What happened when you arrived at the hotel?

A. We took a shower, got dressed and we went to retrieve our weapons, at which time I noticed that mine was missing.

Q. When you say you went to retrieve the weapons, where did you retrieve them from?

A. We opened up the case.

Q. Where was the case when you got to the hotel?

A. The case was with us all the time. The case was in the room.

Q. Was Mr. Downing's weapon there?

A. Yes.

Q. And Mr. Forte's weapon?

A. Yes.

Q. Yours was the only weapon that was not?

A. Correct.

Q. Were either of the other

weapons, were they disturbed in any way or damaged?

A. No.

Q. What did you do when you noticed that your weapon was missing?

A. I panicked.

Q. What did you do then?

A. Well, we panicked. We didn't know where the weapon -- I thought they were playing a joke on me and then they said no, they weren't playing a joke and that they wanted to -- they -- we were all

upset now. So, the first thing I did was call SP Peekskill, Sergeant Welsh.

Q. Did you speak to Sergeant Welsh at that time?

A. Of course, I had to, he's my station commander.

Q. What did you tell him?

A. Advised him that my gun was stolen.

Q. What did he tell you to do?

A. Go back to the airport, file a report and that he would take care of matters on his end until I got back to New York.

Q. When he said take care of

matters on his end, what did he mean?

A. He would take care of it by reporting it. I had did my job, he said, I reported it to him. I did what I was supposed to do.

Q. Is there paperwork that you understand has to be filled out when there's a gun that's stolen or missing from State Police?

WYNDER

A. No, there's no paperwork. There's an EDP form that you get every year.

Q. I'm sorry?

A. EDP form. It's sent to you by Pistol Permit.

Q. That's something that you fill out on a yearly basis?

A. Yes. At the beginning of each year or the middle of the year, whenever they send it out, you get it once a year, it has the weapons that are under your shield that you are carrying, and you're supposed to initial that these weapons are in your possession.

And at the time of the incident, I went back to Los Angeles airport, I filed a missing report for my gun and they

94979

said that they had to now file it everywhere because they didn't know where it was stolen from, that meant Kansas City or St. Louis, they had to report it to that authority. They had to report it to Port Authority. They had to report it to

303

WYNDER

NYPD and they would also report it to New York State Police, which I did, also.

Q. Is it your understanding that other than the EDP form that you file once a year, that there's no specific paperwork that you have to fill out if your gun is lost or stolen?

A. Well, I found out later that File 25 is supposed to be sent, but that's not supposed to be sent by me, that's supposed to be sent by the sergeant.

Q. Do you know whether that was sent?

A. I didn't find out that that wasn't sent until -- let's say nine years later.

Q. Other than the File 25 that was to be sent by the sergeant, was there any other paperwork that you were supposed to fill out for New York State Police regarding the gun?

94979

A. The EDP form. I filled out the EDP form where it stated that -- do you have this gun in your possession? On that

WYNDER

paper I wrote, "Gun stolen out of LaGuardia, gun is not in possession of member."

Q. How long after the gun was missing did you fill out that EDP form saying the gun was stolen?

A. When they sent it down. I don't recall when.

Q. After you reported the gun to the Los Angeles police and they reported it in turn to various other police departments, as well as New York State Police, did you do anything else in connection with the gun?

A. Yes, I retrieved my gun.

Q. When did you retrieve it?

A. I don't remember the date. Could have been somewhere in May of nine -- I'm --

Q. If you look at paragraph 9 --

A. What year?

Q. It says March of 1990; is that accurate?

A. Yeah, around that time. Around

WYNDER

that time. It was recovered.

And I had to get a letter from division on letterhead stating that I was fit for full strenuous duty and that they were notified that I was retrieving my gun from NYPD.

Q. Let me just back up for a moment.

Between the time that you were in Los Angeles and the gun was lost or stolen until the time that you retrieved the gun, did you return to duty?

A. Of course.

Q. What did you use instead of that gun?

A. Well, first of all, that gun that you are questioning about was my own personal gun, not division's gun.

Q. So you had another gun that was issued to you by division that you used while you were on duty?

A. Correct. That is the gun that a File 25 must be sent if your gun is stolen or lost or fired. But this was my own

WYNDER

off-duty personal gun.

Q. So just to clarify, you are saying that your understanding is that if your State Police-issued gun is lost or stolen, the File 25 must be sent?

A. Yeah. That I know. That would have been a whole investigation if I had lost my own personal -- I mean the gun that was issued by division.

Q. Did you have an understanding or a belief as to whether your gun was just misplaced or actually stolen by someone?

A. Repeat that.

Q. Did you believe that the gun was just misplaced at the airport or did you believe it to be stolen by someone? What did you believe happened to it?

A. No, it was stolen. When we opened up the case, you could see where it had been pried open.

Q. The case had been pried open?

A. Yes. After we opened it and I further examined it, you could see where it was popped open.

307

WYNDER

Q. So you are saying the case has, like, a lock on it?

A. Of course. We had to lock it. Firearms. It's firearms. It's a lock -- if you've ever seen a firearms case, it has to be locked. That's the only way you can transport weapons.

Q. So the lock on the case was completely broken?

A. It was pried up, you could see where they popped it up, raised it on the side to get the gun out.

Q. Did the Los Angeles Police Department do any investigation regarding the case being pried open, take photos of it?

A. Yeah. Uh-huh.

Q. Who conducted that investigation, if you can recall?

A. I don't know. It was a sergeant.

They took a picture. I believe he wrote down -- he took the serial number, which is the most important, and

he told us, "If we find a gun, we'll let you know. Good luck."

Q. Did you have any idea of who had stolen the gun or any suspicion of who had stolen it?

A. Someone who handle the baggage.

Q. Other than that, you didn't have any particular suspicion?

A. No.

Q. You said that you now retrieved the gun.

How did the gun come to be back in your possession?

A. It was found in the possession of a woman who was found with two other automatics and 125 vials of crack, and her statement was that she had got it from her boyfriend who had got it from a baggage handler who worked at LaGuardia who stole the gun and sold it to him.

Q. Do you remember that woman's name?

A. No, it's on the report. I believe her name -- I think it's Cynthia

309

WYNDER

Jenkins.

Q. Did you know Cynthia Jenkins before you saw her name on that report?

A. No, I did not.

Q. I'm going to ask you to look at paragraph 93 on the top of page 22. It reads as follows: "That New York City police required that plaintiff produce a

letter from his own sergeant before they would release the weapon to plaintiff."

Did I read that accurately?

A. Yes, you did.

Q. Did you consider that to be unusual, that they required this letter?

A. What, NYPD?

Q. Yes.

A. No, not after they explained to me. They have a rubber gun squad --

Q. What does that mean?

A. Members who are sick, out on disciplinary, whatever, they can carry their shield and ID, but they can't carry a gun. So they wanted to make sure -- see, State Police works differently. You

310

WYNDER

either carry or you don't. So as long as you are fit for full strenuous duty as a State Trooper, you can carry your weapon.

NYPD works differently, so that's why they asked for that letter.

Q. They wanted to make sure that you were not someone who was not able to carry a weapon but trying to get one?

A. Correct.

No, not get one, but try to get back a weapon that maybe the job told me I

couldn't carry.

It's self-explanatory. I mean NYPD, 30,000 members, a lot of them don't carry guns. I mean I wasn't upset about it.

Q. In paragraph 94, it indicates that you were in fact given a letter from Sergeant Antalek, correct?

A. Correct.

Q. And 95 indicates that after the weapon was returned to you, you would report it in your possession each and every year to the New York State Police?

A. Correct. The EDP form was given to me every year, which I put on the second one when I got the gun back that my gun was returned to me, and after that, for the next following years, I always initialed that form as soon as the weapon was in my possession.

Q. In paragraph 96, you indicate that: "Even though the weapon was reported by plaintiff each year, NYSP continued to carry the weapon in their NYSPIN computer system as stolen."

Did I read that correctly?

A. Correct.

Q. Can you explain to me what you meant by paragraph 96?

A. Well, after the weapon was returned to me, either NYPD or the State Police failed to properly take the weapon out of the database under the serial number as recovered.

Q. And you don't know, as you sit here today, whether it was NYPD or the New York State Police who failed to take it

out of the computer system?

A. Well, New York State Police should have followed up on on it. Once I told them that my gun was back in my possession, State Police has an obligation, because they handle all permits and licenses to carry for the State of New York. So they were obligated to straighten out the status of my weapon, which they failed to do so.

