UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

KENNETH WYNDER,

              Plaintiff,                        Memorandum and Order

                                                  99 Civ. 772 (ILG) (CLP)

     - against -

JAMES MCMAHON, ET AL.,

              Defendants.
------------------------------------------------------x

GLASSER, United States District Judge:

       This Memorandum and Order addresses the defendants' motion for summary judgment in a case that was commenced more than fourteen years ago, the history of which is reflected on a docket sheet of 254 entries. A procedural history of this case is provided in a Memorandum and Order ("Order") deciding the defendants' Rule 12(b)(6) motion dated August 27, 2008. Dkt. No. 141. A broad overview of that history begins with the dismissal of the original Complaint <u>sua</u> <u>sponte</u> by the judge to whom the case was originally assigned on the ground that the Complaint failed to logically articulate the theory of the case or the claims asserted. The dismissal was without prejudice and with leave to replead. Dkt. No. 38. The First Amended Complaint was filed shortly thereafter and was again dismissed <u>sua</u> <u>sponte</u> for essentially the same reasons. The plaintiff was again granted leave to replead. Dkt. No. 51. After the plaintiff filed a Second Amended Complaint, the Court dismissed the complaint, on that occasion without leave to amend. Dkt. No. 64.

The plaintiff appealed to the Second Circuit which found that the Second Amended Complaint satisfied Rule 8 of the Federal Rules of Civil Procedure and remanded the case.  Wynder v. McMahon, 360 F.3d 73 (2d Cir. 2004).  On remand, the plaintiff filed a Third Amended Complaint which was reassigned to this Court upon the plaintiff's request.  When the Clerk of the Court erroneously entered final judgment in favor of the defendants, the plaintiff, rather than move to amend the judgment to correct the clear error, appealed to the Second Circuit again, which vacated the judgment.  Wynder v. McMahon, 184 F. App'x 92 (2d Cir. 2006).

On remand and upon defendants' motion to dismiss the Third Amended Complaint, the Court dismissed many of Mr. Wynder's claims.  Dkt. No. 141.  Three years after that decision, in 2011 the plaintiff moved to file a Fourth Amended Complaint to include New York State as a defendant which Magistrate Judge Pollak denied.  This Court upheld the denial, noting that it had already decided the issue in its 2008 Order and that "plaintiff has been on notice since at least 1999 that, as a matter of law, New York State was a proper party" but never named it as a defendant.  Dkt. No. 222.  The plaintiff promptly made a "Motion for Reconsideration and to Renew" but in fact did not argue for reconsideration of the denial and instead sought to relitigate an entirely separate issue on meritless grounds.  The Court denied the motion and, after the plaintiff's counsel opposed threatened sanctions by rearguing the same issues raised in the motion for reconsideration, the Court imposed sanctions pursuant to 28 U.S.C. § 1927.  Dkt. Nos. 228, 237 & 245.

The defendants, James McMahon, David Spahl, Robert Jones, Louis Barbaria, Craig Masterson, and Josh Keats (collectively, "defendants"), now move for summary judgment on the plaintiff's four remaining claims: (1) disparate treatment under 42

2

U.S.C. §§ 1981 and 1983, the New York State Human Rights Law ("NYSHRL"), and the New York State Constitution; (2) procedural due process under § 1983; (3) hostile work environment under §§ 1981 and 1983, NYSHRL, and the New York State Constitution; and (4) retaliation under NYSHRL and the New York State Constitution.[1] The defendants argue that the plaintiff cannot establish the claims as a matter of law and assert defenses of absolute immunity and qualified immunity. For the following reasons, the defendants' motion is GRANTED.

## FACTUAL BACKGROUND

Kenneth Wynder ("plaintiff" or "Wynder") is an African-American man who was employed as a state trooper by the New York State Police ("NYSP") between 1987 and 1999. He claims that during the course of his employment he was subjected to discriminatory treatment and a hostile work environment because of his race. Mr. Wynder's host of allegations are described in detail in this Court's previous Order, familiarity with which is assumed. See Order at 1–13. The facts pertinent to the pending motion, either undisputed or, where disputed, viewed in the light most favorable to Mr. Wynder, are as follows.[2]

---

[1] The disparate treatment and hostile work environment claims brought pursuant to § 1983 allege violation of the Equal Protection Clause of the Fourteenth Amendment. See Order at 51; West v. Atkins, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States . . . .").

[2] Mr. Wynder's 706-page opposition brief does not contain a 56.1 counterstatement as required by Local Civil Rule 56.1. Facts asserted in the 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted" by the 56.1 counterstatement. Local Civ. R. 56.1(c). Accordingly, defendants ask the Court to deem all their asserted facts to be admitted. Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment ("Defs.' Reply") at 4–6 (Dkt. No. 247). Defendants rightly point out that this failure to submit a 56.1 counterstatement in such a heavily factual case is inexcusable. Nevertheless, this Court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules," and may "opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," which the Court has done in this case. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (quotation omitted).

### A. New York State Police Academy

Mr. Wynder graduated from the NYSP Academy in 1987 and began his employment with NYSP immediately.  Wynder Deposition Day I ("Wynder Dep.") at 14, 30 (Dkt. No. 253).[3]  After working as a trooper at NYSP's Peekskill station for five years, in 1992 he transferred to work at the Academy as a basic counselor.  Id. at 30–31, 39, 41.  At the Academy, Mr. Wynder refused to run with recruits or perform other chores that other counselors did.  Id. at 46–48.  Mr. Wynder believed that running with recruits is not part of a counselor's job.  Id. at 46.  Defendants assert that it is.  Defendants' Rule 56.1 Statement ("Defs.' 56.1") ¶ 5 (Dkt. No. 239).  Mr. Wynder claimed that because of this refusal, Captain Masterson, Assistant Director of the Training Academy, told him that he would not return as a counselor for the next session.  Wynder Dep. at 49.