Q. Who did you tell that the weapon was recovered? Who did you report that to?

A. What do you mean?

Q. When the weapon was retrieved, you were notified by NYPD, correct?

A. Correct.

Q. Once you were notified by NYPD that the weapon was retrieved, who did you tell in State Police?

A. Sergeant Antalek.

Q. Were you the first person in New York State Police that was told or would a commanding officer at New York State

WYNDER

Police be told about your gun and they would tell you?

A. They wouldn't have to. NYPD contacted me personally, because it was an off-duty gun. It was a complaint that was filed by me, so the first person they are going to contact is me.

Q. Did Sergeant Antalek tell you that you had to fill out any particular paperwork?

A. No. He said, "Go get your gun." I went down to get my gun and that's when I was told by NYPD that I had to have a letter from them, and then I had to go all the way back to Hawthorne and get a letter from him and then bring it back to NYPD to get my gun.

Q. Looking at paragraph 97: "Upon information and belief, McMahon ordered Barbaria to conduct a criminal

investigation against plaintiff in the year 1997 and use as the basis for the investigation plaintiff's stolen weapon."

Did I read that correctly?

WYNDER

A. Yes, you did.

Q. First of all, how do you know that a criminal investigation was conducted?

A. How do I know that a criminal investigation was conducted?

Q. Yes.

A. One, this was -- we're talking 1997?

Q. Yes.

A. And we're talking about something that happened in 1989? In the administrative charges, if there were to be any would not stand up under administrative rules and regs under New York State Police. You have an 18-month bar on complaints that are over 18 months old.

So, therefore, we're going back, what, '89, '97, eight years, and the only complaints that could continue to stay open that long would have to be criminal charges.

Q. Any other reason that you

WYNDER

believe that this was a criminal investigation?

A. Yes. Lieutenant Barbaria testified in 1998 -- actually 1997, in December, that he had got from a confidential informant that I had traveled to California and killed a drug dealer in the commencement of a drug deal that went bad.

Q. Was that the first time that you had heard that, when Lieutenant Barbaria testified?

A. As to this confidential informant?

A. Yes.

Q. Yes.

A. Yes, at my hearing.

Q. Were you surprised to hear Lieutenant Barbaria speak about the testimony of the confidential informant?

A. Of course I was.

MR. MERRITT: I'll have to object to that because there is no evidence that there was testimony by a

WYNDER

confidential informant.

MS. ODESSKY: I misspoke.

Q. The information from the confidential informant, you were surprised by that?

A. Of course I was. I've never committed a crime in my life.

Q. Did you have any understanding of where that information would have come from?

A. I believe the State Police made it up.

Q. Do you have a belief as to any particular person that made that information up?

A. Well, during my training, information with the State Police, it would have to be chief inspector with Internal Affairs -- it could have been anybody, but being the fact that Masterson was head of Internal Affairs and that he didn't like me, I would assume Captain Masterson was in charge of that and that it had to be signed off by McMahon to go

WYNDER

94979

back into my personnel file and go back nine years.

Q. That assumption that it was Captain Masterson, what did you base that on?

A. The fact that Masterson, when I was at the Academy said that he would keep an eye on me and he also was close friends with Captains Spahl and Masterson, was still in Internal Affairs and this was where this was coming from, and of course anything that he needed to do to me he had to get it from McMahon -- McMahon's approval.

Q. That was again, based upon your understanding that that's how the chain of command works, that McMahon would have to approve these things?

A. Of course. I mean you have to look at it -- you're going back nine years. Under Civil Service Laws, Section 75, you cannot commence any investigations or any punishment to any member for anything that was done administratively

318

WYNDER

after 18 months.

We're talking eight years, so it had to be a crime and you have to get

approval by McMahon.

Again, chain of command.

Q. I'm going to direct your attention to paragraph 101, that's on the bottom of page 23.

Do you see that?

A. 103.

Q. 101.

A. 101. Okay.

Q. At the bottom of page 23. It says, "McMahon, Masterson and Barbaria all knew that the gun investigation was a hoax and a fraud from inception, but they continued the investigation in an effort to turn up any evidence of wrongdoing that they might be uncovered to terminate plaintiff's employment."

A. Yes.

Q. Did I read that correctly?

A. Yes, you did.

Q. Again, is that what's written in

319

WYNDER

paragraph 101, does that go along with your belief that the information from the confidential informant was made up by the New York State Police?

A. Yes, it was. This was all a fishing expedition targeted at a black man

to get him removed from State Police. Everybody -- not everybody but society has a prevalent way of associating drugs with blacks, so this was a very good opportunity for the State Police to use anything to discredit me, and as far as this being a hoax, they already knew that this gun investigation was over nine years old, eight years old, I'm sorry, and the fact that they could do nothing to me. They had to brush it up and make it more enticing in order to continue the investigation; and one way would be by falsifying a confidential source and then using the gun by saying that I went to California to commit a murder.

Now, as farfetched as that would be to any trained law enforcement -- do

you have a name, are you going to call Los Angeles Police Department and state, Hey, by the way, eight years ago, did anybody get murdered? So they knew that the only statute of limitations that can stay open forever is murder. So they knew that this was the only way that they can continue to investigate me forever.

Q. Why did they want to investigate

you?

A. Because I was black and they wanted me off the job and I had called them racist and I had pointed out racist and discriminatory things that the State Police does. I worked for them and I was not following orders, and what I mean by following orders, I wasn't going along with the discriminatory practices that the New York State Police practices on a common basis.

Q. Were you ever told that you did not report the gun correctly, either when it was stolen or when it was returned to you?

A. Yes, they used that as -- their reasoning for why they looked into it, but if you look at --

Q. Who told you that, that you didn't report it properly?

A. Lieutenant Barbaria.

Q. What particularly did he tell you about what was not done properly?

A. That my gun was not reported to the New York State Police.

Q. Did you tell him that you had reported it to Sergeant Welsh?

94979

A. Well, we have a problem on that I spoke to Lieutenant Barbaria. I didn't speak to Lieutenant Barbaria until after charges were preferred against me. That's not correct.

Lieutenant Barbaria brought me in in September to do a statement from Internal Affairs on an inquiry into my gun. He stated that I did not report it to New York State Police. I informed him that I did report my gun.

Q. Was he saying that you didn't

322

WYNDER

report the gun when it was stolen or that you didn't report the return of it or both?

A. No, he said I did not report my gun stolen to New York State Police. I informed them that I did, and, also, in his own reports, as we've handed over in discovery, his so-called confidential informant, quote, stated that I went to California, and the reason why I reported my gun stolen to my employer, the New York State Police, was to cover-up a murder.

So Lieutenant Barbaria knew that my gun was reported stolen to the New York State Police. He knew that. And then he

94979

also told me --

Q. Let me ask you another question, because we're getting a little far from my question here.

You were asked at some point, called in by Lieutenant Barbaria to give a statement --

A. Yes.

Q. -- regarding the gun situation?

323

WYNDER

A. Yes.

Q. Prior to that time, had you ever been asked by someone in the New York State Police to give a sworn statement?

MR. MERRITT: About the gun?

Q. About anything in connection with your employment.

A. Up until that time have I been --

Q. Up until the time you were called in by Lieutenant Barbaria.

MR. MERRITT: We're talking about September 17, 1997. Up until that time.

A. Not that I can recall. I probably might have. I can't answer that question truthfully without knowing -- I have to refresh my memory.

94979

Q. How about the incident regarding the Newburgh -- City of Newburgh police, did you give a statement in connection with that?

A. Yes, any statement would have to be under oath.

324

WYNDER

Q. That was prior to you being called in by Lieutenant Barbaria, correct?

A. Correct.

Q. For the gun on September 17, 1997?

A. Correct.

Q. You say in your complaint, specifically under paragraphs 107 and 108, basically that by taking the statement, your rights were violated, and the statement was conducted in violation of the provisions of a collective bargaining agreement between NYSP and the New York State Police Benevolent Association?

A. That's correct.

Q. Can you tell me, what is your understanding about what was wrong with Lieutenant Barbaria taking a statement from you regarding this gun situation?

A. Well, first of all, he lied to me in the fact that he never read me my

94979

Miranda Rights.

Q. Let me ask you, when you had given a statement previously regarding the

325

WYNDER

City of Newburgh situation, were you read your Miranda Rights prior to giving that statement?

A. No.

Q. So why was it your understanding that you should be read your Miranda Rights in connection with this particular statement?