Mr. Wynder contacted Lieutenant Cook, the affirmative action officer at NYSP, to complain about Masterson's refusal to allow him to return and to inform Cook that there were no minority academic instructors at the Academy.  Id. at 50–51.  Shortly thereafter, Masterson told Mr. Wynder that he would return for the next session, but as an instructor rather than as a counselor.  Id. at 53–55; Defs.' 56.1 ¶ 8.  Defendants assert that the promotion was intended to remedy the lack of minority instructors.  Id.  Mr. Wynder construed the promotion as a punishment for complaining; he also thought that he was set up to fail because he was unqualified for the position.  Wynder Dep. at 55–57.

---

[3] Defendants originally submitted only a portion of the transcript from Mr. Wynder's deposition, as is within their rights.  See Tycoons Worldwide Grp. (Thailand) Public Co., Ltd. v. JBL Supply Inc., 721 F. Supp. 2d 194, 201 (S.D.N.Y. 2010) ("[T]he local rules contemplate that, as appropriate, parties may submit deposition excerpts rather than full transcripts in support of motions filed with the Court." (citing Local Civ. R. 5.1)).  Mr. Wynder failed to submit any portion of the transcript from his own deposition, despite the fact that a majority of his allegations are discussed only in his deposition testimony and not in any of his submitted exhibits.  The Court requested that defendants submit a complete transcript of Mr. Wynder's deposition, which they did.

Prior to assuming his position as an instructor, Mr. Wynder was required to attend the Academy's Instructor Development School.  Defs.' 56.1 ¶ 9; Wynder Dep. at 14, 59.  He claimed that he was thereafter assigned to teach a course that recruits were required to pass to remain in the Academy and that he felt pressured when Masterson observed his classes but not the classes of others.  Id. at 59–60, 63–64.  Mr. Wynder believed that Masterson attempted to have him removed from his position after the first two classes of the session but that after complaining to Cook, he was permitted to stay on as an instructor.  Id. at 64, 67.  At the end of the session, in 1993 Mr. Wynder returned to the Peekskill station as a trooper; six months later, he was transferred to the Hawthorne station and remained there until he retired in 1999.  Id. at 85, 88, 93–94.

### B. Internal Affairs Bureau Investigations

Around November 1996, the Internal Affairs Bureau ("IAB") of NYSP began investigating Mr. Wynder based on a confidential source's allegations that, among other things, Mr. Wynder had committed a drug-related homicide in California and then reported his gun stolen to cover up that crime.  Fitzgerald Declaration ("Fitzgerald Decl."), Ex. C (Dkt. No. 241).  Mr. Wynder claimed that his gun had been stolen in 1989 during his vacation in California with Christopher Downing, a U.S. Customs agent, and NYSP Trooper Keith Forte.  Wynder Deposition Day II ("Wynder Dep. II") at 78–79, 85, 89 (Dkt. No. 254).  The investigation did not corroborate any of the source's accusations, but IAB determined that Mr. Wynder had not complied with NYSP regulations requiring him to report his stolen weapon.  Defs.' 56.1 ¶ 35.

During the course of the investigation, Lieutenant Barbaria, one of the IAB investigators, contacted U.S. Customs about Mr. Wynder's trip to California with Downing and Forte.  Id. ¶ 43; Fitzgerald Decl., Ex. D.  Barbaria learned that Mr. Wynder

and Downing were involved in a business called "For You Enterprises." Defs.' 56.1 ¶ 42; Fitzgerald Decl., Ex. D; Wynder Dep. at 159–65.[4] Based on this information, Gregory Schreffler of the NYSP Financial Crimes Unit conducted a financial background investigation of Mr. Wynder and discovered that he had filed for bankruptcy three times and that the third petition appeared to contain false information. Defs.' 56.1 ¶ 45.

Mr. Wynder believed that he was harassed throughout the investigation, claiming, among other things, that (1) IAB subpoenaed his bank records and, in the process, told his bank that he was under criminal investigation; (2) Captain Spahl, the station commander at NYSP's Hawthorne station, told other troopers that Mr. Wynder was under criminal investigation, that he was "dirty," and that he "should be stayed away from"; and (3) Spahl directed an ostensibly random drug test at the Hawthorne station to be rescheduled from a date on which Mr. Wynder was out on sick leave to the day after he returned to work. Wynder Dep. at 130–32, 181–85; Wynder Dep. II at 26, 42–47, 52–53, 59.

### C. First Disciplinary Hearing

On December 22, 1997, NYSP charged Mr. Wynder with filing a false bankruptcy petition and engaging in outside employment without authorization. Durden Declaration ("Durden Decl."), Ex. D (Dkt. No. 240). A disciplinary hearing was held on January 27 and 29, 1998, where Captain Jones presented the charges against Mr. Wynder before a hearing board. Durden Decl., Exs. E & F. McMahon accepted the findings and recommendations of the hearing board, finding Mr. Wynder not guilty of the false bankruptcy petition charge but guilty of the unauthorized outside employment

---

[4] Various exhibits in this case reflect different names for Mr. Wynder's business. The Court uses the name that Mr. Wynder identified during his deposition. See Wynder Dep. at 159.

charge.  Durden Decl., Ex. H.  As a result, Mr. Wynder was suspended without pay for

five days, formally censured for his conduct, and put on probationary status for six

months.  Id.

### D. Second Disciplinary Hearing

Mr. Wynder claimed that on January 20, 1998, and again on January 27,

Barbaria informed him that because of his earlier failure to properly report his stolen

gun, the gun listing in the NYSP computer system ("NYSPIN") needed to be corrected.

Wynder Dep. II at 143–44.  On January 28, Mr. Wynder went to NYSP's Newburgh

station to correct the listing.  Id. at 144.  After a superior officer denied him access to the

NYSPIN terminal, Mr. Wynder reentered the station and accessed the terminal.  Durden

Decl., Ex. M.