A. Because the Newburgh case was administrative charges. I believe this was a criminal investigation, drugs, guns, and anything that I say can or would be used against me in a court of law; and, apparently, from discovery, as we found out now, that there was a criminal investigation going on and anything --

Q. What was the basis for your belief that there was a criminal investigation going on?

A. The basis?

Q. Yes. You said it was through discovery that you've learned there was a criminal investigation.

What's the basis for you now

WYNDER

saying there was a criminal investigation?

A. A memo from captain -- not captain, Colonel Young to Colonel Shepley (phonetic) in regards to a criminal investigation that was conducted by Captain Klusacek and whose report was forwarded to the U.S. Attorney to have criminal charges brought against Trooper Wynder.

Q. Do you know what those criminal charges were, in connection with what conduct by you?

A. Well, we're still waiting for you to release that information to us. We requested in a document demand that you release that report that was sent to you my by attorney and we've been denied that.

Q. I'm just asking you whether you know what the charges were without specifically talking about that document.

A. Well, how else would I know? Also, the fact that I knew that it had to do with drugs and a murder because Barbaria had testified to that at my

WYNDER

hearing and that he had told me.

Q. Is there any other reason other than that document that you believe that the statement Lieutenant Barbaria was taking from you was in connection with a criminal investigation.

MR. MERRITT: You mean other than what he just testified to?

Q. Other than what you just told me.

A. What do you mean?

Q. You just told me that the basis for your belief that Lieutenant Barbaria was conducting a criminal investigation when he took that statement from you on September 17, 1997 was based upon the memo that you were provided in discovery from Colonel Young, correct?

A. Uh-huh.

Q. Is there anything else that you base --

MR. MERRITT: He also testified that Barbaria testified in 1998 that he conducted a criminal investigation --

328

WYNDER

MS. ODESSKY: Mr. Merritt, hold on --

MR. MERRITT: He testified to that fact, as well.

MS. ODESSKY: Mr. Merritt, I would ask you to not put answers on the record and to lead the witness in any way. I would really object to that.

You've done it on Friday and you've again attempted to do it today. If you want, we'll call the judge --

MR. MERRITT: Let's do it right now. Let's stop playing games.

You made a wrong statement and you can't retract it, and I'm informing you that you made a wrong statement based upon his testimony. You don't like that? That's fine. Let's call a judge --

MS. ODESSKY: If you want to clarify my statement, that's fine.

MR. MERRITT: I did that and you interrupted me three times. You've interrupted me three times when I tried to clarify your statement and you keep

interrupting me.

MS. ODESSKY: You keep interrupting me.

MR. MERRITT: I wasn't finished yet.

MS. ODESSKY: Go ahead and finish.

MR. MERRITT: We'll take a break now. I told you we had to clarify your statement because you made a misstatement.

MS. ODESSKY: Are we still on the record?

MR. MERRITT: I think she's still taking it down.

MS. ODESSKY: Go ahead and clarify my statement. If you want to call the judge over this --

MR. MERRITT: Are you going to stop interrupting -- when you stop interrupting me, I'll be glad to speak.

MS. ODESSKY: Go ahead.

MR. MERRITT: Your previous question and the previous answer to the previous question, you asked Mr. Wynder

how he learned about the fact that there was a criminal investigation against him. He first said that there was a memo, then he secondly testified that he learned about it through the testimony of Lieutenant Barbaria at his hearing in 1998. He stated that.

Then when you came back and

asked the question again, you said other than the memo, and I said to you, are you also referring to the other thing that he testified, the testimony of Lieutenant Barbaria at his administrative hearing, and you interrupted me four times and threatened to call the judge. That's what it's all about.

I'm clarifying your question and his answer, because he answered and told you that one of the sources of his information was direct testimony from Lieutenant Barbaria at his administrative hearing.

MS. ODESSKY: Okay. Fine. Thank you.

WYNDER

Can we proceed now?

MR. MERRITT: No, we're going to take a break.

MS. ODESSKY: For the record, the time now is 1:35.

Are you taking a lunch break or do you want to continue?

MR. MERRITT: I'm taking a short break right now.

And we're going to continue. As soon as this room cools down, I'll be

back.

MS. ODESSKY: There's no reason to put gratuitous remarks on the record.

(Brief recess taken.)

MS. ODESSKY: I understand what Mr. Merritt's clarification of my last question is.

BY MS. ODESSKY:

Q. So I'll just ask you, Mr. Wynder, to make it very simple, other than anything that you've already testified to today that we've discussed, is there any other basis for your belief

that Lieutenant Barbaria was conducting a criminal investigation when he took that statement from you on September 17, 1997?

A. Yes, that was in July of that year, from the branch manager, Brenda Bennie, who told me that Captain Klusacek and the State Police were conducting a criminal investigation, and also my neighbors who told me that they were conducting a criminal investigation, Preston Felton who was surveilling me.

Q. Did he tell you that it was a criminal investigation, Preston Felton?

A. No, he didn't have to, but as in

my experience as a trained officer in the State Police, Internal Affairs only shows up when there's a crime. They are not there for administrative inquiries.

And also the fact that I had just had a drug test done prior to that, so I knew that -- those were all my sources that there was a criminal investigation in progress.

Q. I'm going to ask you to look at

paragraph 109 on page 25.

It reads as follows: "The herein referenced sworn statement was taken well after plaintiff received written administrative charges which was in direct violation of Section 3.1, NYSP administrative manual and in direct violation of New York code, rules and regulations."

Did I read that correctly?

A. Yes, you did.

Q. What did you mean when you said it was taken after you received written administrative charges?

A. Well, the New York State Police Manual is condensed of ideas and rules and regs that the superintendent wants his

members to follow, and then there's also sections in the manual that are stated as NYCRR, which is New York State codes -- it is mandated by the law that these formats have to be followed, and according to 3.1 of disciplinary in the New York State Police, a member -- any complaint that is

filed against a member is to have a complete and thorough investigation done before charges can be preferred to protect, one, the New York State Police, two, the State of New York and three, the member.

Q. Hang on, because I think you misunderstood my question.

It was specifically with regard to what you wrote in paragraph 109, the referenced sworn statement was taken well after plaintiff received written administrative charges.

What written administrative charges are you referring to in that paragraph?

A. I'll clarify myself. As I referred to Section 3.1, the State Police on December 27, 1997 preferred charges against me.

Q. Which charges were those?

A. Those were for bankruptcy fraud and working without approval outside work, which again was in violation of 3.1 which

states that, "A complete and thorough investigation must be conducted before charges can be preferred against a member."

It is also mandated that this Section 3.1 is mandated by legislature which you can find --

Q. Yes. With regard to paragraph 109, specifically when was the sworn statement taken in relation to the charges preferred against you on December 27, 1997?

A. I believe those -- that statement that was -- I was forced to take came sometime in January.

Q. So you're not referring to the statement taken September 17, 1997?

A. No.

MR. MERRITT: Let the record reflect that he didn't say the year. So January -- I know it's inferred --

Q. Are you talking about January 1998?

A. Yes, January 1998, to those

WYNDER

charges that you're referring to in 109 of the complaint, yes, in January of 1998 is when the State Police first asked me to give a statement to these charges.

Q. Looking at paragraph 110, it reads as follows: "A sworn statement was taken from plaintiff on January 20, 1998 by Barbaria, and prior to commencing the questioning, plaintiff asked Barbaria, Am I the target of a criminal investigation, to which Barbaria refused to answer."

Is it your understanding that during the questioning by New York State Police in general, the taking of a sworn statement, that you are permitted to ask questions of the person taking the statement?

A. Rephrase yourself.

Q. Is it your understanding that generally, when you have provided a sworn statement to the New York State Police Department in the past, for example, when you did that in connection with the City of Newburgh incident, is it your

understanding that you are permitted to ask questions of the person taking the statement from you?

A. You are asking me if I have a right to request why they are taking the statement?

Q. Yes.

A. Yes, as per the PBA contract, I have the right to ask am I a target of a criminal investigation, to invoke my Fifth Amendment rights.

Q. Did you ask that question when you were giving the sworn statement regarding the City of Newburgh incident?

A. No.

Q. Why not?

A. Because at that time I knew that it was administrative and it was no crime. Under the contract --

Q. I'm going to ask you, Mr. Wynder, if you have something to say, you'll have plenty of opportunity to say it but just wait for me to pose another question to you. Thank you.

338

WYNDER

94979

MR. MERRITT: With regard to the previous question that you asked Mr. Wynder about 3.1 of the contract, you did interrupt him in the middle of his explanation, and I know you wanted to clarify the question, but I would object to the fact that should let him answer the question fully before you interrupt. He was attempting to answer your question with regard to 109 and you stopped him before he finished his answer.