In a subsequent IAB investigation, it was discovered that Mr. Wynder had

accessed the terminal through the log-in of Trooper Keats.  Id.  At that time, Keats told

IAB that he had logged off the terminal on January 28 when he had finished using it.

Defs.' 56.1 ¶ 76.  At some later point, Keats realized that, in fact, he had neglected to log

off the terminal on that day but had mistakenly told IAB that he had logged off because

his customary practice was to log off when he had finished using the terminal.  Durden

Decl., Ex. K (Keats Dep.) at 54.  On May 11, 1999, NYSP held a disciplinary hearing

regarding Mr. Wynder's conduct at the Newburgh station and, as a result of the findings

of the hearing board, he was suspended without pay for ten days, formally censured, and

put on probationary status for six months.  Durden Decl., Ex. L.

### LEGAL STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law."  Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (quotation omitted).

The moving party bears the burden of establishing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  Id. at 322–23.  To defeat a motion for summary judgment, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)), and cannot "rely on conclusory allegations or unsubstantiated speculation."  Id. (quotation omitted).

A court deciding a motion for summary judgment must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation omitted).  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

**DISCUSSION**

**I. § 1981 Claim**

Title 42 U.S.C. § 1981 provides the substantive right that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts," while § 1983 provides the exclusive legal remedy for violations of § 1981 by state actors.  Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989); Patterson v. Cnty of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004); see also Rehman v. State Univ. of N.Y. at Stony Brook, 596 F. Supp. 2d 643, 654 (E.D.N.Y. 2009) (extending this principle to actions against individual state actors in their individual capacities).  Defendants seek to dismiss Mr. Wynder's § 1981 claim for disparate treatment and hostile work environment on the basis of Jett.  Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs.' Mem.") at 13 (Dkt. No. 242).

When a plaintiff alleges § 1981 and § 1983 claims for the same conduct, a court may dismiss the § 1981 claim or deem it merged with the § 1983 claim; the result, in practice, is the same.  See Gladwin v. Pozzi, No. 06 Civ. 0650 (SCR) (JFK), 2010 WL 245575, at *7 (S.D.N.Y. Jan. 22, 2010); Perry v. Metro. Suburban Bus Auth., 319 F. Supp. 2d 338, 341–42 (E.D.N.Y. 2004).  When the Court previously analyzed Mr. Wynder's § 1981 and § 1983 claims in tandem at the motion to dismiss stage, it effectively deemed the § 1981 claim merged with the § 1983 claim.  See Order at 64–76. To resolve any remaining ambiguity, Mr. Wynder's § 1981 claim, as an independent cause of action, is dismissed.

## II. Absolute Immunity

Absolute immunity from civil liability is accorded to judges and prosecutors for actions taken in their official capacities, as well as to government officials performing analogous functions.  DiBlasio v. Novello, 344 F.3d 292, 296–97 (2d Cir. 2003).  Such immunity "'defeats a suit at the outset, so long as the official's actions were within the

scope of the immunity.'" <u>Root v. Liston</u>, 444 F.3d 127, 130–31 (2d Cir. 2006) (quoting

<u>Imbler v. Pachtman</u>, 424 U.S. 409, 419 n.13 (1976)).  "The process for determining

whether a given defendant is entitled to absolute immunity involves two steps: first, the

court must determine whether the administrative hearing in which the defendant

participated was judicial in nature . . . ."  Order at 40 (citing <u>DiBlasio</u>, 344 F.3d 292).  To

do so, the court must consider six criteria:

> (a) the need to assure that the individual can perform his
> functions without harassment or intimidation; (b) the
> presence of safeguards that reduce the need for private
> damages actions as a means of controlling unconstitutional
> conduct; (c) insulation from political influence; (d) the
> importance of precedent; (e) the adversary nature of the
> process; and (f) the correctability of error on appeal.

<u>Cleavinger v. Saxner</u>, 474 U.S. 193, 202 (1985) (citing <u>Butz v. Economou</u>, 438 U.S. 478,

512 (1978)).  If the court finds that, "upon a balancing of all the factors," the hearing

qualifies as judicial in nature, <u>see</u> <u>Wetzel v. Town of Orangetown</u>, No. 06 Civ. 6117

(SCR), 2010 WL 743039, at *5 (S.D.N.Y. Mar. 2, 2010), it must then determine "whether

the defendant's role in that hearing was analogous to that of a judge or prosecutor in a

traditional judicial proceeding."  Order at 40 (citing <u>DiBlasio</u>, 344 F.3d 292).  Witnesses

at such hearings are also entitled to absolute immunity.  Order at 45 (citing <u>Cleavinger</u>,

474 U.S. at 200).

Defendants raise the defense of absolute immunity for Captain Jones as NYSP's

assistant counsel at Mr. Wynder's first disciplinary hearing and Trooper Keats as a

witness in the second disciplinary hearing.  Defs.' Mem. at 18–24.  The Court previously

rejected defendants' assertion of this defense at the motion to dismiss stage with leave to

renew it with more developed factual bases so that the Court could properly determine

whether those hearings were "functionally equivalent to judicial proceedings"; whether

Jones' role was "sufficiently prosecutorial"; and whether Keats was a witness.  Order at

39–47.  Defendants now reassert the defense, offering evidence to support it.