MS. ODESSKY: Okay.

Q. Mr. Wynder, do you have anything further to say with regard to paragraph 109?

A. Yes. As I was stating to you, you asked me about this sworn statement, which we now know took place on January 20, 1998, and the reason why this is here it's in direct violation of 3.1, as the manual states that you have to do a complete investigation, and in my trained experience as a trooper and as anybody knows, to do a complete and thorough

investigation, you have to contact and talk to everybody; and in this situation, according to rule 3.1, they have to do

94979

this because they have to protect me, the State of New York and the New York State Police.

So by not contacting me and asking for a statement before they preferred charges against me, the State Police violated their own regulations by not doing a thorough and complete investigation, and, also, I'd like to state for the record not only is this 3.1 section in the New York State Police Manual, it is found in the New York State State code of rules and regulations which makes it a law, and in that point the State Police violated the State of New York laws.

Q. Thank you.

You mentioned before a few minutes ago that charges were preferred against you on December 27, 1997, correct?

A. Correct.

340

WYNDER

Q. Those charges included charges related to bankruptcy fraud and working without approval, correct?

A. Correct.

Q. Now, the working without approval, what did that charge pertain to?

A. New York State Police alleged that I had worked with -- that I had worked without their permission, outside employment.

Q. What particular outside employment were they talking about?

A. My company, For You, as I stated earlier.

Q. Was that charge accurate, that you were working without their approval?

A. No, that charge was false.

Q. Why was it false?

A. Well, I'll give you two reasons.

One, I never worked for For You Enterprises. I was the president of For You Enterprises. So I was not working for For You Enterprises. To me, that is

synonymous with the fact that you own stock in a company and you get a check from the company, is that work? No, it's not.

And according to the New York State rules and regulations for working without approval or working outside, you must receive pay for what you are doing for it to be considered outside

employment. That means you can volunteer, you can work; as long as you don't receive a paycheck, you are not working outside employment.

And also --

Q. Can I just stop you right there to clarify?

Your contention is because you did not receive a paycheck, that you were not required to report to the New York State Police that you had the For You company?

A. Well, the New York State Police, according to their rules and regulations, you must have gainful employment within

which you receive remuneration for your work and I did not receive any money or remuneration for any of my services for For You Enterprises, so, therefore, I was not employed outside of the New York State Police.

Q. During the time that you had the For You company of which you were the president, did For You make any profits?

A. Whatever profits -- we didn't make any profits. We broke even and we kept the money into the business and

94979

nobody received any pay. Nobody was paid for work.

Q. You told me there was a second reason.

What was the second reason?

A. I did have approval and I showed you earlier. I had outside approval from my sergeant. Even though I didn't need it, I put it in anyway and I was approved.

Q. That was from Sergeant Welsh?

A. No, that was Sergeant Smosky, I believe.

343

WYNDER

Q. As to the second charge regarding the -- charges regarding the bankruptcy fraud, you did file a bankruptcy petition, correct?

A. Yes, I did.

Q. Was that petition the first time you filed for bankruptcy?

A. No, it wasn't.

Q. How many times had you filed for bankruptcy?

A. I believe once prior, if I can recall right.

Q. What was your understanding about what the bankruptcy fraud charges were based on?

A. Bankruptcy charges were based on the fact that I had perjured myself on the petition by using the wrong Social Security number and failing to inform that I had a checking account and failing to inform that I had filed a previous bankruptcy.

Q. Was that accurate? Each of those were accurate?

A. All those charges were false.

Q. Did you have a wrong Social Security number on there, on the petition?

A. Yes, there was a wrong Social Security number on there.

Q. Why was the wrong Social Security number on there?

A. Well, if we can clarify for the record, if the State Police had taken a statement from the lawyer who did my bankruptcy, as they found out during the hearing that it was done because of a computer default, which means he was supposed to change it and he did not, which he testified to.

Secondly, the fact that -- what relief would you get for putting in a wrong Social Security number in

94979

bankruptcy?

The other ones were my checking account that the State -- if the State Police had done an investigation before they preferred the charges against me, they would have realized that I wrote a

WYNDER

check to Mr. Shoshano (phonetic), my attorney, for the services rendered, which proved I had a checking account.

Third, as far as not filing, not disclosing that I had filed previously another bankruptcy, if the State Police had did an investigation and turned the page over in the complaint on my bankruptcy form, they would have found out that my lawyer put in there, please state previous attorney firm that was used for your prior bankruptcy, which was there in black and white, but as Lieutenant Barbaria testified at my hearing, he never did an investigation before charges were preferred.

Q. Is it your contention that if there were misstatements on your bankruptcy petition, that those were the result of your attorney?

A. I'm not stating it as a fact.

94979

As Mr. Shoshano testified to the fact that he had a default program.

Q. When you say "a default

346

WYNDER

program," what do you mean?

A. A default program is basically set up for maybe 80 or 90 percent of people who always answer one way and then you just change it when it's yours. So in this case, as Mr. Shoshano testified that he put the wrong Social Security number because he had not changed it from the previous person that he was with, and he also testified to the fact that why would a bankruptcy attorney file paperwork on a client with the wrong Social Security number knowing that no relief would be granted under another Social Security number?

And secondly, he did state that I paid him with a check.

And third, I did have a previous attorney which was all in the bankruptcy petition form, which, again, as I state for the record, if Lieutenant Barbaria and the State Police had followed their own rules and regulations of 3.1 and did a complete and thorough investigation, they

WYNDER

would have realized this before they preferred charges against me, but because they were on a witch-hunt to target and have me terminated because I was black, the State Police refused to do any investigations and just brought me up and charges because, quote, as I was told by PBA president, Al Wolford, they had me cold.

Q. What did you understand that to mean?

A. They were going to fire me. They had everything they needed. I was guilty.

Q. Mr. Wynder, I just want to go back. You had stated a couple of times during this deposition that part of the reason that you believe that certain things were done to you by the State Police was the fact that you had pointed out discriminatory practices by the State Police?

A. Correct.

Q. Can you indicate to me when and

348

94979

WYNDER

how you did that during your entire career?

A. Well, again, as we stated, at the Academy I made noises and questioned why out of a 50-40-10 ratio, which the State Police has to use to hire minorities on this job, that they would pick the most inferior minorities they could find and put them in a position to fail and not give them help -- and my memos -- when that I stated to -- when I wrote there were no minority instructors and that the State Police, in my opinion, which was by Captain Young at the Academy stated that I was correct, and the fact that the State Police did not have any black academic instructors nor were they trying to find any black academic instructors and I brought that to their attention and they rectified that problem by forcing me to do it and then I believe right after that they forced other -- they didn't force but they did go out and look for black academic instructors after I left.

349

WYNDER

Q. Can you tell me what else you did other than what you've just testified

to to expose what you say are discriminatory activities?

A. Well, that was -- that was the main one. I put it in writing and I contacted the EEOC, so, therefore, I was a target of the New York State Police.

Q. Anything else other than what you've testified to today regarding the discriminatory activities?

MR. MERRITT: I have to object. He has testified at length with regard to the things that he did in yesterday's deposition. He told you step by step all the steps he did, and you are asking him today, apparently, to clarify all those things that he told you yesterday.

So if you clarify your question, other than yesterday -- he did testify at length about that same question and the same answer.

MS. ODESSKY: Okay.

Q. Mr. Wynder, other than what

350

WYNDER

you've already testified to at this deposition, which includes today and yesterday, is there anything else?

A. As far as --

Q. As far as things that you did

during your entire career at the New York State Police to speak about discriminatory actions?

A. Yes. Everything that we spoke about yesterday brought it to that point where I had become a target of the State Police.

Q. I'm going to ask you to turn your attention to paragraph 115, which is on page 27.

Do you have that?

A. Yes.

Q. That reads: "During the two-day hearing held on January 27 and January 29, 1998, Defendant Jones obtained exculpatory evidence from Sergeant Nohai," N-o-h-a-i -- I believe you have it spelled in paragraph 117, N-o-h-a-i.

I believe that's the correct

spelling?

A. Yes.

Q. Did I read that accurately?

A. N-o-h-a-i.

Q. Did I read the paragraph accurately?

A. Yes, you did.

Q. Now, this two-day hearing that

you're referring to on January 27 and 29, 1998 pertained to the charges filed on December 27, 1997 regarding the bankruptcy and the outside work, correct?