The weight of the <u>Butz</u> factors indicates that the NYSP disciplinary hearings were

judicial in nature.  <u>Bohmer v. New York</u>, 684 F. Supp. 2d 357, 364 (S.D.N.Y. 2010) is

instructive and precisely applicable here.  Applying the <u>Butz</u> factors, the court found:

> First, . . . it is very important for NYSP to be able to conduct
> disciplinary hearings free from harassment or intimidation
> because of the public's interest in having police officers who
> follow the law and behave according to NYSP codes of
> conduct.  Second, the rules and regulations governing these
> proceedings establish an adversarial process in which there
> are many safeguards to protect the accused officer from
> abuse.  Many of them are analogous to the safeguards in
> judicial proceedings . . . .  Third, any errors in the proceeding
> can be corrected by appealing the superintendent's decision
> in state court, pursuant to Article 78 of CPLR.

<u>Id</u>.[5]  The regulations governing Mr. Wynder's disciplinary hearings and the record of the

first hearing demonstrate that the hearings had procedural safeguards and were

adversarial in nature:  Mr. Wynder chose one member of the three-person hearing

board and was represented by counsel of his choice,[6] who called witnesses, cross-

examined witnesses, submitted evidence, and made opening and closing statements.

<u>See</u> 9 New York Code of Rules and Regulations (NYCRR) §§ 479.7–.8; Durden Decl.,

Exs. E, F, H, J.

Additionally, there is no evidence or even a suggestion that the hearing board is

subject to outside influence.  The board is required to make an "independent decision"

and is not "bound by any prior determination or recommendation."  9 NYCRR § 479.8.

---

[5] <u>But see</u> <u>DiBlasio</u>, 344 F.3d at 299 ("[I]n the context of determining whether absolute immunity
is appropriate, Article 78 proceedings are generally not considered adequate avenues for
'appeal.'" (citation omitted)).

[6] In fact, he was represented by Mr. Merritt, his counsel in this action.  <u>See</u> Durden Decl., Ex. E.

The board members also must "refrain" from discussing the hearing or their deliberations "unless the superintendent or counsel for the parties consult them in their capacity as officers of the hearing board." Id.  Although NYSP's superintendent designates two of the three members of the hearing board and reviews the board's findings and recommendations, 9 NYCRR § 479.7–.8, there is no evidence or even a suggestion that the members are pressured to please the superintendent by finding in favor of NYSP over their colleague.[7]  Finally, the importance of precedent in the context of these disciplinary hearings is simply irrelevant; one would not expect prior decisions of these hearing boards to have precedential value.  In any event, this factor does not outweigh the other five factors, which strongly indicate that the hearing was judicial in nature.

The Court must next determine whether Jones functioned as a prosecutor in Mr. Wynder's first hearing and whether Keats was a witness in the second hearing.  It is evident that Jones functioned as a prosecutor:  He was assigned by NYSP's division counsel to represent NYSP at the hearing, he made opening and closing arguments, and he called witnesses and submitted evidence to prove that Mr. Wynder was guilty of the charges.  See Durden Decl., Exs. E & F; Pl.'s Ex. 16 (McMahon Dep.) at 83.  As the functional equivalent of a prosecutor, Jones is entitled to absolute immunity.  See DiBlasio, 344 F.2d at 296–97.  Therefore, none of Mr. Wynder's claims against Jones may proceed.

With respect to Keats, the Court previously observed that the Complaint was unclear as to whether Mr. Wynder seeks to impose liability on Keats on the basis of his

---

[7] Indeed, McMahon stated that he generally delegated the task of choosing board members and that he was not aware of who participated as board members in Mr. Wynder's hearings.  Pl.'s Ex. 16 (McMahon Dep.) at 81.

statement to IAB during the investigation or on the basis of his testimony at the second disciplinary hearing.  Order at 45–47.  It is now apparent that Mr. Wynder objects to Keats' statement to IAB, which implicated Mr. Wynder, and not to Keats' testimony at the hearing, in which Keats explained that his prior statement to IAB had been mistaken.  See Durden Decl., Ex. M; Pl.'s Ex. 21.  While witnesses who testify in judicial proceedings or their functional equivalent are protected by absolute immunity, see Cleavinger, 474 U.S. at 200; Rolon v. Henneman, 517 F.3d 140, 145–46 (2d Cir. 2008), in this case, Keats' statement to IAB was made during the course of IAB's investigation, almost a year before the disciplinary hearing was held.  See Durden Decl., Exs. L & M.  Therefore, Mr. Wynder's inexplicable hostile work environment claim against Keats is not precluded by absolute immunity, although it is meritless, as will be discussed infra.

## III. Disparate Treatment Claim

At the summary judgment stage, under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff must first establish a prima facie case of disparate treatment "by demonstrating that: (1) [he] is a member of a protected class; (2) [his] job performance was satisfactory; (3) [he] suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination."  Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006).  If the plaintiff establishes a prima facie case, then the defendant must articulate "a legitimate, non-discriminatory reason for the action."  Id.  If the defendant meets his burden, then the plaintiff must "prove discrimination, for example, by showing that the employer's proffered reason is pretextual."  Id.[8]

_____

[8] Disparate treatment and hostile work environment claims alleging denial of equal protection under § 1983 are evaluated using the same legal standards as such claims alleging violation of

Defendants move for summary judgment on Mr. Wynder's disparate treatment claim under § 1983[9] for his assertion that Masterson ordered him to perform manual labor as a counselor at NYSP Academy that white counselors were not required to do, arguing that Mr. Wynder has failed to raise an inference of discrimination.  Defs.' Mem. at 25–27; see Third Amended Complaint ("Compl.") ¶ 20.  Raising an inference of discrimination in a disparate treatment claim requires "a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group."  Ruiz v. Cnty. of Rockland, 609 F.3d 486, 493 (2d Cir. 2010) (internal quotation omitted).  Mr. Wynder's deposition testimony establishes that he was ordered to perform the same manual labor as white counselors:

> A: . . . I did not know how to do carpentry and I did not run with the recruits.
>
> Q: When you say "run with the recruits," physically run?
>
> A: Physically run with the recruits, which is not my job description as a counselor.  I did that when I was a recruit.
>
> . . .
>
> Q: Any troopers who are members of a minority who did either the carpentry or running with the recruits?
>
> A: No.  They were all white.
>
> . . .
>
> Q: Were other individuals that were up there as counselors or instructors, did they do errands?
>
> A: Oh, yes, they did.  They went along with the program.
>
> . . .
>
> Q: Who was asking for these errands to be done?