A. Correct.

Q. Who is Defendant Jones?

A. Defendant Jones was the prosecutor for the New York State Police, Investigator Robert Jones.

Q. When you said that he obtained exculpatory evidence from Sergeant Nohai, what are you referring to?

A. Well, prior to this hearing stated here January 27 and January 29, my attorney, Richard Merritt, requested discovery which is part of my amendment

rights to due process and civil rights and we were denied paperwork from the New York State Police. And we went into this hearing without any evidence or paperwork to defend myself properly, and to the best defense that I could possibly obtain to maintain my job.

During this time one of the sargeants was called up to -- let me rephrase that.

Right before the hearing, I had

been given a package that was left in my folder, unknown, unsigned. In it was paperwork that stated that I had been approved for outside employment.

Q. Where did you get that from?

A. As I repeat, I found it in my mail folder at SP Hawthorne. No name, nothing on it.

Q. Let me stop you there, Mr. Wynder, for a moment.

In paragraph 115, you referred to exculpatory evidence from Sergeant Nohai.

Who is Sergeant Nohai?

A. He was my sergeant at New York State Police, Hawthorne.

Q. What is the exculpatory evidence that you're referring to in that paragraph?

A. Outside employment.

Q. How do you know that Defendant Jones obtained that evidence from Sergeant Nohai?

A. Well, on January 27, we had to have an adjournment and it was scheduled for the 29th, and I went back to my station, SP Hawthorne, and Sergeant Nohai

was there and he said, "Hey, I was up in Albany all day on the 27th, waiting to be called and Defendant Captain Robert Jones," I'm sorry, he's a captain, "failed to call me. He didn't need me," he said.

I said, "Really?"

I said, "Why were you up there?"

And he told me, he said, "Oh, I had all the paperwork from your outside

WYNDER

employment," and I was being charged with working outside my employment without approval, when here's a sergeant who was holding onto the information; and as a matter of fact, I had requested that paperwork because I knew that I had asked for outside employment approval and they told me they didn't have it. But here it is, we had it.

Q. Now, did you eventually, according to what you say in paragraph 117, you called Sergeant Nohai as a witness or your attorney did as a witness on your behalf, correct?

A. Correct.

Q. Sergeant Nohai in fact came without evidence to the hearing?

A. Yes. As is stated here, he did come, he testified to it, that he was up there with that package and later on in the hearing, my attorney questioned and put it on the record that Robert Jones was withholding exculpatory evidence, to which Jones replied, if I remember correctly,

that he was only going to offer this evidence if it was brought up, which, therefore, he had admitted that he knew about the evidence and that he wasn't going to call it unless we brought it up, which we had to bring it up because he was refusing to bring it up.

As a matter of fact, he was never going to bring it up.

Q. I'm going to ask you to look at paragraph 119. That reads as follows: "As a result of the foregoing, plaintiff was caused to suffer emotional trauma and damages which eventually led to his nervous breakdown and disability retirement."

Going back to the beginning of that paragraph, when you say, "As a result of the foregoing," what are you referring to there, "foregoing"? Are you referring

94979

to the hearing?

A. The foregoing, which meant the hearing.

Now, I am still being prosecuted

356

WYNDER

by the State Police. They refused me my back pay because I'm black, color of my skin --

Q. Hold on, Mr. Wynder, because I think you are misunderstanding again my question.

My question is, I'm asking specifically, when you say "the foregoing" in paragraph 119, are you referring to the hearing, that particular hearing held on January 27 and 29th, 1998?

A. No.

Q. Are you referring to everything that went before?

A. Everything in this complaint.

Q. Everything before that paragraph?

A. Right.

Q. Now, I'm going to ask you to look at paragraph 127. That's on page 29. It reads as follows: "During the aforesaid hearing, Defendants Jones and McMahon acted through his subordinates" --

94979

"acting through his subordinates, refused

WYNDER

to produce a material witness at the hearing."

A. Correct.

Q. And going to paragraph 128, "The witness, Mr. Gregory P. Schreffler (phonetic), who is listed on administrative charges against plaintiff and was declared to be an employee of the NYSP, signifying that Defendant McMahon had control of the witness."

Did I read those two correctly?

A. Yes, you did.

Q. Can you explain to me why you wanted Mr. Gregory P. Schreffler to testify?

A. Yes, I can.

On December 27, 1997, when charges were preferred against me, there were two witnesses that were put against me for these alleged crimes which were Gregory Schreffler, and it was stated as head of financial crimes unit and Lieutenant Barbaria, Internal Affairs.

My right as a civil rights

WYNDER

violation -- is the right to confront any witnesses against me who brought these charges. And on this day, after Lieutenant Barbaria had finished testifying, my attorney, Mr. Merritt, requested -- well, I take that back.

The State Police said that they rested their case, so Mr. Merritt requested that, do they have any more witnesses, they said no, and Mr. Merritt stated that he wanted to call Gregory Schreffler as a witness for the defense for the fact that the State Police did not want to produce him.

Q. Was Mr. Schreffler ultimately allowed to testify?

A. Well, what happened after that was we had vigorous and furious objections from Robert Jones stating that Gregory Schreffler, which to this day is unbelievable, stated that he was irrelevant to the case, knowing that it was the State Police who put them on their witness list and as a witness against me

WYNDER

and then failed to produce him, and the previous day, this was on the 29th, that on the 27th, that his name had been mentioned 27 times by Lieutenant Barbaria, so Gregory Schreffler was a very, very significant witness against me.

Q. Mr. Wynder, did Mr. Schreffler end up testifying at the hearing?

A. At the hearing, police officer -- not police officer, Arnold, who presided on the hearing board --

Q. Maybe you misunderstood. That's a yes or no answer that I'm looking for.

Did Mr. Schreffler end up testifying at the administrative hearing?

A. Quote, Arnold and Jones stated that he would not be produced because he would divulge how the State Police does their investigations.

Q. So the answer is to my question is no, that he did not testify?

A. The answer to your question is no, he did not, but I told you why he did not testify.

Q. Was it an option for you, for your attorney to call Mr. Schreffler to testify?

94979

A. My civil rights -- I have a right to call any witness that is preferring any allegations against me, and yes, it was our right to call him, which was denied by the New York State Police to call -- supposedly, Gregory Schreffler is head of New York State Police Financial Crimes Unit, which for the record there is no New York State Police Financial Crimes Unit, and, secondly, Gregory Schreffler is a civilian, and rules and regs of the New York State Police Manual State that no civilian can conduct or participate in any administrative charges or criminal charges against a member of the New York State Police.

Q. So is it your understanding that Defendant Jones refused the request by plaintiff to call Mr. Schreffler; is that your understanding?

A. You are asking me did Robert

361

WYNDER

Jones purposely fail to call Gregory Schreffler?

Q. No. I'm asking you, did Robert Jones refuse a request by either yourself or Mr. Merritt to call Gregory Schreffler during this hearing?

A. Yes, Mr. Jones refused to call him himself and then denied my attorney the privilege and the right to call Gregory Schreffler.

Q. Did either you or your attorney seek any further action once that request was denied, either through State Police or through court or any other agency?

A. I don't understand.

Q. You said that Mr. Jones denied the request by you and your attorney to call Mr. Schreffler, correct?

A. Yes.

Q. Did you or Mr. Merritt, acting on your behalf, take any further action with regard to that denial of the request?

A. Well, the action that my attorney took right there was that he

objected and that he wanted to have a telephone conference call to whoever was in charge to have this witness produced, where he was told by the hearing officer who presided, which was Colonel Arnold, that that wasn't going to happen and that he refused -- again, as I stated before, they refused to produce him based on the fact that he would divulge how they did

their investigation.

Q. Did you or your attorney seek any court action to rectify the problem?

A. Well, in the middle of a hearing, the State Police don't afford you that liberty to adjourn and ask for outside help, which we requested, which was denied.

Q. I ask you to turn to paragraph 127 that reads, again, as follows: "During the aforesaid hearing, Defendants Jones and McMahon, acting through his subordinates, refused to produce a material witness at the hearing."

Did I read that correctly?

WYNDER

A. Yes.

Q. It's fair to say that Superintendent McMahon was not present himself at the hearing, correct?

A. Correct.

Q. Is it your understanding that, again, you are saying that Mr. McMahon acted through his subordinates, that Defendant Jones was acting under the orders of Superintendent McMahon?

A. Yes. Not only was Defendant Jones acting under the order of McMahon,

so was Colonel Arnold and the board that was apppointed by Superintendent McMahon.

Q. I'm going to ask you to look at paragraph 130 which is on page 30, it reads: "Two administrative hearings were conducted by McMahon utilizing false administrative charges."