---

Title VII, but a plaintiff alleging a § 1983 violation must also show that the discrimination was intentional.  Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 225–26 (2d Cir. 2004) (citations omitted).

[9] Mr. Wynder's disparate treatment claim is also brought pursuant to NYSHRL and the New York State Constitution.  His state law claims are discussed collectively, infra.

> A: A lot of it was Captain Masterson.  He would call you into the office and tell you, "Go wash my car down the block. . . ."
>
> Q: The other individuals who were doing these errands, were they minorities?
>
> A: No, they were white, and that's what Masterson meant by I wouldn't go along with the program.  I wouldn't do everything that they asked me to do.

Wynder Dep. at 46–48, 70–72.

Mr. Wynder's testimony establishes that Masterson did not treat him less favorably than white counselors.  Indeed, Mr. Wynder indicated no less than five times during his deposition that he refused to run with recruits or run errands because he did not believe it was in his job description to do so; he never suggested that he refused because he was asked to perform these activities while white counselors were not.  See id.  Accordingly, defendants' motion for summary judgment on this claim is granted.

## IV. Procedural Due Process Claim

Mr. Wynder alleges four violations of due process under § 1983, all in connection with his first disciplinary hearing:  (1) Jones hid exculpatory evidence obtained from Sergeant Nohai on the first day of the disciplinary hearing and declined to call Nohai as a witness;[10] (2) defendants refused to produce the subpoena used to obtain Mr. Wynder's bank records which were introduced into evidence at the hearing; (3) defendants refused to produce Schreffler of the NYSP Financial Crimes Unit as a material witness; and (4) defendants denied Mr. Wynder pre-hearing discovery, including copies of his personnel file.  See Compl. ¶¶ 115–17, 121–136; Order at 63.[11]

---

[10] The Court previously noted that the Complaint alternately spells the sergeant's name as "Nohia" and "Nohai" and assumed that "Nohia" was the correct spelling.  Order at 9 n.12.  The record now reveals that "Nohai" is the correct spelling.  See, e.g., Durden Decl., Ex. F at 112.

[11] Absolute immunity prevents this claim from proceeding against Jones, but the Court considers the claim to the extent it is brought against McMahon, Masterson, and Barbaria.

Defendants argue that the alleged procedural due process violations are without merit. See Defs.' Mem. at 35–40.

The Court applies a two-step inquiry to Mr. Wynder's procedural due process claim, determining "(1) whether [he] possessed a liberty or property interest and, if so, (2) what process he was due before he could be deprived of that interest." Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 313 (2d Cir. 2002).

### A. Property Interest

The Complaint asserts that Mr. Wynder's "[c]ontractual rights contained in the Collective Bargaining Agreement between PBA [presumably, the Police Benevolent Association] and NYSP have been deemed property rights." Compl. ¶ 136. Previously, the Court observed that it was "not aware of any federal case in which the rights of NYSP officers under their Collective Bargaining Agreement have been held to constitute property rights cognizable under the Due Process Clause," but granted Mr. Wynder "the benefit of the inference to which he is entitled at this stage of the proceedings that this portion of the Complaint states a constitutional violation." Order at 63–64.

Courts have held that collective bargaining agreements may provide property interests protected by the Fourteenth Amendment. See, e.g., Ciambriello, 292 F.3d at 314 ("We have repeatedly recognized that a collective bargaining agreement may give rise to a property interest in continued employment."); Danese v. Knox, 827 F. Supp. 185, 190–91 (S.D.N.Y. 1993) (collecting cases). Mr. Wynder apparently alleges that his five-day unpaid suspension, formal censure, and being placed on probation for six months at the conclusion of the first disciplinary hearing were property interests provided by his Collective Bargaining Agreement ("CBA") of which he was deprived without due process. See Durden Decl., Ex. H. However, the Court must examine the

16

specific provisions of Mr. Wynder's CBA to determine whether they afford him those property interests.  See Ciambriello, 292 F.3d at 314 (examining specific provisions of a CBA to determine whether it gave the plaintiff a property interest in the position from which he was demoted); Danese, 827 F. Supp. at 191 ("[T]he issue in this case is not whether a collective bargaining agreement can create a protected property interest, for it can.  Rather, the issue is whether the right that this particular collective bargaining agreement allegedly creates . . . is a property right which is subject to due process protection.").  Because Mr. Wynder's CBA is not before the Court, it cannot properly make this determination.[12]

Nevertheless, even assuming arguendo that Mr. Wynder's CBA provides such a property interest, and even assuming that such a property interest rises to the level of being protected by the Due Process Clause,[13] as a matter of law, Mr. Wynder received all the process that he was due.

### B. The Process Due

"'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'"  Ciambriello, 292 F.3d at 319 (quoting Mathews v. Eldridge, 424 U.S. 319, 334 (1976)).  "In determining how much process is due, a court must weigh (1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the value of other safeguards, and (3) the

---

[12] Despite direct indication from this Court in its previous Order that it needed more information about the CBA to properly assess the procedural due process claim, Mr. Wynder does not provide the CBA as an exhibit.  Defendants do not brief the issue, arguing only that even if Mr. Wynder has a property interest, which they do not concede, he received due process. Defs.' Mem. at 36.