And we just established that Supérintendent McMahon was not present during these hearings, correct?

A. Correct, but --

Q. What did you mean when you say

that the hearings were conducted by McMahon?

A. Well, it was conducted -- he had to approve them. Every charge that has to be signed has to be signed off by the superintendent of the New York State Police, which in this case, the first one -- two administrative hearings -- the first one was the charges of bankruptcy fraud, which as we stated on the record had the New York State Police did their investigation would have found out that they were false charges but they never did, before they preferred the charges.

The fact that they withheld

exculpatory evidence to the fact that I did obtain approval outside and that I never received any pay which proved that they were false charges and, three, was the second charges that were brought against me was after, at my hearing, from my statement, in reference to the first charge on January 27 -- actually is, as I go back, January 20, 1998, as I was forced

to give a statement to my first hearing, Lieutenant Barbaria told me that my gun was still listed in the computer as stolen and he told me to take care of it.

Q. Mr. Wynder, I don't want you to cut you short, but I think you are getting again very far from my question.

My question was specifically in paragraph 130, when you have there that administrative hearings were conducted by McMahon, I'm asking you, did you mean that McMahon was personally conducting them or that they were conducted under the direction of Superintendent McMahon?

A. They were conducted under his supervision, because everything is chain of command. He has to follow direct orders, and the fact that he signed off on

the charges. There can be no hearings unless McMahon has thoroughly read everything that's been done and signs off on it.

So, yes, McMahon was the one who apppointed and conducted these false

administrative charges against me.

Q. I'm going to ask you to look at paragraph 133. That reads: "Plaintiff was denied copies of police records and reports contained in his personnel file which would have shown improper and unlawful police conduct in their investigation and in bringing false charges against plaintiff."

Did I read that correctly?

A. Yes, you did.

Q. Were you aware that your attorney, Mr. Merritt, was given the opportunity to look at your personnel file and to take copies of documents from your personnel file; were you aware of that?

MR. MERRITT: Let's just clarify this. What time frame are you talking about?

MS. ODESSKY: My understanding, Mr. Merritt, and correct me if I'm wrong,

94979

was that you were permitted, during the hearing to --

MR. MERRITT: That's an absolute

367

WYNDER

falsehood. I was denied it in writing. I was denied every time I made a request -- every request I made for information before that hearing was denied me in every way, shape and form. I was never given any discovery and I was never allowed to look at his personnel file.

The only time the personnel file was allowed to be looked at was during a Workmen's Comp hearing, and I was only given one-third of his file at that time to look at it, all the rest was withheld by the State Police.

So if you want to put a time frame on your question. There was a period of time when it was offered and it was at the Workmen's Comp hearing in 2002 and 2003 and they only produced one-third of his file.

Q. I'm going to ask you to turn, Mr. Wynder, to paragraph 140 on page 31.

A. Yes.

Q. That reads: "On January 27, 1998, Barbaria issued a direct order to

WYNDER

plaintiff to straighten out his missing weapon problem," and I believe you began to tell me about that before.

Was that during a conversation you had with Lieutenant Barbaria?

A. It wasn't a conversation.

For the record, it was -- I was ordered to give a statement on January 20, 1998 in reference to the complaint of bankruptcy fraud and outside work.

At that time, after the hearing was over, Lieutenant Barbaria stated -- before, I'm sorry, before, he stated to me that, "When you went out on sick leave on 12/27/97 and Captain Spahl came and retrieved your weapon and your shield," after running my gun, they found out that my gun was still listed in the computer, in NYSPIN, as stolen, and he told me that, "if I was you, I would take care of it and I'm giving you an order to take care of it, because you cannot walk around with your gun listed as stolen."

Q. Did you take action as a result

WYNDER

of that?

A. On January 27, after the first day of hearing had commenced, again, Lieutenant Barbaria again stated to me, "You still haven't taken care of your gun. Take care of it." That's the last time I'm going to ask you. On January 28, I went to SP Newburgh where I attempted to retrieve the information so that I could call NYPD to have my gun taken out of the system as stolen.

Q. Let me just back up a little bit.

Were you ever assigned to SP Newburgh as a trooper?

A. No.

Q. Why did you go to SP Newburgh on that day?

A. I lived in Newburgh.

Q. Why did you not go to SP Hawthorne where you were assigned?

A. Well, as a member of the New York State Police, I have access to every State facility in the State of New York.

370

WYNDER

Why would I drive an hour to SP Hawthorne when I can handle what I needed

to handle at SP Newburgh, which was five minutes from my house?

Q. When you arrived at SP Newburgh, what did you do there?

A. I requested help in retrieving my gun, which at that time I don't really recall the specifics, I was heavily sedated at the time, I was on Prozac, I was stressed out, so I don't really remember that whole period of time that I was there.

Q. Do you recall at all whether you yourself used a computer terminal, a NYSPIN terminal, at SP Newburgh?

A. Well, again, as I said, I didn't recall, but sitting through the hearing, it was determined that I never used a terminal, which was restated in testimony and under oath by Sergeant Kreplin (phonetic) who stated I never sat down at the terminal, I never used it. I never logged onto the computer.

371

WYNDER

And the hearing, which after I was brought up on charges again, which was a trap by the State Police, I find it ironic that after Barbaria sent me to have my gun taken care of, that was the same

day a new charge -- charges were preferred and instigated against me, on January 28, 1998, while I was still in the middle of other charges at the other hearing.

Q. Can you tell me, Mr. Wynder, everything that you recall doing at SP Newburgh on that day when you went to try to straighten out the gun problem?

A. The only thing I can remember is I went to the station to retrieve information to find out how I could get my gun taken out of the system. That's all I can recall at that time. I was heavily sedated, I was upset, I was in the middle of a hearing already, I was stressed out already. So I really don't recall. I can only tell you by what was recalled in refreshing my memory as I sat through the hearings and what happened that day

WYNDER

through the hearings was apparently I was brought -- I came in and I spoke to an investigator who stated that --

Q. Who was that? I'm sorry. Are you talking about Josh Keats?

A. Edward Martinez.

Q. Do you recall what you said to Martinez?

A. No, I don't recall, but what was stated at the hearing was that he said that I asked him, "Could I use the computer to run my gun?" And he told me that I could not use the NYSPIN and that I had to leave the station.

I find out at the hearing, we testified that that was wrong, because as a New York State trooper, I was certified to use the NYSPIN and there's no reason for anyone to ever tell a trooper or a member that he cannot use a NYSPIN if he's certified. So where did that come from? I don't know to this day.

I believe that was a false charge that the State Police used to bring

me up on charges.

Q. I'm going to ask you to look at paragraph 142 and you say that, "Keats testified at an administrative hearing held on May 11, 1999, that he supplied a false sworn statement to NYSP prior to administrative charges being issued against plaintiff."

Now, the hearing you're referring to is the hearing that you had regarding the charges of misusing the

NYSPIN system?

A. Correct.

Q. Who is Keats? Is he a trooper?

A. Yes. Josh Keats, to my recollection, and at the hearing testified -- well, prior to that, as we prepped for the hearing, I didn't recall, so I didn't recall by whatever documents we were able to retrieve or whatever, but Keats had testified in a sworn statement that he got up from his NYSPIN terminal and I sat down and I used his terminal in order to pull up what I needed for my gun

374

WYNDER

charges.

Q. Did you do that?

A. Did I do that? As I testified before, I don't remember, but we have sworn testimony from a Sergeant Kreplin that I never sat at the terminal and I never at any time retrieved any information from the NYSPIN under someone else's NYSPIN number.

And at this time it was Josh Keats who testified that I walked away from it, but at the hearing, it was revealed that it wasn't Josh Keats, there was another trooper who was sitting on the

computer using Keats' log-in number, running the information that was supplied to me, and, also, it was revealed at the hearing that Sergeant Kreplin said that this was a -- how can I put it? This was a normal practice that was practiced at SP Newburgh, that all the members used each other's PIN numbers when they were on a terminal, for the same charge that they were bringing up on me.

WYNDER

Also, I found out everybody in Newburgh was white, and I didn't even use the NYSPIN computer and I was brought up on charges.

Q. Is there any document that shows whether or not you used the NYSPIN terminal that day?

A. There is no documents that state that I ever used the NYSPIN. The NYSPIN documents with my information on it was run under Keats' log-on number.

Q. As you sit here today, do you have a recollection of asking Trooper Keats to run that information regarding your gun for you?

A. No, I don't recall. As I stated, I was very sedated, I was on

Prozac.