[13] See Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 269–70 (S.D.N.Y. 2005) (noting that it is unsettled in this circuit whether an unpaid suspension constitutes a property interest within the meaning of the Fourteenth Amendment).

government's interest." Spinelli v. City of New York, 579 F.3d 160, 170 (2d Cir. 2009) (citing Mathews, 424 U.S. at 335). The touchstone of due process is the requirement that a person facing deprivation of property be given notice of the case against him and the opportunity to be heard. Id. at 169 (citing Mathews, 424 U.S. at 348–49). The essence of the opportunity to be heard is the "opportunity to present reasons, either in person or in writing, why proposed action should not be taken"; in other words, the accused is entitled to the "opportunity to present his side of the story." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985).

Other courts in this circuit have concluded that, in the context of a police officer facing suspension, notice and an opportunity to be heard are both necessary and sufficient to satisfy due process. See MacFall v. City of Rochester, 746 F. Supp. 2d 474, 486 (W.D.N.Y. 2010); Munno, 391 F. Supp. 2d at 270; Gates v. Sicares, 706 F. Supp. 169, 173 (D. Conn. 1989). In this case, Mr. Wynder had notice of the charges against him because he was served with the charges one month prior to the disciplinary hearing. See Durden Decl., Exs. D & E. He also had the opportunity to be heard on the charges prior to being disciplined. At the two-day hearing, Mr. Wynder testified at length and he was represented by counsel who presented a defense. See Durden Decl., Exs. E & F.

Moreover, Mr. Wynder had the opportunity to be heard on his four specific allegations of due process violations because his counsel challenged and objected to them during the disciplinary hearing. The board heard all four objections and ruled against Mr. Wynder on all of them. See Durden Decl., Ex. E at 10–16 (subpoena), 92–111 (denial of discovery) & Ex. F at 102–12 (Schreffler), 112–84 (Nohai). The opportunity to be heard does not mean the right to win, and Mr. Wynder was accorded

18

all the process, procedural and substantive, that was his due.[14]  Defendants' motion for summary judgment on this claim is granted.

## V. Hostile Work Environment Claim

"To defeat a motion for summary judgment on a claim of racially hostile work environment, a plaintiff must produce evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment."  Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 227 (2d Cir. 2004) (quotation and alterations omitted).  The evidence must demonstrate that the misconduct created an objectively hostile environment, that the plaintiff subjectively perceived it as hostile, and that the hostility was motivated by the plaintiff's race.  Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 694 (2d Cir. 2012).  Whether the alleged conduct creates a hostile work environment is "decided based on the totality of the circumstances, in light of such factors as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Patterson, 375 F.3d at 227 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  To  establish the claim

---

[14] Furthermore, Mr. Wynder entirely misrepresents what occurred with respect to Nohai and Schreffler.  Nohai was not an exculpatory witness; he testified that Mr. Wynder's application for outside employment was denied at the zone level and that he informed Mr. Wynder of that fact.  See Durden Decl., Ex. F at 154–65.  Indeed, the board specifically noted that it found Mr. Wynder guilty of engaging in unauthorized outside employment based, in part, on Nohai's testimony.  See Durden Decl., Ex. H at 1160.  Moreover, Mr. Merritt called Nohai as a witness and had ample opportunity to examine him.  See Durden Decl., Ex. F at 112–84.  Additionally, Schreffler was not denied as a witness; the hearing board ruled that Mr. Wynder could call Schreffler, but only to question him about specific documents already in evidence that related to Schreffler's investigation, and not about the internal operations of the NYSP Financial Crimes Unit.  Mr. Merritt then chose not to call Schreffler as a witness.  See Durden Decl., Ex. F at 108–12.

under § 1983, the plaintiff must also show that the discrimination was intentional.  Id. at
226–27.

Defendants move for summary judgment on Mr. Wynder's hostile work
environment claim alleging a denial of the Equal Protection Clause under § 1983,[15]
arguing that Mr. Wynder proffers no evidence that actions were taken because of his
race, and that he "complains about personnel action with which he disagrees, which
were not severe, pervasive or threatening."  Defs.' Mem. at 43.  "[L]iability for an Equal
Protection Clause violation under § 1983 requires personal involvement by a defendant,
who must act with discriminatory purpose."  Reynolds v. Barrett, 685 F.3d 193, 204 (2d
Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  Therefore, the Court
considers whether each defendant, with the exception of Jones, who is protected by
absolute immunity, personally engaged with discriminatory purpose in enough conduct
that created a hostile work environment.

**A. Superintendent McMahon**

To maintain a hostile work environment claim against McMahon under a theory
of supervisory liability, Mr. Wynder must prove that McMahon directly participated in
creating the hostile environment or that he created a policy or custom under which the
hostile environment existed.  See Sash v. United States, 674 F. Supp. 2d 531, 543
(S.D.N.Y. 2009).[16]  Defendants argue that Mr. Wynder proffers no evidence that

---

[15] Mr. Wynder's hostile work environment claim is also brought pursuant to NYSHRL and the
New York State Constitution.  His state law claims are discussed collectively, infra.

[16] In its prior Order, the Court cited the then-accepted standard for supervisory liability in a
§ 1983 action, where a plaintiff could establish liability through one of five ways under Colon v.
Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  See Order at 82.  It then determined that the
Complaint sufficiently alleged two of those five ways, direct participation in the violation and
creating a policy under which the violation occurred.  Id.  Since that Order was issued in 2008,
the Supreme Court changed the standard for supervisory liability in Ashcroft v. Iqbal, 556 U.S.

McMahon was directly involved in any of the allegedly harassing incidents.  Defs.' Mem. at 14–17.  Mr. Wynder responds that McMahon was aware of his allegations and his workers' compensation claim and that McMahon was regularly briefed regarding the IAB investigations.  Memorandum of Law in Response to Defendant's [sic] Motion ("Pl.'s Opp'n") at 25–26 (Dkt. No. 243).