You got to remember that was the date in between a hearing to have me fired.

Q. Do you have any recollection as to whether when you went to SP Newburgh to try to straighten out the gun problem, did

you ask anyone else, anyone at SP Newburgh, to run that gun information for you on the NYSPIN terminal?

A. Again, as I stated, but from the hearing, it was stated that I asked Investigator Martinez to help me. Investigator Martinez again said that -- which he had no authority and no command over me, said and told the State Police that he had told me to leave the station and that I couldn't use the NYSPIN, which was illegal. As long as you are certified, you can use a NYSPIN.

He also stated that I was out on sick leave and that was the reason why I couldn't use the terminal.

Well, State Police policies rules and regs state that any member, as long as he's not suspended, has a right and access to anything in the State

Police, and also on that date, again, as I told you, at this hearing that was held on May 11, 1999, documented proof that six white members used the NYSPIN under Keats'

name and they admitted to it. Sergeant Kreplin admitted to it.

Sergeant Kreplin admitted that I never sat down at the terminal and I never used the NYSPIN.

As a matter of fact, the State Police tried to change their charges against me from using the NYSPIN while logged on underneath somebody to causing it to be used under -- so they even admitted that I never sat at the NYSPIN, but I was still brought up on charges.

Q. Mr. Wynder, as you sit here today, the only recollection you have of the date that you went to SP Newburgh is the fact that you went there intending to straighten out the gun charge?

A. Correct.

Q. And you don't have any recollection as you sit here today of what you did there or who you spoke to?

A. Not really. I couldn't recall. I didn't know what I said. Again, as I

stated to you, this was January 28, 1998,

WYNDER

right in the middle of the hearings that's already on the record that happened on the 27th of 1998 and 29th of January in trying to have me terminated from my job, so at this point in my time I was heavily sedated again. I really don't recall too much that happened.

All this that we testified to hear is actual testimony and proof that I never, ever used the NYSPIN, never used it while I was logged on under somebody else's name.

As a matter of fact, it was brought to the attention at this hearing that six other white members used it, and we brought that up at the trial and we were quoted -- we were stated that that's not what we're here for, so I know for a fact that I was being targeted because of the color of my skin, and they were trying to make my life as miserable as they can and my working environment --

Q. I just want to try to get direct answers to my questions so that we can

WYNDER

wrap this up at some point. I don't want to cut you short with your answers, but I believe that you've answered the question.

If you have something that you want to add, I'll give you the opportunity at the end of my questions to add that. Okay?

A. Can I just -- so I don't have to come back as to that answer, another reason why I know that I was a target of the State Police because I was black was the fact that Kevin Flynn -- I believe you have -- you have in your notes, Kevin Flynn actually testified that as a white trooper, he actually used the NYSPIN while it was logged on under Keats' name. And he did not -- he was never brought up on charges, and the reason why he wasn't brought up on charges is because they used him as a witness against me.

Now, if rules and regs state you cannot use the terminal while it's logged on somebody else, but because the State

380

WYNDER

Police wanted me off this job, they used somebody who had committed a violation of the rules and regs against me.

Also, to answer your question, Keats did testify that he had supplied a false statement on the hearing, on the stand, under oath, my attorney asked him, what you have today to say is the truth -- what you said on that statement that was taken right after this incident, I believe he replied that no, what I have to say today on the stand is true, what I said on that statement was false and what I have to say today is the truth.

Mr. Merritt, my attorney, asked him, "Trooper, are you aware that you have said that you committed perjury?"

And his answer was, "Yes."

Q. Thank you, Mr. Wynder.

Kevin Flynn, when he used the NYSPIN, is it true that his use of the NYSPIN was in connection with looking up information regarding your gun on that day in SP Newburgh; is that correct?

381

WYNDER

A. From the statement and the evidence, yes.

Q. Did you know Kevin Flynn prior

94979

to the date that you went to SP Newburgh to straighten out your gun?

A. No.

Q. SP Newburgh is about how far from where you were living? You said you were living in Newburgh at the time?

A. Correct. It was about five to six minutes.

Q. That was five to six minutes by car?

A. Correct.

Q. Is that how you got there that day, by car?

A. My wife drove me, or a friend. I didn't really drive that day. I wasn't really driving too much. I didn't have any money.

Q. I'm going to ask you to look at paragraph 148 which reads: "On January 9, 1998, under orders from McMahon, a teletype was released to every New York

382

WYNDER

State trooper revealing plaintiff's sick leave and type of illness, in violation of both contractual rights under the CBA and federal right to privacy."

Did I read that correctly?

A. Yes, you did.

94979

Q. What teletype are you referring to?

A. On December 27, 1997, I signed myself out of the blotter as sick and unable to perform my duties.

Right after that, a File 15 or 25 was sent, I don't recall, stating that I was out on mental stress.

Q. Who was that sent to?

A. Every station.

Q. Did you see a copy of this?

A. Yes.

Q. Do you have a copy of it?

A. Yes, it was provided to you. You should have a copy.

Q. I'm going to ask you, Mr. Wynder, specifically, during to the very last page where you have monetary

383

WYNDER

figures there for each of the claims, can you tell me how those monetary figures were arrived at, if you know?

A. I figured that the fact that I was -- so much suffering and the pain and damages that this job brought me, I lost a promising career, which I can tell you right now was worth millions. Psychological damages that I suffered and

all of the illegal violations that the State Police has done and the fact that this needs to be brought to the attention of the -- for how the State Police, if they did this to me as a member of the State Police, what makes you think -- what do they think they are doing to civilians?

I worked for them and they broke every rule and regulation and laws that they could find in order to get me off this job and have me arrested.

Q. But specifically, Mr. Wynder, how did you arrive at those sums, specifically for the first one, you have

WYNDER

$6,500,000; second one, 5,500,000?

Is there any particular way that you arrived at that calculation?

A. Well, I just figured out, as much damage as they all did to me, I figured that they should pay dearly, so, unfortunately, today, this money would hold me over for what they did to me and what they caused me. I mean my character -- defamation of character.

I'm known to every police agency out there, FBI, Department of Justice,

U.S. Attorney, District Attorney. I mean this was all stated in Lieutenant Barbaria's sworn testimony that he contacted everybody in regards to Trooper Wynder.

So yes, these numbers were made from my own figures as to what I think each of these defendants should pay for what they conspired to do to me.

Q. Let me ask you, regarding your claim for, you said, psychological injuries, prior to the time that you first

WYNDER

saw Dr. Butts, did you ever experience any psychological problems before that?

A. No.

Q. You said that back in 1998, when you went to SP Newburgh to check out the gun, you were very out of it -- I may not be quoting you correctly, but you said that you were taking medication at that time?

A. Yes, I was.

Q. What medication were you taking at that time, if you can recall?

A. I believe I told you that: Prozac, which is why I was driven that day.

Q. When did you stop taking Prozac?

A. Sometime after I received my full disability and I came off the job, I went to sedatives instead of Prozac.

Q. I believe the sedative you mentioned yesterday was Buford (phonetic)?

A. Yes. And there may be some others from Dr. Butts. I believe we gave you a list.

WYNDER

Q. When you first saw Dr. Butts, how often did you see him?

A. I saw him almost every two weeks. Whenever -- and if I needed to see him more -- at that time I was seeing him almost constantly because of the stress and the pressure of still being associated, in my opinion, with a racist organization like the State Police, and I was very upset, and till this day I still see Dr. Butts when I'm stressed; and I still have to see Dr. Butts because I continue to be targeted by the State Police.

I have retired with a permanent disability, awarded a full disability, but yet still I have been denied a shield, retired shield, a retired ID, which is

94979

given to all retired members, but of course because I'm black and I have said the State Police was racist, I was denied that.

I have been awarded Workers' Compensation, which they have stated that

387

WYNDER

I was unlawfully and illegally targeted by State Police which caused my disability and I'm still owed over $30,000 in back pay that everyone is aware, even Workers' Compensation.

So yes, I still see the State -- I still see Dr. Butts, as far as my psychological condition, and, also, the fact that I am still a target of the State Police, because the charges against me for murder and drugs has never been founded, unfounded or closed, so, therefore, in my sight, the State Police still thinks that I did that murder in California and that I'm a drug dealer.

Q. Mr. Wynder, what specific symptoms do you have of the stress that you allege you have? What physical symptoms do you have?