Mr. Wynder's allegations that McMahon was personally involved in creating a hostile work environment are belied by the record and by Mr. Wynder's own words.  Mr. Wynder produces two letters that he wrote to McMahon, one informing McMahon of his "allegations" against NYSP and his intention to investigate NYSP's "discrimination practices" through a civil rights action, and a second concerning his workers' compensation case against NYSP.  Pl.'s Exs. 11a & 12a.  These letters show nothing more than McMahon's general knowledge of Mr. Wynder's vague accusations against NYSP and the fact that Mr. Wynder had a workers' compensation case against NYSP.

Furthermore, Mr. Wynder offers no evidence that McMahon was personally involved in the IAB investigations or surrounding incidents; rather, he repeatedly speculates that McMahon must have been involved because of the "chain of command" within NYSP, which "starts from the superintendent and works its way down. . . .  If you read the manual, it states Superintendent McMahon, on the first page, everything contained in this manual is under his orders."  Wynder Dep. II at 64; see also id. at 43–44, 49, 52, 55–56, 62, 139–41.  Mr. Wynder fails to disprove IAB Chief Inspector

---

662 (2009).  After Iqbal, courts in this circuit have not reached a consensus on the extent to which Iqbal altered the five Colon factors and the Second Circuit has not yet addressed the issue. See Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012).  However, courts in this circuit have generally agreed that in § 1983 intentional discrimination cases, such as Mr. Wynder's race-based discrimination action, supervisory liability still may be established through those two ways.  See, e.g., Plair v. City of New York, 789 F. Supp. 2d 459, 465–66 (S.D.N.Y. 2011); Sash, 674 F. Supp. 2d at 544.

Fitzgerald's statement that Fitzgerald would "periodically brief" McMahon on all IAB "cases of interest," but that McMahon did not "interfere with or direct" the IAB investigations of Mr. Wynder.  Fitzgerald Decl. ¶ 29.[17]  Although McMahon signed charges that were preferred against Mr. Wynder after the IAB investigations, reviewed the disciplinary hearing boards' findings and recommendations, and disciplined Mr. Wynder accordingly, there is no evidence that these actions were unwarranted, racially-motivated, harassing conduct.  See Durden Decl., Exs. D, H, & L.

Finally, McMahon disclaims recollection or knowledge of any specific incidents regarding Mr. Wynder, disclaimers which are neither challenged nor disputed.  See Pl.'s Ex. 16 (McMahon Dep.) at 11, 25–30, 34–36, 49–53, 75–83, 92–94, 155, 178–99. Because there is no genuine dispute as to McMahon's personal involvement, as a matter of law, he cannot be held liable for creating a hostile work environment.  Defendants' motion for summary judgment on this claim is granted.

## B. Captain Masterson

Mr. Wynder's allegations against Masterson fall into two categories: (1) as Assistant Director of the NYSP Training Academy, Masterson harassed Mr. Wynder there; and (2) as an IAB staff inspector, Masterson harassed Mr. Wynder through the IAB investigations.

### 1. NYSP Academy

Mr. Wynder contends that when he was a basic counselor at the Academy, Masterson harassed him in the following ways:  (1) Masterson promoted Mr. Wynder to

---

[17] Although Mr. Wynder cites excerpts from Fitzgerald's deposition in support of his argument that McMahon was directly involved, Pl.'s Opp'n at 26, he does not provide the deposition transcript to the Court and it is not in evidence.  Defendants submit a one-page excerpt of the transcript, which discusses a single, narrow issue that is irrelevant to this analysis.

the position of academic instructor after he had complained about the lack of minority instructors with the intention that Mr. Wynder would fail in the new position and be terminated; (3) Masterson assigned Mr. Wynder to teach a course that recruits needed to pass to remain at the Academy; (4) Masterson created additional pressure by sitting in on Mr. Wynder's class; (5) Masterson tried to have Mr. Wynder removed from the position after the first two classes; and (6) when that failed, Masterson did not permit Mr. Wynder to return for the following year. See Wynder Dep. at 53–67, 85–87.

Mr. Wynder's allegations are unsupported by evidence that Masterson engaged in harassing conduct. Mr. Wynder refused to run with recruits as a counselor and complained about the lack of minority instructors. When he was promoted to the position of instructor, which does not require running with recruits, both of these issues were resolved. Mr. Wynder offers no evidence other than his saying so to support his assertion that the promotion was intended as a pretext to terminate him; indeed, he attended Instructor Development School which qualified him for the position. Given the complete absence of evidence of harassment that is even colorable, no reasonable jury could find that Masterson created a hostile work environment for Mr. Wynder. Defendants' motion for summary judgment on this claim is granted.

### 2. IAB Investigations

Mr. Wynder asserts that Masterson harassed him by direct involvement in the IAB investigations. Compl. ¶¶ 85–88, 98–107, 121, 129, 135. The only evidence Mr. Wynder submits to connect Masterson to the investigations is a document recording that Masterson, as an IAB staff inspector, requested Mr. Wynder's personnel file to determine whether Mr. Wynder had reported his weapon as stolen to NYSP. Pl.'s Ex. 6. Masterson admitted that he made this request, but explained that it was required as a

matter of NYSP protocol which Mr. Wynder does not dispute.  Pl.'s Ex. 20 (Masterson Dep.) at 30–33, 37.  Masterson played no other role in the investigations, which IAB Chief Inspector Fitzgerald confirmed.  Id. at 24–77; Fitzgerald Decl. ¶ 30.  Indeed, Masterson's name is not to be found in the investigative reports or disciplinary hearing documents submitted into evidence.

Mr. Wynder's evidence of Masterson's direct involvement, consisting of a request for Mr. Wynder's personnel file, is too nebulous to support his allegation that Masterson instigated the investigation of Mr. Wynder's stolen weapon and supports none of his other allegations.  Because there is no genuine dispute as to Masterson's personal involvement in the IAB investigations, as a matter of law, he cannot be held liable for creating a hostile work environment on this basis.  Defendants' motion for summary judgment on this claim is granted.