A. Well, fatigue, sometimes I can't keep focused, I have a very low tolerance

94979

now for misjustice that's done. I also have nightmares. I have work stress. I mean at The Wiz, I had to leave for over a

388

WYNDER

month because I was so stressed out by all of the stuff that was still going on with the State Police. Even now I have ups and downs now to the fact that it's been six years and I am still trying to figure out how I filed a complaint in federal court six years ago and the State Police has failed to answer, which shows me that there is racism out there and the system is corrupt and the fact that I'm still paying for it. I thought I would go to the federal government and get satisfaction, but, apparently, the State Police is very powerful, so they can do illegal things.

I do know -- I'm well versed on the law and it states that when you file a complaint, notice of pleadings is all you need. I had a bias judge tell me on the stand that I don't believe the State Police would do this to you because you are black --

Q. Mr. Wynder, all I asked you about at this point was your physical

WYNDER

symptoms, not about the biased judge.

A. My symptoms are still going on.

Q. If this matter were to go to trial, who will your witnesses be?

A. I haven't determined that.

Q. So as of today, you cannot tell me the name of any individual who you intend to call at a trial?

A. Well, due --

MR. MERRITT: I'm going to object to this line of questioning entirely. This case is not scheduled for trial. We have no -- at this point we have given you 26 discovery, which is all we're required to do, there's a list of witnesses with the 26 discovery, and until you answer the complaint, you are not entitled to anymore discovery.

MS. ODESSKY: I think I'm entitled to find out who the witnesses will be --

MR. MERRITT: You are --

MS. ODESSKY: You are cutting me off.

WYNDER

You accused me of cutting you off several times. You haven't let me speak. I'm just answering you.

I believe I am entitled to know who the witnesses are and I will leave a space for that and I will continue my demand to know who the witnesses are if we go to trial, and I also believe I'm entitled to ask about other lawsuits that Mr. Wynder has brought and I will put that in writing, and if you deny that request, then we'll take it up with the judge.

I have nothing further. Thank you.

Insert

MR. MERRITT: I'm not through, since you carried on as far as you did.

MS. ODESSKY: I didn't carry on, and I really object to your mischaracterization of the way that I have been conducting this deposition.

You allowed your client to basically answer my questions and go beyond. I did not cut him off. I tried

391

WYNDER

my best to listen to his statements, which, frankly in large part had little to

do with my questions, and I believe I have been extremely patient; and I think that you have been mischaracterizing what I've said throughout this deposition.

If you have something to say on the record, please put it on now.

MR. MERRITT: Thank you.

EXAMINATION BY

MR. MERRITT:

Q. Was there a time when the New York State and Local Police and Fire Retirement System granted you a full and complete disability retirement?

A. Yes, there was.

Q. Was it stated why that full disability retirement was granted to you by the Police and Fire Retirement System?

A. No, all they said that I was permanently incapacitated from the performance of my duties, and it was alleged that an incident occurred on a specified day and date -- has received

their consideration.

Q. I show you what is labeled the New York State and Local Retirement System, signed by a Peter J. Buckley.

Is this the only correspondence

you ever received --

MS. ODESSKY: Can I see that?

MR. MERRITT: You've seen it but I'm going to ask him the question.

MS. ODESSKY: I think during the deposition I'm entitled to see that document. I'm sure I've seen it within hundreds of other documents, but if you are going to ask him to look at it, I believe I should have a copy of it, as well.

MR. MERRITT: You do have a copy.

MS. ODESSKY: Yes, I would like to see it right now.

MR. MERRITT: I'm going to produce a copy to you just as soon as you copy it on your machine.

MS. ODESSKY: I think before he

WYNDER

answers the question I would like to see the document, and perhaps I might have an objection to it.

So I think a common courtesy of conducting deposition, I should see the document while you are showing it to the witness.

MR. MERRITT: Then the documents

that you marked with the court reporter, A B, C and D, which you didn't provide me with until today, you are saying that you should have produced every one of those, and I should have examined them before you asked questions?

MS. ODESSKY: You have them all.

MR. MERRITT: Would you like to see the document? Why don't you take a look at this document?

MS. ODESSKY: Yes, I will. Thank you.

MR. MERRITT: You are more than welcome. Tell me you haven't seen it before.

MS. ODESSKY: I didn't say I

haven't seen it.

Can I finish? All I said, Mr. Merritt, was I need to see it before you ask the witness about it.

MR. MERRITT: Let the record reflect that that particular document has been an exhibit in at least four motions that have already been applied for by Miss Odessky. She has made three motions on 12(b)6 --

MS. ODESSKY: Yes, I see that.

MR. MERRITT: She's had an opportunity to read the document and look at it.

MS. ODESSKY: Until you showed it to me now, Mr. Merritt, I didn't know which of the hundreds of documents that are in this case you're referring to.

Now I have seen it and you can show it to the witness.

MR. MERRITT: Thank you.

BY MR. MERRITT:

Q. Mr. Wynder, that document which I showed you, which is signed by Peter J.

Buckley, is that the only correspondence that you ever had from the State Police declaring your disability?

A. Correct.

MR. MERRITT: That's all I have. Thank you very much.

Let the record reflect that Miss Odessky has stated today that she does not have a witness to produce and she has adjourned the depositions for her witnesses at least three times and that we also have a court ordered letter and it was directed to Magistrate Pollack, dated May 8, 2005, which Magistrate Pollack

endorsed and signed so ordered that the following witnesses would be produced and the dates listed and I will read now are James McMahon, March 17, 2005; David Spahl, March 18, 2005; Robert Jones, March 24, 2005; Louis Barbaria, March 25, 2005; Craig Masterson, March 28, 2005, and Josh Keats, March 31, 2005.

Miss Odessky stated today she will not produce those witnesses.

WYNDER

MS. ODESSKY: Just for the record, Mr. Merritt is well aware that that schedule had been changed subsequently to its being issued, it had been changed during the conference.

It was my understanding that we were to get through the deposition of Mr. Wynder, which we have just concluded today.

I have been attempting, Mr. Merritt, to get the witnesses to be deposed during the month of August, but, unfortunately, due to vacation schedules, including my own schedule, which includes my being out of town from August 22 and returning September 6, I have been unable to do that.

I'm certainly willing and able to schedule witnesses in the week containing Labor Day, from September 6 on, and I'm willing to work with Mr. Merritt to schedule those witnesses and go forward with their depositions.

MR. MERRITT: Miss Odessky,

WYNDER

you'll have to give me specific dates that you are going to produce witnesses, because you have adjourned them and made false statements to the court and false statements about that order. That order was never altered by any magistrate or any judge and you know it was never altered.

You were required to produce those witnesses, you have failed to do so from day one, and you still cannot give me a date certain for the production of any of your witnesses in this case; and until you can, I will not make any deals with you or work with you. You must give me dates.

MS. ODESSKY: Mr. Merritt, do you have a calendar with you? If you have a calendar, I'm willing to settle on dates with you and I will call you back and let you know what witnesses we will have on

which of those dates, but you need to tell me dates that you will be available.

MR. MERRITT: You give me the dates that you have available, you write

them in a letter to me, you address it to the magistrate and get approval, the same way I've been required to do up until now. I got my letter approved and signed by the magistrate.

MS. ODESSKY: That schedule you know full well, Mr. Merritt, was altered and there was a conference with the judge about that, and, also, I don't appreciate you saying on the record that I made false statements. That's absolutely incorrect.

I'll send it to you in a letter and then we can discuss it.

MR. MERRITT: The facts are, Miss Odessky, that you not only have made false statements to me, you lied to a Federal District Court judge when you said you had permission to file a late motion.

WYNDER

MS. ODESSKY: That's not on the record. If you want to totally misconstrue the record, that's fine. But this deposition is at an end.

MR. MERRITT: Thank you.

(Time noted: 2:50 p.m.)

KENNETH N. WYNDER, JR.

Subscribed and sworn to before me

this day of , 2005

C E R T I F I C A T I O N

I, TAMMY O'BERG, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, KENNETH N. WYNDER, JR., was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

TAMMY O'BERG

94979

E X H I B I T S

| DEFENDANTS' EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| D | Charge of discrimination | 220 |

| EXAMINATION BY | PAGE |
| --- | --- |

94979

MS. ODESSKY 213

MR. MERRITT 391

LITIGATION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

Page Line Page Line

94979

REQUEST FOR PRODUCTION OF DOCUMENTS

| Page | Line | Page | Line |
|---|---|---|---|

INFORMATION TO BE FURNISHED

| Page | Line | Page | Line |
|---|---|---|---|
| 233 | 15 | 389 | 20 |

QUESTIONS MARKED FOR A RULING

| Page | Line | Page | Line |
|---|---|---|---|