### C.  Captain Spahl

Mr. Wynder alleges that Spahl, as station commander at the Hawthorne station, harassed him in the following ways: (1) Spahl ordered Mr. Wynder to return from paid sick leave early and refused to restore this leave; (2) Spahl used the IAB investigations to cause Mr. Wynder's colleagues to ostracize him; (3) when Mr. Wynder signed out on unpaid sick leave but had not yet left the station, Spahl ordered him to leave; (4) Spahl told other NYSP troopers that Mr. Wynder was a dirty cop to cause troopers to ostracize him; and (5) Spahl ordered a station-wide drug test when Mr. Wynder returned from sick leave to catch him as a drug user.  Compl. ¶¶ 54–64, 75–81, 85–88.

Mr. Wynder fails to proffer any evidence that Spahl was personally involved in the first two incidents.  See Wynder Dep. at 118–20, 126–29.  He also utterly fails to support his claim that Spahl was personally involved in the remaining three incidents or

that Spahl was motivated by racial animus beyond merely saying so.  See Wynder Dep. at 119–25, 130–33, 142, 149; Wynder Dep. II at 53–59, 62, 66–69.  No reasonable jury could conceivably find that Spahl created a hostile work environment for Mr. Wynder. Defendants' motion for summary judgment on this claim is granted.

### D. Lieutenant Barbaria

Mr. Wynder's allegations against Barbaria all concern Barbaria's actions in the IAB investigations.  See Compl. ¶¶ 98–114, 129, 135, 139–45.  During Mr. Wynder's first disciplinary hearing, Barbaria testified to his extensive participation in the investigations as an investigator assigned to the case.  See Durden Decl., Ex. E.  While Mr. Wynder complains of numerous improper procedures throughout the investigations, he offers no evidence other than complaints that Barbaria deviated from the proper requirements of his job for the purpose of harassing Mr. Wynder because of his race or that Barbaria harbored any racially-motivated animus towards him.  No reasonable jury could justifiably find that Barbaria created a hostile work environment for Mr. Wynder.  Therefore, defendants' motion for summary judgment on this claim is granted.

### E. Trooper Keats

Mr. Wynder's only allegation against Keats is that he gave IAB a "false sworn statement" during an investigation of Mr. Wynder's actions at the Newburgh station on January 28, 1998, which resulted in a second disciplinary hearing.  Compl. ¶ 142. Defendants do not dispute that Keats' statement, that he had logged off the NYSPIN terminal when he was done using it, was incorrect; they explain only that Keats believed it was correct at the time because it was his customary practice to log off when his work was done.  Defs.' 56.1 ¶¶ 76, 79; Durden Decl., Ex. K (Keats Dep.) at 54.

Keats' single statement to IAB, which apparently played only a partial role in NYSP bringing charges against Mr. Wynder, see Durden Decl., Ex. M, cannot reasonably be regarded as creating a hostile work environment.  See Kaytor v. Elec. Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010) ("Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe."  (citations omitted)).  Moreover, Mr. Wynder proffers no evidence that Keats intentionally lied to IAB when giving his statement, let alone that Keats lied with the purpose of harassing Mr. Wynder on the basis of his race.  As a matter of law, Keats cannot be liable for creating a hostile work environment for Mr. Wynder.  Therefore, defendants' motion for summary judgment on this claim is granted.

The Court has scrutinized with care the serious accusations of discrimination, racial or otherwise, and of assorted other actionable conduct made against McMahon, Masterson, Spahl, Barbaria, and Keats and is driven to conclude that they are a stew of unwarranted ipse dixits.

## VI. State Law Claims

Mr. Wynder's remaining claims are his disparate treatment, hostile work environment, and retaliation claims pursuant to NYSHRL and the New York State Constitution.  Having granted summary judgment to defendants on Mr. Wynder's federal claims, the Court declines to exercise supplemental jurisdiction over the state law claims.  A court may decline to exercise supplemental jurisdiction over a pendent state law claim if the court has dismissed all federal claims over which it has original jurisdiction.  See 28 U.S.C. § 1367(c)(3); Cave v. East Meadow Union Free Sch. Dist., 514 F.3d 240, 250 (2d Cir. 2008) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." (quoting United Mine Workers of Am.

v. Gibbs, 383 U.S. 715, 726 (1966))). Accordingly, Mr. Wynder's state law claims are dismissed without prejudice.[18]

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. The Court declines to exercise supplemental jurisdiction over Mr. Wynder's state law claims, which are dismissed without prejudice.


**SO ORDERED.**


Dated:   Brooklyn, New York
      April 24, 2013


              /s/
              I. Leo Glasser
              United States District Judge

---

[18] As a final matter, the Court briefly disposes of Mr. Wynder's argument that the decision in his workers' compensation proceeding is entitled to collateral estoppel effect in this action. Pl.'s Opp'n at 2–3. Mr. Wynder bears the burden of proving that the issue in this case "is identical to one that was raised and necessarily decided in the prior action." Cobb v. Pozzi, 363 F.3d 89, 113 (2d Cir. 2003). He has failed to demonstrate that the numerous issues involved in the pending motion have been necessarily decided by the workers' compensation decision. As just one example, that decision discusses the collective actions of NYSP members and finds Mr. Wynder's employer, New York State, to be at fault, whereas the only defendants in this action are individual members of NYSP whose personal involvement and discriminatory intent are prerequisites to liability. The workers' compensation decision that Mr. Wynder's "employer's actions went beyond the level of lawful personnel decisions taken in good faith," Pl.'s Ex. 1, in no way compels the conclusion that the six individual defendants in this action are liable for claims of disparate treatment, procedural due process violations, creation of a hostile work environment, and retaliation. The Court will not address any of Mr. Wynder's other arguments, which are completely irrelevant to the disposition of the pending motion.